UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DICKINSON FROZEN FOODS, INC.,

          Plaintiff/Counterdefendant,

      vs.

FPS FOOD PROCESS SOLUTIONS
CORPORATION,

          Defendant/Counterclaimant.

Case No: 1:17-cv-00519-DCN

**MEMORANDUM DECISION AND
ORDER**

# I. INTRODUCTION

Before the Court is a Motion for Sanctions for Spoliation of Evidence (Dkt. 39) filed by Defendant/Counterclaimant FPS Food Process Solutions Corporation. Having reviewed the record, the Court finds that the facts and legal argument are adequately presented in the briefs. Accordingly, in the interest of avoiding further delay, and because the Court finds the decisional process would not be significantly aided by oral argument, the Court decides the Motion on the record without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(2)(ii). For the reasons set forth below, the Court **GRANTS** the Motion.

# II. BACKGROUND

Plaintiff/Counterclaimant Dickinson Frozen Foods, Inc. ("Dickinson") owns and operates a vegetable processing facility located in Sugar City, Idaho.

Defendant/Counterclaimant FPS Food Process Solutions Corporation ("FPS") designs, manufactures, and sells large industrial tunnel freezers internationally to the food processing industry. This case arises out of the purchase and sale of an industrial freezer built by FPS for Dickinson.

FPS freezers are custom designed and created to meet a customer's specific needs. The units are approximately the size of a semi-truck trailer, or even larger, and can cost millions of dollars. Food products enter FPS freezers on one end, and, while traveling through a series of conveyor belts, are blast frozen and ready for packaging by the time they exit the freezer. Unlike a home freezer, industrial tunnel freezers do not have an independent ability to cool or freeze products. Instead, the freezers are supported by a refrigeration infrastructure fueled by a cooling liquid.[1] Refrigeration infrastructures are complex and can take up entire buildings, or even several buildings. In the food processing industry, customers seeking to purchase an industrial tunnel freezer are responsible for designing and installing a sufficiently robust refrigeration infrastructure to support the freezer.

In its collaboration with customers to design a freezer, a customer informs FPS of the intended food product, the required production amount, and the temperature desired after freezing. Using this information, FPS then calculates the cooling output the customer's refrigeration infrastructure will need to produce to support the custom designed freezer and meet the customer's desired outcome.

---

[1] A refrigeration infrastructure consists of one or more compressors, condensers, evaporators, vessels, valves, gauges, piping, and suction risers, and powers a freezer. Ammonia is typically the cooling liquid used to fuel a refrigeration infrastructure. Dkt. 40, ¶¶ 4-5.

On March 11, 2016, Dickinson and FPS entered a written contract (hereinafter the "Agreement") for Dickinson's purchase of an FPS freezer. Dickinson agreed to pay FPS $926,000 in exchange for an FPS model MT5-6 IQF Tunnel Freezer (hereinafter the "FPS Freezer"). Under the Agreement, FPS promised to build Dickinson a freezer that would freeze 8,000 pounds of diced and shredded potatoes an hour to 0°F. FPS represented the FPS Freezer would fully perform with a refrigeration infrastructure that provided 210 tons of refrigerant delivering -40°F of cooling "at the coil." This meant Dickinson's refrigeration infrastructure needed to be capable of delivering -40°F to the refrigeration coil of the FPS Freezer. Dickinson hired Kemper Northwest, Inc. ("Kemper") to design and install the refrigeration infrastructure (hereinafter the "Refrigeration System").

On July 23, 2016, FPS delivered the FPS Freezer to Dickinson's Sugar City facility. FPS hired third-party contractor Cold Steel Contractors, LLC ("Cold Steel") to assist it with installation. The FPS Freezer arrived in two halves, each about 28 feet long, 14 feet wide, and 14 feet high. After portions of Dickinson's building were demolished to make room for the FPS Freezer, the two halves were loaded by crane onto the frame assembly and then welded together by Cold Steel.

Dickinson alleges the FPS Freezer failed to meet contract specifications as soon as it started operating. For instance, instead of producing 8,000 pounds of frozen potatoes an hour, the FPS Freezer produced a maximum of 4,000 pounds per hour. Dickinson also claims the FPS Freezer could only run for 6 hours or less at a time (when it was intended to run for 20-22 hours per day) and suffered from excessive ice and frost buildup.

Dickinson immediately notified FPS of the performance issues. For the next year, FPS sent numerous field service technicians to the Sugar City facility to attempt to resolve the issues.

During the course of these visits, the parties disagreed over whether the FPS Freezer was incapable of meeting contract specifications, or whether Dickinson's Refrigeration System was instead inadequate. FPS contends its technicians repeatedly alerted Dickinson that the Refrigeration System appeared incapable of delivering -40°F at the coil, and that Dickinson's employees were harming the FPS Freezer's efficiency by spraying hot water on the unit to clean it, by constantly opening the door to look inside, and by using the wrong oil to run the FPS Freezer. FPS claims Dickinson largely dismissed these warnings. Dickinson maintains it made each of FPS' suggested modifications to its Refrigeration System, but that the FPS Freezer still failed to meet contract specifications and continued to suffer from the same performance problems.

On or about June 21, 2017, Jason Kwok, Senior Manager of the Support Group for FPS, met with representatives from Dickinson, Kemper, and Nestle (one of Dickinson's biggest customers) at the Sugar City facility to conduct more tests on the FPS Freezer and Refrigeration System. Although, during the visit, representatives from Kemper and Nestle concluded the Refrigeration System was sufficient to meet contract specifications, FPS continued to maintain Dickinson's Refrigeration System was incapable of supporting the FPS Freezer.

On July 13, 2017, Dickinson's in-house counsel sent a letter to FPS rejecting and revoking Dickinson's acceptance of the FPS Freezer. The letter demanded a full refund of the entire sum paid by Dickinson to FPS pursuant to the Agreement, and also stated:

> At this time in order to mitigate Dickinson's damages, until a new replacement Tunnel Freezer can be ordered and fully operational, it would be best to retain possession of the Freezer machine and continue to operate it, even in its unsatisfactory condition, so as to limit Dickinson's continuing lost profit damages, and consequential and incidental damages.
>
> When the time has come with a fully operational replacement Tunnel Freezer, Dickinson will make arrangements for FPS to take back possession of the defective Freezer Machine.

Dkt. 39-5, at 3.

FPS's in-house counsel responded on July 24, 2017, and rejected Dickinson's repudiation of the Agreement. Based in part on a report prepared by James Peterson, a consultant hired by FPS, FPS's in-house counsel suggested Dickinson's failure to provide the FPS Freezer with the contractually required refrigeration capacity was the cause of the FPS Freezer's alleged failure to meet contract specifications.[2] However, FPS conceded there were minor issues with the FPS Freezer that were capable of being resolved, and suggested litigation would not result in a satisfactory outcome for either party. The letter concluded: "FPS has the knowledge, the resources, and the resolve to provide the highest level of freezer functionality that is reasonably possible in the

---

[2] Peterson is an independent consultant for Cold Solutions, LLC ("Cold Solutions"). FPS hired Peterson as a refrigeration consultant in November 2016 to provide consulting on numerous FPS projects. On July 17, 2017, Peterson emailed Kwok and Jeffrey Chang, President of FPS, an analysis of the FPS Freezer and Refrigeration System. Dkt. 44-39. Although it is not apparent from the briefing what prompted Peterson's report, or what specific information Peterson relied upon to write it, it is clear Peterson did not visit the Sugar City facility or inspect the FPS Freezer prior to his July 17, 2017, email. Instead, Peterson's "one and only site visit to the Plant [occurred] in September, 2017." Dkt.51-1, at 19.

circumstances, but it can only do so with the ongoing cooperation of Dickinson. FPS kindly requests that such cooperation continue." Dkt. 39-6.

After receiving FPS' July 24, 2017, correspondence, Dickinson showed Peterson's analysis to representatives from Nestle and Kemper. Believing Peterson's conclusions were based on some flawed assumptions and speculations, they suggested Peterson should visit the Sugar City facility to inspect the FPS Freezer and Refrigeration System. Dickinson did not respond to FPS's rejection of Dickinson's repudiation letter until August 23, 2017. On that date, Dickinson's in-house counsel emailed FPS and invited Peterson to come to the "Sugar City facility to observe the freezer tunnel and to meet with Bent Wiencke of Nestle and with a representative of Kemper. . . so that they can have an impartial engineering discussion." Dkt. 44-23, at 1. FPS agreed, and Dickinson contends it thereafter planned an "Engineer Summit" for Peterson to meet with engineers from Nestle, and representatives from Dickinson, Kemper, and Colmac Coil.[3]

The meeting occurred on September 20-22, 2017, and Kwok and Peterson attended. FPS contends Kwok and Peterson were present at the meeting to continue FPS's attempt to resolve performance issues, as FPS believed Dickinson had accepted its request that the parties continue to work together to avoid litigation. FPS was under this impression because Dickinson responded to FPS's July 24, 2017, letter rejecting repudiation and requesting cooperation by inviting FPS's consultants to the facility to "have an impartial engineering discussion," and also because FPS had continued to send

_____

[3] Colmac Coil ("Colmac") is an industrial and commercial coil manufacturer. The parties utilized Colmac's services during the "Engineer Summit" to "pull data," such as system component information on the Refrigeration System, during "'performance tests' of the FPS Freezer." Dkt. 44-13, at ¶ 12.

service technicians to the Sugar City facility to work on the FPS Freezer after Dickinson's July 13, 2017, repudiation letter. *Id*. In fact, FPS continued to send technicians to Dickinson's facility to troubleshoot through September, 2017. Dkt. 41, at ¶ 11. However, unbeknownst to FPS, Dickinson purchased a new tunnel freezer for approximately $1.4 million from GEA Food Solutions North America ("GEA") in August, 2017.

Following the September 20-22, 2017 meeting, an engineer from Kemper sent Dickinson an email suggesting the tests run during the meeting illustrated the Refrigeration System was adequate but that the FPS Freezer continued to malfunction. On September 27, 2018, Dickinson asked FPS to outline a plan for what it intended to do to modify the FPS Freezer. In response, FPS sent Dickinson a pre-litigation settlement offer on October 17, 2017. Without admitting fault, FPS offered Dickinson a full refund of the purchase price of the FPS Freezer in exchange for Dickinson's release of any claims against FPS. Believing it was still using the FPS Freezer, FPS offered Dickinson the opportunity to retain possession of, and to continue to operate, the FPS Freezer until the earlier of 150 days from: (a) the date Dickinson received FPS's full refund; or (b) the date Dickinson notified FPS in writing that the FPS Freezer was no longer required and could be removed. Dkt. 39-8, at 2. The settlement offer advised Dickinson that FPS would remove the FPS Freezer at its own expense following the aforementioned possession period, and also directed Dickinson to exercise reasonable care to avoid injury or damage to the unit prior to removal.

Dickinson rejected FPS's settlement offer the next day. In an October 18, 2017, letter, Dickinson suggested it would work with FPS's insurance provider to obtain prompt payment of its purchase price refund and to initiate settlement discussions regarding Dickinson's "significant claim" for consequential damages. Dkt. 39-9, at 2. The letter also stated: "[Dickinson] is anticipating having the Freezer removed in January, 2018. We would seek FPS's full cooperation by coordinating the exact dates and being in agreement on the vendor FPS will use for the removal." *Id*. Shortly after rejecting FPS's settlement offer, Dickinson's industrial refrigeration expert, Chuck Taylor, examined the FPS Freezer and provided opinions on its design, installation, configuration, and operation. Taylor spent over 225 hours analyzing the FPS Freezer and Refrigeration System. Dkt. 46-1, at 5.

Dickinson thereafter filed the instant suit on December 21, 2017, pleading claims for breach of contract and, in the alternative, breach of express warranty, violations of the implied covenant of good faith and fair dealing, and promissory estoppel. On December 22, 2017, Dickinson, through counsel, sent FPS's in-house counsel a letter stating:

> Please take notice that beginning on January 13, 2018, Dickinson will have a crane and initiate the multi-day process of removing the defective Freezer Machine from its facility and will temporarily have it on site. Given that Dickinson has revoked its acceptance of the Freezer Machine, FPS is invited, at its own expense, to arrange for pick-up of the uninstalled Freezer Machine. Assuming FPS will elect to salvage the Freezer Machine, please coordinate with our office so we can make the necessary arrangements.

> Once the Freezer Machine is in FPS's possession, FPS will remain obligated to preserve it as evidence during the pendency of Dickinson's dispute with FPS. Failure to adequately preserve the Freezer Machine, or any other documents or evidence relevant to the parties' dispute, may constitute spoliation of evidence or subject FPS to sanctions.

Dkt. 39-11, Exhibit G, at 3.

Dickinson maintains the parties' lawyers were in touch through emails and telephone conversations between December 22, 2017, and January 11, 2018, but FPS never requested that it be provided with an opportunity to inspect the FPS Freezer or Refrigeration System during such communications. On January 10, 2018, Dickinson's counsel spoke with FPS's in-house counsel. Although the phone call dealt primarily with whether FPS would waive formal service of process and whether FPS had tendered the lawsuit to its insurer, Dickinson's counsel notes, "at no point in that call did [FPS's in-house counsel] raise an objection to Dickinson's intent to disassemble the FPS Freezer three days later nor make any demand whatsoever that FPS be allowed to test or to inspect the FPS Freezer or Refrigeration System prior to disassembly." Dkt. 44-26, at ¶ 23.

However, on January 12, 2018, the day before Dickinson planned to disassemble the FPS Freezer, Kwok emailed Todd Campbell, Dickinson's Director of Operations, and stated FPS would have people at the Sugar City facility to observe and record the unit's dismantling and to "arrange transportation to pick up" the FPS Freezer so that FPS could store and preserve it. Dkt. 39-12, Exhibit H, at 3. Campbell replied FPS could not "monitor[] anything." *Id*., at 2. On January 17, 2018, four days after the FPS Freezer and Refrigeration System were removed and dismantled, an independent contractor for FPS emailed Campbell that he had been asked by FPS to get some photos "and assess pick up and storage of the unit." *Id*. Campbell responded, "[a]t this point you or anyone

associated with FPS are not allowed on site. No photos or access. When that changes FPS will be notified and things can move forward." *Id*.

The extraction of the FPS Freezer took place on January 13, 2018. The parties offer widely varying accounts of Dickinson's disassembly and subsequent storage of the unit. Dickinson contends it hired a number of qualified professional contractors, including most of the contractors who initially installed the FPS Freezer, to carefully disassemble it. Dickinson also hired Idaho Steel Products, Inc. ("Idaho Steel"), a third-party contractor that specializes in the construction, installation, and removal of food processing equipment, to assume primary responsibility for disassembly of the FPS Freezer.

Dickinson maintains that, given the sheer size of the FPS Freezer, Idaho Steel's personnel had to remove the welding where the two halves of the FPS Freezer had originally been welded together. Idaho Steel personnel then disconnected the belts and chains and the four connecting bolts for each fan motor and dismounted the various fans and engines from the FPS Freezer. Dickinson's employees subsequently worked to store the FPS Freezer, its component parts, and its control panel, in Dickinson's parking lot in crates and under tarps. Dickinson states it asked its employees and Idaho Steel to take special care and every reasonable precaution in the disassembly process to ensure that the FPS Freezer and its component parts were not damaged, destroyed, or altered any more than reasonably necessary during removal.

FPS alleges Dickinson instead used straight edges to cut the FPS Freezer in half and cut the legs out from under the two halves. Rather than simply disconnecting or

unhooking them, FPS suggests Dickinson severed all refrigeration, water, steam, air lines, and electrical wiring and conduits from the FPS Freezer. FPS contends Dickinson also severed fan motors, thumper motors, and chains and pipe sections from the FPS Freezer. Dickinson allegedly used duct tape to cover the "gaping holes it had created" with removal of such parts, as well as to cover "the massive incision it cut down the middle of the FPS Freezer." Dkt. 39-1, at 8.

The parties also disagree over Dickinson's subsequent storage of the dismantled unit. While Dickinson claims it has carefully stored the disassembled FPS Freezer in its parking lot—"the only place with adequate space at Dickinson's Sugar City Facility to store it"—in crates covered with tarps, FPS alleges all parts were "dumped" into crates and have been exposed to the elements ever since the January 13, 2018, disassembly. *Compare* Dkt. 44, at 17 *with* Dkt. 39-1, at 8. FPS contends such exposure has resulted in significant damage above and beyond that sustained during Dickinson's initial removal. For instance:

> A 'refrigeration coil' consists of a series of pipes and 'fins' that dissipate heat. . . [t]he pipes of the refrigeration coils have suffered weathering and damage; [t]he conduit piping, which feeds cooling power to the FPS Freezer, has been . . . exposed to the elements for prolonged periods of time and will require dehydrating and chemical treatment to be restored, if at all; [r]ust appears throughout the FPS Freezer; [v]ermin have invested the FPS Freezer and the floor is now covered in droppings; [and] the computer control panel shows signs of standing water and the circuitry is weathered.

Dkt. 39-1, at 9-10.

FPS also highlights Dickinson significantly altered the Refrigeration System to work with its new GEA freezer after disassembling the FPS Freezer. As a result,

"significantly meaningful discrepancies exist within the various paper records relating to the FPS Freezer's design and installation," including "differences in dimensions, equipment make and model, configurations, and diagnostic numbers." *Id*., at 10. Given such discrepancies, FPS contends "testing of the actual FPS Freezer and the actual refrigeration infrastructure on site at the Plant at the time of operation (as opposed to relying on documents) is critical." Dkt. 39-1, at 10.

Because Dickinson barred FPS access to the Sugar City facility, FPS contends it was unable to assess the unit's condition until October 16, 2018, during a site visit with FPS's counsel and technical expert arranged through discovery. After FPS's expert determined there were multiple tests he could not run due to the disassembly and storage of the FPS Freezer and subsequent modification of the Refrigeration System, FPS's counsel conferred without resolution with Dickinson's counsel. FPS's counsel thereafter filed the instant Motion for Spoliation, seeking dismissal as a sanction for Dickinson's purportedly willful destruction of the key evidence in this suit.

### III. LEGAL STANDARD

The authority to sanction a party who has despoiled evidence is based on Federal Rule of Civil Procedure 37 and on the court's inherent power to levy sanctions in response to abusive litigation practices. *Leon v. IDX Sys., Corp*., 464 F.3d 951, 958 (9th Cir. 2006). Rule 37 sanctions are available when a party "fails to obey an order to provide or permit discovery." *Id*. (citing *Fjelstad v. Am. Honda Motor Co*., *Inc*., 762 F.2d 1334, 1337-1338 (9th Cir. 1985)). Where, as here, Rule 37 is not applicable because there was no associated discovery order, federal trial courts "are invested with inherent powers that are governed

not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) (internal quotation marks and citations omitted). The court's inherent powers include "'the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial.'" *Id.* (quoting *Campbell Indus. V. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980)).

A court's discretion in imposing sanctions can range in severity from minor sanctions, such as awarding attorneys' fees, to more severe sanctions including permitting a jury to draw an adverse inference against a party responsible for the destruction of evidence, ordering the exclusion of evidence, or even dismissal of claims. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Reinsdorf v. Skechers U.S.A.*, 296 F.R.D. 604, 626 (C.D. Cal. 2013). To decide which spoliation sanction, if any, to impose, courts generally consider: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party. *Reinsdorf*, 296 F.R.D. at 626.

The exercise of a court's inherent powers must be applied with "restraint and discretion" and only to the degree necessary to redress the abuse. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45 (1991); *see also Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79 (3rd Cir.1994) (courts should choose "the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim"). Accordingly, the determination of an appropriate sanction for spoliation is "confined to the sound

discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001) (internal citations omitted).

## IV. ANALYSIS

As an initial matter, the Court must address Dickinson's claim that spoliation sanctions are unavailable because it did not "destroy" any evidence. Dkt. 44, at 28. Dickinson suggests it merely "disassembled" the FPS Freezer and Refrigeration System, and that courts have found spoliation sanctions are unavailable where evidence is not lost or destroyed. *Id*. Dickinson's definition is overly restrictive. Spoliation is "'the destruction *or significant alteration* of evidence, *or* the failure to preserve property for another's use as evidence[,] in pending or reasonably foreseeable litigation.'" *Reinsdorf*, 296 F.R.D. at 626 (quoting *Zubalake v. UBS Wardburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (emphasis added)). FPS has presented substantial evidence to establish the FPS Freezer and Refrigeration System were not simply "disassembled," but were at least significantly altered, if not destroyed.

For instance, with respect to the FPS Freezer, Dickinson did not simply remove the welding between the two original halves, but cut metal and plastic inside the FPS Freezer that were not part of the mid-line. Dkt. 41, at ¶¶ 15, 17-18. All six of the unit's "fins" used to dissipate heat "have been completely bent beyond repair" and have large gashes in them. *Id*., at ¶ 13. Other large metal components are severely dented. Dkt. 41-7. The conduit piping, which feeds cooling power to the FPS Freezer, has been cut and sections have been removed. Dkt. 41, at ¶ 15. The insulation encapsulating the FPS Freezer body has been shredded. *Id*., at ¶ 16. The conveyor belt support bed, which runs

the entire length of the FPS Freezer, has been cut in half, and the conveyor belt chain

mail has been removed from the freezer "and dumped in a wooden box." *Id*., at ¶¶ 17-18.

In addition, components such as fan motors, gear motors, and computer wiring used to

connect the FPS Freezer to its computer control panel have all been severed, and the

mounting brackets and connection points used to attach these items to the FPS Freezer

have also been cut. *Id*., at ¶ 19.

> Dickinson also significantly altered the Refrigeration System. Specifically:

> The FPS Freezer only required a single ammonia supply line ("LTRL"), coil connection, and defrost condensate ("DC") riser for each refrigeration coil. Since removing the FPS Freezer, Dickinson has reconfigured its refrigeration infrastructure by splitting its pipes into two LTRL lines, two coil connections, and two DC risers. . . .

> New refrigeration piping has been added to attach to a new GEA precooling unit, which is of an entirely different type and configuration than the precooling unit that previously served the FPS Freezer.

> The FPS Freezer piping was removed, the sections where those pipes entered and exited the Plant's ceiling were patched with . . . metal, and new pipes for the GEA Freezer added in different areas of the Plant's ceiling than that of the FPS Freezer's piping. . . .

> A surge drum for the GEA precooler that did not exist when the FPS Freezer was installed has now been integrated into the refrigeration infrastructure.

> New valves for the refrigeration infrastructure roof piping have been added.

Dkt. 40, at ¶¶ 11, 14, 15, 17-18.

> Due to such changes, testing of the FPS Freezer and Refrigeration System, both as

they interfaced together and independently during the relevant period of operation, is

impossible at this point. *Id*., at ¶¶ 22-29.

Moreover, Dickinson's subsequent storage of the FPS Freezer has caused additional damage to the FPS Freezer. As mentioned, the pipes of the refrigeration coils "have suffered weathering and damage"; the conduit piping has "been exposed to the elements for prolonged periods of time and will require dehydrating and chemical treatment to be restored, if at all"; rust appears throughout the FPS Freezer; vermin have "infested the FPS Freezer and the floor is now covered in droppings"; and the control panel shows signs of standing water and the circuitry is weathered. Dkt. 41, at ¶¶ 14-15, 20-22.

Although Dickinson argues it hired and utilized qualified professional third-party contractors to disassemble the Freezer, that it warned such contractors "to take special care and employ every reasonable precaution in the disassembly process," and that FPS's characterization of the disassembly is mere hyperbole, Dickinson does not present evidence to rebut FPS's evidence showing both the FPS Freezer and Refrigeration System have been significantly altered. Dkt. 44, at 16, 28-29. As such, the Court finds Dickinson did not merely disassemble the FPS Freezer and Refrigeration System, but improperly engaged in the spoliation of evidence.

### A. Elements of Spoliation

A party seeking sanctions for spoliation of evidence must establish that the party having control over the evidence had an obligation to preserve it at the time it was destroyed, that the evidence was destroyed with a "culpable state of mind," and that the evidence was relevant to the party's claim or defense. *Reinsdorf*, 296 F.R.D. at 626 (quoting *Zubalake*, 220 F.R.D. at 220); *see also Lofton v. Verizon Wireless LLC*, 308

F.R.D. 276, 287 (N.D. Cal. 2015) ("The party requesting spoliation sanctions bears the burden of proving all three elements of the claim."). The parties dispute FPS's ability to prove the first two elements of a spoliation claim. As to the third element, Dickinson and FPS agree the FPS Freezer and Refrigeration System are relevant to both parties' claims and defenses. The FPS Freezer is the object of the parties' Agreement and the basis for Dickinson's multi-million dollar claim, while the Refrigeration System is the basis of FPS's defense. As such, there can be no question as to the relevance of the evidence.

    *1. Duty to Preserve*

"A party must preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence." *Bown v. Reinke*, 2016 WL 107926, at *5 (D. Idaho 2016). The duty to preserve arises "not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Id*. Further, a party must ensure that relevant information is retained on a continuing basis once the preservation obligation arises. *Zubalake*, 220 F.R.D. at 218-220. FPS contends Dickinson's duty to preserve the FPS Freezer and Refrigeration System as evidence was triggered on July 13, 2017, when Dickinson attempted to repudiate the Agreement, continued throughout the pre-litigation period, and remained in place after Dickinson filed its Complaint on December 21, 2017, and subsequently disassembled the FPS Freezer and Refrigeration System on January 13, 2018.

Dickinson agrees its duty to preserve the FPS Freezer as evidence arose on July 13, 2017, but maintains it discharged this duty because it gave FPS a meaningful and

adequate opportunity to inspect the FPS Freezer prior to removal. Dickinson cites several cases for the proposition that spoliation sanctions are inappropriate when the opposing party had an adequate and meaningful opportunity to inspect the evidence prior to its destruction. Dkt. 44, at 19-20 (citing *Fujitsu*, 247 F.3d at 436; *Cedar Petrochemicals, Inc v. Dongbu Hannong Chem. Co*., *Ltd*., 769 F. Supp. 2d 269, 291 (S.D.N.Y. 2001); *Gaffield v. Wal-Mart Stores E., LP*, 616 F. Supp. 2d 329, 337-388 (N.D.N.Y. 2009)). FPS responds such cases are inapposite and are solely Second Circuit authority. Regardless, the Court finds FPS was not given an "adequate and meaningful opportunity to inspect" the FPS Freezer and Refrigeration System.

Dickinson first suggests FPS had an adequate and meaningful opportunity to inspect the FPS Freezer and Refrigeration System prior to disassembly because FPS's employees tested both many times after installation in an attempt to resolve performance issues. FPS's visits to the Sugar City facility to troubleshoot are entirely distinguishable from the opportunity to inspect evidence after a lawsuit is filed. FPS's site visits were made to work with Dickinson to resolve problems with the FPS Freezer and Refrigeration System, not in the anticipation of litigation. As such, FPS did not have the opportunity to run tests or analysis to defend against Dickinson's claims.

Dickinson also suggests Peterson, FPS's "retained expert," had already tested and inspected the FPS Freezer and Refrigeration System before disassembly, thus relieving Dickinson of any further preservation obligations. Dkt. 44, at 22-23. However, Peterson was hired by FPS in November 2016 (eight months before Dickinson attempted to rescind the Agreement in July 2017) as an independent consultant for numerous FPS

projects, and was never retained by FPS as an expert in this litigation. Peterson repeatedly

confirmed this during his deposition:

> Q.    Mr. Peterson, were you ever requested by any representative of FPS to be an expert witness in this litigation?
> A.    No.

Dkt. 49-1, Ex. B at 131: 13-16)

> Q.    Okay. And I think we already established, you weren't retained as any sort of litigation expert in this case or anything like that.
> A.    I am not.
> Q.    Okay. You're not here to defend against a lawsuit or claims or anything like that. Right?
> A.    I don't believe so.

*Id*., at 191: 7-13.

> Q.    Okay. So said another way, you -- the first time you received a communication from FPS regarding litigation and that you need to prepare files and whatnot in order to -- in case there was going to be a lawsuit was approximately one month after your visit in September of 2017.
> A.    Yes.
> Q.    So obviously, in September of 2017, you weren't going there with an eye towards litigation. Right?
> A.    Correct.

*Id*., at 250: 10-20.

Dickinson's claim that "FPS's own retained expert, James Peterson . . . actually

tested and inspected the FPS Freezer," is misleading in light of such testimony. Dkt. 44,

at 22. Moreover, although Peterson visually inspected the FPS Freezer, he did not run any

tests on the FPS Freezer or Refrigeration System during his September 2017 visit:

> A.    As far as testing goes, I didn't hook anything up to the system. Everything I did was visual off of the freezer panel or off the compressor panels. Colmac [h]ooked up some pressure testing equipment to the data loggers --
> Q.    Okay.
> A.    -- that I looked at --

| Q. | Okay. |
|---|---|
| A. | -- but I didn't do the testing. |
| Q. | -- Okay, so that -- that's helpful. . . So you did visual observations; Colmac collected some data? |
| A. | Yes. |

*Id.*, at 184: 11-24.

Dickinson suggests Peterson agreed the Refrigeration System exceeded contract specifications and the FPS Freezer was inadequate after his site visit. Although FPS disputes this contention, Peterson's conclusions are irrelevant to the instant motion because he viewed the FPS Freezer and Refrigeration System on one occasion three months before the instant suit was filed, and did not run any tests on either.

Nonetheless, Dickinson contends, due to Peterson's September, 2017, site visit, FPS "had an opportunity to obtain a refrigeration engineering expert to test and to evaluate the Refrigeration System *after* the date that FPS knew Dickinson's lawyer was making a claim for damages, and FPS then in fact conducted such an inspection with a well-qualified industrial refrigeration engineer." Dkt. 44, at 22 (emphasis in original). This assertion is inaccurate. FPS did not know Dickinson was making a claim for damages during the September, 2017, site visit. At that time, FPS believed Dickinson had accepted FPS's July 24, 2017, rejection of Dickinson's repudiation of the Agreement because Dickinson responded by inviting FPS's consultants to the Sugar City facility to "have an impartial engineering discussion," and because FPS had continued to send service technicians to the Sugar City facility to work on the FPS Freezer after Dickinson's July 13, 2017, repudiation letter. Dkt. 44-23.

Although Dickinson suggests it is disingenuous for FPS to claim it did not know in September of 2017 that it would be defending against litigation while, at the same time, arguing Dickinson knew litigation was likely as early as July of 2017, it is not unusual for a plaintiff to have knowledge that it will be filing suit long before a defendant does. *Silvestri v. Gen. Motors Corp*., 271 F.3d 583 (4th Cir. 2001) (plaintiff reasonably anticipated litigation three years prior to notifying defendant). As late as September 27, 2017, *after* the September 21, 2017, site visit, Dickinson asked FPS to "outline a plan [sic] what FPS intends to do . . . for all modification you are planning to perform" on the FPS Freezer, implying FPS should continue with its repair attempts, rather than prepare for litigation. Dkt. 44-41, at Exhibit 15-1.

Because it was unaware Dickinson had already purchased a new freezer, and believed the parties were still working together to resolve the issue, FPS did not reasonably anticipate litigation until a month after the September 2017 visit, when Dickinson rejected FPS's offer to buy back the FPS Freezer on or around October 18, 2017. Since each of FPS's visits to the Sugar City facility were made in the attempt to troubleshoot and service the FPS Freezer, rather than to inspect the FPS Freezer and Refrigeration System to defend against litigation, FPS did not have an "adequate and meaningful opportunity to inspect" the relevant evidence prior to disassembly. Dkt. 44, at 19.

Finally, Dickinson argues it discharged its duty to preserve the FPS Freezer and Refrigeration System as evidence because it notified FPS, in July, October, and December of 2017, that the FPS Freezer and Refrigeration System would be removed,

but FPS neither made any demands to inspect or test the unit prior to disassembly, nor suggested Dickinson should not remove it. Dkt. 44, at 24-25. The record does not support this contention. Dickinson's July 13, 2017, repudiation letter stated Dickinson would retain the FPS Freezer until it could purchase a replacement and then "make arrangements *for FPS to take back possession* of the defective Freezer machine." Dkt. 39-5, at 3 (emphasis added). As discussed, FPS reasonably believed Dickinson retracted this repudiation. Moreover, Dickinson never notified FPS it purchased the GEA replacement freezer and never made arrangements for FPS to take back possession of the FPS Freezer. In the absence of such communication, Dickinson's July 13, 2017, correspondence did not give FPS notice of the unit's imminent removal.

Similarly, Dickinson's October 18, 2017, letter notified FPS Dickinson was "anticipating having the Freezer removed in January, 2018." Dkt. 39-9, at 2. However, the letter also stated: "We would seek FPS's full cooperation by coordinating the exact dates and being in agreement on the vendor FPS will use for the removal." *Id*., at 3. Dickinson cannot be said to have given notice of *its* impending removal and disassembly of the FPS Freezer and Refrigeration System by requesting that the parties work together to coordinate a date for *FPS to remove the unit*.

Dickinson did not file this suit until December 21, 2017. In a December 22, 2017, email, Dickinson notified FPS for the first time that Dickinson would remove the FPS Freezer on January 13, 2018. Although it is unclear why FPS did not request that Dickinson refrain from disassembly after receiving the December 22 letter, FPS only had approximately three weeks to do so. The Court cannot find Dickinson discharged its duty

to preserve the key evidence in this dispute by giving FPS less than a month to request an inspection or to prevent Dickinson's removal and disassembly of the FPS Freezer and Refrigeration System.[4]

Once Dickinson's duty to preserve took effect in July of 2017, Dickinson was required to preserve the FPS Freezer as evidence. This duty was not discharged simply because FPS's employees and independent consultant attempted to repair the FPS Freezer and Refrigeration System before FPS was aware litigation was likely, nor because Dickinson gave FPS three weeks-notice that the FPS Freezer and Refrigeration System would be disassembled. Having found Dickinson had the duty to preserve the FPS Freezer as evidence, its removal and disassembly of the unit was, at a minimum, negligent. *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1070 (N.D. Cal. 2006) (once the duty to preserve attaches, any destruction of evidence is negligent).

### 2. *Dickinson's culpability*

Federal courts have not been "uniform in defining the level of culpability—be it negligence, gross negligence, willfulness or bad faith—that is required before sanctions are appropriate for evidence destruction." *Reinsdorf*, 296 F.R.D. at 627 (internal

---

[4] The cases Dickinson relies upon to suggest otherwise do not support its position. Dickinson suggests the court in *Thiele v. Oddy's Auto & Marine, Inc.*, 906 F. Supp. 158, 162 (W.D.N.Y. 1995) held there was no spoliation claim where the party asserting spoliation had an opportunity to inspect evidence but failed to do so. *Thiele* instead held sanctions were inappropriate where the party seeking them inspected the relevant evidence at the same time it was inspected by plaintiffs. *Id.* While Dickinson retained an expert who inspected the FPS Freezer and Refrigeration System in preparation for litigation, FPS did not have this opportunity. Nor did the court in *McDonald v. ISK Biosciences, Inc.*, 1997 WL 34479221, at *2 (S.D. Tex. 1997) deny sanctions because the plaintiff failed to utilize her opportunity to conduct an inspection. Instead, sanctions were denied because defendant "was under no duty to interrupt the operation of its plant, including the completion of its scheduled construction project" and because plaintiff "failed to demonstrate defendant intentionally destroyed evidence it was required to preserve in connection with the case." *Id.*

quotation marks and citation omitted). In the Ninth Circuit, district courts may impose sanctions for negligent destruction of evidence, even without a finding of bad faith. *In re Napster*, 462 F. Supp. 2d at 1066. The Ninth Circuit has instructed sanctions may be imposed against a spoliating party that merely had "simple notice of 'potential relevance to the litigation.'" *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 2013) (quoting *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991)). Because Dickinson destroyed relevant evidence it had a duty to preserve, the Court finds its conduct was sufficiently culpable to warrant sanctions.

Dickinson argues the Court should apply Idaho law, which requires a "rigid *scienter* requirement for spoliation claims." Dkt. 44, at 25. In Idaho, the "merely negligent loss of destruction of evidence is not sufficient to invoke the spoliation doctrine." *Courtney v. Big O Tires, Inc.*, 87 P.3d 930, 933 (Idaho 2004). Dickinson cites *ArcelorMittal Indiana Harbor LLC v. Amex Nooter, LLC*, 2018 WL 509890, at *4 (N.D. Ind. 2018) to suggest many federal courts have held that where state law claims are involved, the court should apply the spoliation law of the state in which it sits. The Indiana court's holding was limited, however, to sanctions based on pre-suit spoliation. *Id*. at *3. Where, as here, the destruction of evidence took place after litigation commenced, "federal courts must have the power to sanction for litigation abuse and need not look to state law in fashioning appropriate sanctions." *Id*. at *6 n. 2 (quoting *Ward v. Texas Steak Ltd.*, 2004 WL 1289776, at *2 (W.D. Va. 2004)); *see also Glover*, 6 F.3d at 1329 (assessing district court's spoliation sanction in a diversity action under federal spoliation standard); *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009); *Flury*

*v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) ("[F]ederal law governs the imposition of sanctions for failure to preserve evidence in a diversity suit."); *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (a spoliation ruling is evidentiary in nature and federal courts generally apply their own evidentiary rules); *Silvestri v. General Motors Corp.*, 271 F. 3d 583, 590 (4th Cir. 2001) (applying federal law of spoliation because the power to sanction for spoliation derives from the inherent power of the court, not from substantive law).

While the Court finds Dickinson was at least negligent in destroying evidence it had a duty to preserve, which sanction, if any, that it imposes depends largely on Dickinson's degree of fault and the resulting prejudice to FPS. *In re Napster*, 462 F. Supp. 2d at 1066.

### B. Appropriate Sanction

FPS argues dismissal is the most appropriate sanction for Dickinson's destruction of evidence it had a duty to preserve.

#### *1.    Dismissal*

Dismissal is an available sanction when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch*, *Inc. v. Nat. Beverage Distrib.*, 69 F.3d 337, 348 (9th Cir. 1995) (citations omitted). Before imposing the harsh sanction of dismissal, the Court must weigh several factors:

> (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking

sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.

*Id.*

While the Court is not required to make explicit findings with respect to each of these factors, a finding of willfulness, fault, or bad faith is required for dismissal to be proper. *Leon*, 464 F.3d at 958.

    a.    *Willfulness*

 "A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the evidence was potentially relevant to the litigation before it was destroyed." *State Farm Fire and Cas. Co. v. Broan Mfg. Co., Inc*., 523 F. Supp. 2d 992, 997 (9th Cir. 2007) (citing *Leon*, 464 F.3d at 958). Here, the FPS Freezer and Refrigeration System were not only relevant to this case, but were integral to Dickinson's theory of liability and to FPS's defense. Dickinson clearly had notice that such evidence was relevant to this litigation. In fact, Dickinson warned FPS one day after Dickinson filed suit that if FPS obtained possession of the FPS Freezer, FPS would "remain obligated to preserve it as evidence during the pendency of Dickinson's dispute with FPS," and cautioned "[f]ailure to adequately preserve the Freezer Machine . . . may constitute spoliation of evidence or subject FPS to sanctions." Dkt. 39-11, Exhibit G, at 3. Because it destroyed evidence it knew was relevant to the litigation, Dickinson's destruction of the FPS Freezer and Refrigeration System was willful.

    b.    *Anheuser-Busch Factors*

Having found Dickinson's destruction of evidence was willful, the Court considers

the five nonexclusive factors articulated by the Ninth Circuit in *Anheuser-Busch* to determine whether case dispositive sanctions are just.[5] 69 F. 3d at 348. The first and second factor support dismissal when the destruction of evidence "obscure[es] the factual predicate of the case and consum[es] months of sanction-related litigation." *Leon*, 464 F.3d at 958 n. 5. Dickinson's spoliation of the FPS Freezer and Refrigeration System obfuscates the very heart of the matter in dispute: whether the FPS Freezer was inadequate or whether the Refrigeration System was instead incapable of supporting the FPS Freezer. The Court has also spent significant time investigating and resolving the spoliation issue. The first two factors thus support dismissal. *Id.*; *see also State Farm*, 523 F. Supp. 2d at 997.

The fourth factor, the public policy favoring disposition on the merits, "always weighs against the sanction of dismissal." *BNSF Ry. Co. v. Quad City Testing Lab*., 2009 WL 1067824, at *4 (D. Mont. 2009). Because factors one and two support sanctions and four "cuts against case-dispositive sanctions," factors three and five—the prejudice suffered by the non-spoliating party and the availability of less drastic sanctions— "are decisive." *Valley Engineers v. Electric Eng'g Co*., 158 F.3d 1051, 1057 (9th Cir. 1998).

*(i)   Prejudice to FPS*

A defendant suffers prejudice if the plaintiff's actions impair the defendant's ability to go to trial or threaten to interfere with the rightful decision of the case.

---

[5] Although this five-factor test is generally used in the Ninth Circuit to review the propriety of Rule 37 sanctions, the *Anheuser-Busch* Court applied it to review sanctions granted under the court's inherent authority. *Id.*at 348; *see also Leon*, 464 F.3d at 951 n. 4. The Court accordingly applies the five-factor test here.

*Anheuser-Busch*, 69 F.3d at 353 (citation omitted). Dickinson suggests FPS fails to provide any meaningful detail regarding what evidence it believes it has been prohibited from establishing at trial. Dkt. 44, at 29-32. For example, while, in its Motion, FPS details all of the changes Dickinson made to the Refrigeration System once it installed the replacement GEA Freezer, Dickinson claims FPS "fails to explain what data it could have gathered from the prior iteration of the Refrigeration System that it cannot now gather." *Id*., at 30. Dickinson argues FPS has not only already collected such data, but also fails to explain how new data could be materially different from the previous data. *Id*. Dickinson also contends FPS has not shown how the purported damage to the FPS Freezer "somehow prevents it from gathering evidence to defend its case." *Id*. at 31. Dickinson repeatedly suggests FPS's allegations of prejudice, "beg the question: 'So what?'" because FPS purportedly has not established precisely how Dickinson's spoliation of evidence prevents FPS from defending its case. *Id*. at 30-31.

Dickinson's contentions are misplaced. First, the finding of spoliation shifts the burden of proof "to the guilty party to show that no prejudice resulted from the spoliation" because that party "is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing." *Apple Inc. v. Samsung*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012). Dickinson's attempt to instead shift the burden to FPS to definitively prove prejudice is inappropriate in light of Dickinson's destruction of the key evidence in this dispute just weeks after it filed suit against FPS. Nor can the Court take seriously Dickinson's claim that the data FPS needs to defend its claims "has *already been gathered*." Dkt. 44, at 30 (emphasis in original). Clearly, Dickinson felt

more data was necessary to prosecute *its* claims, as Dickinson's expert, Taylor, inspected the FPS Freezer and Refrigeration System after the relationship between the parties deteriorated to the point where litigation was imminent, and also ran additional tests on January 8, 2018—just five days before Dickinson disassembled the unit. Dkt. 46-1, at 4, 18. FPS has been prejudiced because Dickinson's expert had the opportunity to run tests and analyze the FPS Freezer and Refrigeration System as it existed at the time the Complaint was filed, while FPS's expert cannot.

Second, the Court finds FPS has demonstrated specific prejudice it has suffered due to Dickinson's spoliation. FPS's expert, Eduardo Ford, as well as FPS's witnesses, detail not only a number of tests that could not be run due to the destruction of the unit, but also why such tests are relevant to FPS's defense. For instance, Ford noted, "had Dickinson not cut the FPS Freezer in half and left it outside for a year, and had it not significantly changed its refrigeration infrastructure, I would have engaged a third-party certifier to calibrate the refrigeration infrastructure instrumentation and gauges to verify the accuracy of the data being recorded." Dkt. 40, at ¶ 23. Such testing is relevant because Dickinson told FPS its temperature sensors indicated the Refrigeration System was providing -40 degrees "at the coil," of the FPS Freezer, as contractually required, but that the FPS Freezer was still malfunctioning. FPS contends the Refrigeration System's temperature gauges were not properly calibrated and weren't operating at a low enough temperature to provide -40 degrees coil temperature, so the Refrigeration System was instead at fault. *See, e.g.*, Dkt. 51-1, at 22; Dkt. 49-3, Exhibit B, at 206, ll. 4-25; 207, ll.

1-25. FPS cannot support its claim that the temperature sensors were miscalibrated due to Dickinson's destruction of evidence.

Among other issues, Ford also identifies the following tests which cannot be performed due to Dickinson's conduct:

> Effectiveness of the FPS Freezer's Sequential Hot-Gas Defrost System relied on Kemper, the refrigeration system designer/contractor. Kemper was required to provide sufficient hot-gas flow to the coils at the design saturated condensing pressure and temperature of the refrigeration system, to assure adequate defrosting of the coils. Case file documents reviewed do not indicate that Kemper performed engineering calculations to determine the required minimum hot-gas flow, pressure and temperature, required to support FPS' Sequential Hot-Gas Defrost System. Opportunity to determine an optimum defrost initiation, frequency and duration was lost by [Dickinson] prematurely cutting-up, dismantling and disposing of the FPS Freezer.

> [C]alculations reported on [by Nestle following the September 2017 meeting] were based on sound engineering calculations and estimates commonly used by industrial refrigeration practitioners to *approximate production demand loads vs. installed coil capacity*; these calculations do <u>not</u> account for coil inefficiencies introduced by fouling of the coil's surfaces with oil, temperature penalty introduced by liquid columns imposed on the coils, uneven distribution of frost on the coils, and, external factors such as operating personnel entering the freezer [an] inordinate amount of times throughout the day.

> The freezer Evaporator Coils and refrigeration infrastructure that supported the FPS Freezer are no longer in place to allow proper testing of equipment and components by sources competent and qualified to conduct and certify test results. Therefore, expert testimony of the actual freezer cannot be performed to arrive at a conclusive opinion as to whether the FPS Freezer evaporator coils were undersized [as Dickinson contends] or not[.]

Dkt. 44-46, at 9-11 (emphasis in original).

In short, FPS has offered specific evidence to establish it was prejudiced due to Dickenson's destruction of evidence. However, there is also a great deal of data regarding the FPS Freezer and Refrigeration System obtained by both parties before the unit was

disassembled. Much of the evidence regarding the respective performance issues associated with the FPS Freezer and with the Refrigeration System, and the parties' interpretations of each, is already in the record. *See, e.g.*, Dkt. 39-6, Exhibit B; Dkt. 39-7, Exhibit C; Dkt. 41; Dkt. 44-7; Dkt. 44-8; Dkt. 44-16; Dkt. 44-31; Dkt. 44-32; Dkt. 44-39; Dkt. 44-46; Dkt. 49-1, Exhibit B. Such evidence will undoubtedly be supplemented at trial. FPS's employees can also testify about the problems they encountered with the Refrigeration System, and their conclusions that the Refrigeration System was inadequate. Thus, although FPS has been prejudiced by Dickinson's conduct, it is not without evidence to support its claims.

*(ii)    Alternative Sanctions*

Even where, as here, a party's destruction of evidence was willful and the victim suffers prejudice as a result, the Court must consider "less severe alternatives than outright dismissal." *Leon*, 464 F.3d at 958 (internal quotation marks and citation omitted). The Court is to choose the "least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Reinsdorf*, 296 F.R.D. at 626. Although the court may impose sanctions for willful spoliation, "a party's motive or degree of fault in destroying evidence is relevant to what sanction . . . is imposed." *Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, 264 F.R.D. 517, 523 (N.D. Cal. 2009).

FPS argues Dickinson not only willfully destroyed the FPS Freezer, but had an improper motive because, with full understanding of its obligation to preserve and protect evidence, "Dickinson proceeded to destroy the very evidence upon which the case centers

weeks after filing this litigation, while actively preventing FPS's efforts to remove and preserve it." Dkt. 39-1, at 17. Dickinson does not acknowledge, much less offer any explanation, for its refusal to allow FPS to view the disassembly of the FPS Freezer and Refrigeration System, nor for its rejection of FPS's request to remove and store the FPS Freezer following removal.

Nevertheless, Dickinson suggests it acted "in good faith from a desire to mitigate damages, *not* with an intent to destroy evidence." Dkt. 44, at 25 (emphasis in original). Dickinson contends it could not provide its customers with a sufficient supply of potatoes due to the defective FPS Freezer, and suggests it was losing millions of dollars in lost profits as a result. Dickinson states it "knew of its obligation to mitigate damages" and "disassembled and replaced the Freezer out of a desire to prevent unnecessary financial losses and to remedy the product supply problems harming its customer relationships." Dkt. 44, at 27. Dickinson cites several cases holding a party may demonstrate good faith by showing it acted from a legitimate business reason or a desire to mitigate damages. *See, e.g., Flint Hills Res. LP v. Lovegreen Turbine Servs., Inc*., 2006 WL 2472819, at *5 (D. Minn. 2006); *Steuhl v. Home Therapy Equip., Inc*., 23 A.D.3d 825, 827 (N.Y. 2005); *Kleinberg v. 516 W. 19th LLC*, 138 A.D.3d 549, 550 (N.Y. App. 2016).

The Court certainly understands Dickinson's need to remove the FPS Freezer to make room for the new GEA freezer, and to alter the Refrigeration System to support the GEA freezer in order to resume desired levels of production and mitigate damages. However, the need to mitigate damages cannot explain Dickinson's refusal to allow FPS to monitor the FPS Freezer's disassembly, its decision to bar FPS from inspecting the

unit shortly after removal, or its rejection of FPS's offer to remove and store the unit at no cost to Dickinson.

Dickinson also claims representatives from Nestle, Kemper, Dickinson, and even FPS's consultant all agreed during the September 2017, meeting that the Refrigeration System was adequate.[6] Dkt. 44-20, at 23. Dickinson further maintains that it believed FPS had conceded that the Refrigeration System met contractual specifications given FPS's near immediate offer to settle shortly after the September 2017, meeting. *Id.*, at 27. Yet, Taylor, Dickinson's industrial refrigeration expert, inspected the FPS Freezer and Refrigeration System on November 10, 2017. Dkt. 46-1, at 4. Dickinson does not explain why it hired Taylor to provide "expert opinions on the design, installation, configuration and operation of the FPS Freezer" if it believed FPS agreed and had conceded the Refrigeration System met contractual specifications and the FPS Freezer was inadequate. Dkt. 46, at ¶ 8. Nor does Dickinson explain why it removed the FPS Freezer and Refrigeration System before FPS's expert had a chance to inspect the unit in preparation for litigation, while, at the same time, ensuring its own expert had such opportunity.

Finally, Dickinson emphasizes that it notified FPS more than once that the FPS Freezer was going to be removed in January 2018, and, on December 22, 2017, specifically told FPS it was going to remove the FPS Freezer on January 13, 2018. Despite multiple subsequent communications between counsel, FPS never objected to the removal. While the Court determined such notification did not provide FPS with an

---

[6] As mentioned, FPS disputes Peterson agreed the Refrigeration System was adequate. *See* Dkt. 51-1, at 20.

adequate opportunity to inspect the FPS Freezer, FPS does not attempt to explain, much

less even acknowledge, its apparent failure to take *any* steps to prevent removal and

disassembly when it had notice of Dickinson's intent to do so. Because it had already

been served with Dickinson's Complaint and had notice of the precise date the unit would

be removed, FPS's failure to request that Dickinson refrain from removal until FPS's

expert could conduct an inspection weighs against the harsh sanction of dismissal.

FPS argues dismissal is appropriate even in the absence of bad faith, where, as

here, "a party has destroyed the very item at issue in the lawsuit." Dkt. 51-1, at 16 (citing

*Unigard*, 982 F.2d at 365, *State Farm Fire*, 523 F. Supp. 2d at 995. However, *Unigard*

and *State Farm* both involved a party's destruction of key evidence before the injured

party had notice of a potential claim against it.

In *Unigard*, 982 F.2d at 368, the Ninth Circuit affirmed the district court's

exclusion of plaintiff insurer's expert testimony regarding the cause of fire, and resulting

summary dismissal, where plaintiff destroyed the electric heater it believed had caused a

yacht fire two years before filing suit against defendant heater manufacturer. Similarly, in

*State Farm*, 523 F. Supp. at 997, the district court determined dismissal was an

appropriate sanction against plaintiff insurer where plaintiff allowed the fire scene and a

ventilation fan—the posited cause of the fire—to be destroyed without first confirming

that defendant fan manufacturer had notice of the potential claim against it. Unlike

plaintiffs in *Unigard* and *State Farm*, Dickinson had filed suit against FPS and notified

FPS of the imminent removal and disassembly of the FPS Freezer and Refrigeration

System *before* removing the unit. Although the Court finds such warning did not

discharge Dickinson's duty to preserve the evidence, or excuse Dickinson's conduct, it is relevant to the Court's assessment of Dickinson's level of culpability and determination of whether less severe sanctions are appropriate.

Under the circumstances, the Court does not believe Dickinson mounted a knowing and concerted effort to destroy the FPS Freezer. Given FPS's failure to take any action, despite its notice of both Dickinson's suit and imminent intent to remove the FPS Freezer and Refrigeration System, Dickinson believed, however imprudently, that FPS did not object to its removal of the FPS Freezer and Refrigeration System, and that FPS did not desire a pre-removal inspection. Although inadequate, Dickinson also took steps to preserve the unit by instructing Idaho Steel to take special care and employ every reasonable precaution in the removal process to ensure the FPS Freezer and its component parts were not damaged. Dkt. 44, at 29.

Thus, although Dickinson's conduct was willful because it severely altered relevant evidence it had a duty to preserve, the Court does not find Dickinson acted in bad faith. The distinction may appear imprecise, however, willfulness does not always equate to bad faith in the context of spoliation of evidence. For instance, "[w]illfulness could include virtually any intentional act, such as adoption of an email management system that deletes stored emails after 30 days, even if the intentional action was not taken with an intent to destroy relevant information." *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1112 (D. Ariz. 2014). Bad faith is more egregious, and suggests not just an intentional action, but a specific intent to destroy relevant evidence.

Except for cases where key evidence was destroyed before the injured party had notice of a claim, such as in *State Farm* and *Unigard*, Ninth Circuit cases cited by the parties have not imposed case-terminating sanctions without a finding of culpability approaching bad faith. *See, e.g., Leon*, 464 F.3d at 956 (finding plaintiff acted in bad faith and affirming dismissal of case as sanction where plaintiff intentionally wiped all of the data on his hard drive and deleted more than 2,200 files, despite having been warned by defendant to "ensure no data on the laptop is lost or corrupted so as to avoid any possible despoliation of evidence."); *Anheuser-Busch*, 69 F.3d at 348 (affirming dismissal as sanction where plaintiff purposefully concealed relevant documents for three years and continuously lied about their existence and condition under penalty of perjury); *Valley Engineers*, 158 F.3d at 1056 (dismissal of claims against counter-defendants was an appropriate sanction where defendant and its lawyers hid critical memorandum and failed to produce it in violation of the district court's order); *Roadrunner Transp. Services, Inc. v. Tarwater*, 642 Fed. Appx. 759 (9th Cir. 2016) (affirming dismissal as sanction where there was ample evidence defendant deleted emails and files on his laptops after receiving multiple preservation demands from plaintiff and even after the district court explicitly ordered him to preserve "all data" on his electronic devices); *see also Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir. 1988) (reversing dismissal of counterclaim where, although defendant had improperly failed to disclose evidence, "[t]he fault at issue was insufficient to support a dismissal").

Thus, although various Ninth Circuit cases have noted that spoliation sanctions may be imposed "not only for bad faith, but also for willfulness or fault by the offending

party," the Court is not persuaded that dismissal is appropriate here. Although Dickinson acted improperly, it did not act in bad faith. Nor did Dickinson deprive FPS of notice that the unit would be removed. Under such circumstances, the Court finds a less harsh sanction than dismissal is appropriate. *See, e.g., Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1054 (S.D. Cal. 2015) (the degree of harshness of sanction should be dictated by the nature of the spoliating party's conduct—the more egregious the conduct, the more harsh the sanction); *In re Napster*, 462 F. Supp. 2d at 1076 (although spoliated evidence was relevant and plaintiff was prejudiced by its destruction, dismissal was not warranted where defendant took steps, however inadequate, to preserve evidence); *see also Milbourn v. Marriott*, 67 F.3d 307 (9th Cir. 1995) (it was within district court's discretion to rely upon the absence of defendants' bad faith as basis for its choice of remedy).[7]

FPS suggests if the Court does not dismiss Dickinson's action, testimony about the FPS Freezer and Refrigeration System should be excluded. Dkt. 39-1, at 18. FPS seeks exclusion of *any* testimony by Dickinson regarding the FPS Freezer and Refrigeration System, as it contends the Court should prohibit Dickinson "from introducing any testimony related to, or derived from, the spoliated evidence." *Id*., at 1. Because the FPS Freezer and Refrigeration System are the sole items at issue in this dispute, Dickinson

---

[7] In its Reply, FPS argues the Court is not required to find Dickinson acted in bad faith in order to dismiss this case, citing *Erlandson v. Ford Motor Co*., 2009 WL 3672898, at *1 (D. Or. 2009). FPS notes the *Erlandson* Court determined dismissal was an appropriate sanction even where plaintiffs' motives in spoliating key evidence were innocent. Dkt. 51-1, at 17. However, as was the case in *State Farm* and *Unigard*, and unlike here, plaintiffs in *Erlandson* spoliated evidence before they filed suit and without giving defendant notice of their intent to do so. *Id*. at *5.

would be precluded from presenting any evidence at all if the Court ordered such exclusion, negating the need for a trial. Excluding any evidence regarding the destroyed evidence would thus be tantamount to dismissal, which the Court has already determined is not warranted.

If the Court does not dismiss Dickinson's case or order exclusion of any testimony regarding the FPS Freezer and Refrigeration System, FPS seeks an adverse inference jury instruction as a sanction for Dickinson's conduct. A party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the evidence was destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the claim or defense of the party seeking sanctions. *In re Napster*, 462 F. Supp. 2d at 1078.

As discussed above, Dickinson disassembled the FPS Freezer and Refrigeration System despite its duty to preserve such evidence. As the basis for this suit, Dickinson knew or should have known it had a duty to preserve the FPS Freezer and Refrigeration System as evidence. Dickinson further acted recklessly in executing its duties to preserve crucial evidence—by failing to allow FPS to observe disassembly or to store the FPS Freezer, by damaging parts of the FPS Freezer and significantly altering the Refrigeration System prior to allowing FPS's expert an opportunity to inspect, and by carelessly storing the FPS Freezer so that it has been exposed to the elements and further deterioration over the course of this litigation. Such conduct constitutes sufficient culpability to justify an adverse inference. *Apple*, 881 F. Supp. 2d at 1150; *see also Glover*, 6 F.3d at 1329 (a

finding of bad faith is not a prerequisite to an adverse jury instruction, destruction of

evidence with simple notice of its potential relevance is sufficient culpability for such

sanction). The relevance of the FPS Freezer and Refrigeration System to this suit is also

undisputed. Therefore, FPS is entitled to an adverse inference instruction. *Id.*

Given the significant prejudice to FPS resulting from Dickinson's conduct, the

Court finds that a non-rebuttable inference is appropriate. A rebuttable presumption

would not be an effective alternative because it would leave Dickinson free to tell its own

story, unchecked by the evidence it failed to preserve. *Apple*, 881 F. Supp. 2d at 1150.

("[W]hen a spoliating party has acted willfully or recklessly, a court may impose a

mandatory presumption.") (citation omitted); *see also Evans v. Avista Corp.*, 2012 WL

4140649, at *15 (D. Idaho 2012). The Court will thus instruct the jury to presume the

following:

> Dickinson has failed to preserve relevant evidence for FPS's use in this litigation. This is known as the "spoliation of evidence." Specifically, Dickinson destroyed the FPS Freezer and Refrigeration System after its duty to preserve this evidence arose. As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement.[8]

---

[8] Although both parties request them, the Court finds monetary sanctions are not appropriate. Given the conclusions herein, FPS's Motion for Sanctions was clearly not frivolous or brought in bad faith, as Dickinson contends. The Court also disagrees with Dickinson's contentions regarding the circumstances surrounding FPS's disclosure of its expert report and declines to address the issue further. Nor are monetary sanctions appropriate against Dickinson since the Court has not found that Dickinson acted in bad faith. *Leon*, 464 F.3d at 961 (before awarding monetary sanctions under its inherent powers, the court must make an express finding that the sanctioned party's behavior "constituted or was tantamount to bad faith").

# V. CONCLUSION

Dickinson spoliated the key evidence at issue in this dispute shortly after filing suit against FPS. It did so despite having warned FPS, a mere three weeks before, that failure to preserve the FPS Freezer as evidence could subject FPS to sanctions. Moreover, although Dickinson ensured its own expert had an opportunity to inspect the FPS Freezer and Refrigeration System in preparation for litigation, it denied FPS this opportunity. For this reason alone, as well as for those detailed herein, FPS has been prejudiced.

Because Dickinson willfully destroyed relevant evidence it had a duty to preserve, and because FPS has been prejudiced thereby, significant sanctions are warranted. However, in the absence of bad faith, and because FPS is not entirely without evidence to support its case, the Court finds an adverse jury instruction imposing a mandatory presumption is the most appropriate sanction. *In re Napster*, 462 F. Supp. at 1078 (a court must impose the least onerous sanction given the extent of the offending party's fault and the prejudice to the opposing party); *Apple*, 881 F. Supp. 2d at 1150 ("[A] ny sanction must be the least drastic available to adequately mitigate the prejudice" the injured party has suffered.).

///

///

///

///

///

# VI.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED:

1. FPS's Motion for Sanctions (Dkt. 39) is GRANTED. The Court will instruct
   the jury as outlined above.

DATED: May 21, 2019

David C. Nye
Chief U.S. District Court Judge