John F. Kurtz, Jr., ISB No. 2396
Dane Bolinger, ISB No. 9104
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5232
Email: jkurtz@hawleytroxell.com
        dbolinger@hawleytroxell.com

Attorneys for Plaintiff/Counter-Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DICKINSON FROZEN FOODS, INC., | Case No. 1:17-cv-00519-DCN |
| Plaintiff/Counter-Defendant, | |
| vs. | DICKINSON FROZEN FOODS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THE COURT'S MAY 21, 2019 MEMORANDUM DECISION AND ORDER (DOCUMENT NUMBER 69) |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, | |
| Defendant/Counter-Claimant. | ORAL ARGUMENT REQUESTED |

45670.0013.12171209.13

# TABLE OF CONTENTS

Page

I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................. 1

II.    STANDARDS OF LAW ........................................................................... 3

III.   ADDITIONAL BACKGROUND ............................................................... 4

IV.    ARGUMENT .......................................................................................... 5

      A.   The Jury Instruction Sanction Ordered by the Court Is Tantamount to a Dismissal With Prejudice, Which Does Not Appear to Be the Result Intended by the Court. ............................... 5

            1.   The Jury Instruction That FPS Would Have Been Able to Prove That the Freezer Was Capable of Performing At the Levels Specified by the Parties Agreement Would Preclude the Jury from Finding that FPS Breached the Parties' Agreement. ............................................................ 5

            2.   The Court's Discussion of the Reasons Supporting the Order Indicates the Court Did Not Intend to Enter a Case-Terminating Sanction. ......................................................... 5

      B.   FPS Has Not Suffered Prejudice From the Current Condition of the Freezer and the Reconfiguration of the Refrigeration System Because There Is Accurate and Reliable Test Data Available to Both FPS and Dickinson That Was Obtained Prior to the Filing of the Lawsuit that Precludes Any Need for Additional Testing of the Freezer or the Refrigeration System. ........................................ 7

            1.   The Inspection and Test by Taylor in November 2017 Was Not Done Because Dickinson Felt More Data Was Necessary and FPS is Not Prejudiced by the Test Conducted by Taylor. ...................................................... 8

            2.   The Deposition Testimony of Ford Confirms That Ford Was Never Provided With the Data Obtained From Tests Conducted During the Period From May Through September 2017 and That the Additional Tests That Ford Claimed Should Be Performed in His Declaration Have Already Been Performed with Calibrated Instrumentation Ensuring the Accuracy and Reliability of the Data. ........................ 9

            3.   The Deficiencies Identified in the Refrigeration System Were Systematically Identified and Eliminated. ............................... 17

45670.0013.12171209.13

4.      The Test Data Obtained From May 2017 Through September 2017 is Accurate and Reliable. ....................................... 18

5.      There Are Numerous Design Deficiencies that Have Been Identified by Taylor, Both a Refrigeration and Freezer Design Expert, Without the Necessity of Testing............................ 22

6.      The Refrigeration System is Substantially the Same as When the Freezer was Installed, and Ford Can Still Test the Two Compressors. ....................................................................... 24

C.      Additional Evidence and Further Clarification of the Reasons for Dickinson's Decision to Install the GEA Freezer and Reconfigure the Refrigeration System Show that Dickinson Did Not Willfully or Culpably Destroy Evidence. .................................................................. 25

1.      The Court Was Unduly Influenced by Taylor's Inspection and Testing in November 2017........................................................ 25

2.      The Court Was Unduly Influenced by Jason Kwok's Misleading Declaration, as the Record Now Shows that FPS Was Actually Investigating the Adequacy of the Refrigeration System Well Prior to the Lawsuit............................... 25

3.      Dickinson's Decision to Disassemble and Remove the Freezer was Made Based on the Good-Faith Belief that FPS Had Obtained All the Performance Data from the Freezer that It Could Possibly Ever Need......................................... 27

4.      The Court Was Unduly Influenced by Dickinson's Decision to Not Allow FPS to Observe the Disassembly of the Freezer. ................................................................................... 30

5.      The Court Was Unduly Influenced by Dickinson's Decision to Retain Possession of the Freezer. ................................... 31

D.      Although Dickinson Contends That No Sanctions for Spoliation Are Appropriate in the Case, There Are Less Harsh Alternative Sanctions Available. ....................................................................... 32

1.      The Instruction is Overbroad in that it Awards FPS Relief That Goes Far Beyond Its Theory That It Could Not Evaluate the Refrigeration System. .................................................... 32

2.      A "Non-Rebuttable Presumption" is Particularly Harsh and is Not Supported by the Case Law.............................................. 33

45670.0013.12171209.13

E.   This Court Should Allow Oral Argument and Should Consider Whether an Evidentiary Hearing or a Jury Instruction Conference Are Necessary. ............................................................................... 34

V.   CONCLUSION .............................................................................................. 35

45670.0013.12171209.13

# TABLE OF AUTHORITIES

Page

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012)) ...................................................................... 6, 33

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012) ........................................................................ 33, 34

*Beck v. Test Masters Educ. Servs., Inc.*,
289 F.R.D. 374 (D.D.C. 2013) ....................................................................................... 34

*Beck v. Test Masters Educ. Servs., Inc.*,
No. CV 04-1391 (JDB), 2012 WL 10817176  (D.D.C. Sept. 25, 2012) .......................... 34

*Bracey v. Grondin*,
712 F.3d 1012 (7th Cir. 2013) ......................................................................................... 4

*Diabetes Centers of Am., Inc. v. Healthpia Am., Inc.*,
CIV. H-06-3457, 2008 WL 336382 (S.D. Tex. Feb. 5, 2008) ......................................... 35

*Gaffield v. Wal-Mart Stores E., LP*,
616 F. Supp. 2d 329 (N.D.N.Y. 2009) ............................................................................ 27

*Green v. Ford Motor Co.*,
No. 1:08-CV-0163-LJM-TAB, 2008 WL 5070489 (S.D. Ind. Nov. 25, 2008) ............... 22

*Hynix Semiconductor Inc. v. Rambus Inc.*,
645 F.3d 1336 (Fed. Cir. 2011) (overturning *Hynix Semiconductor Inc. v. Rambus, Inc.*,
591 F. Supp. 2d 1038 (N.D. Cal. 2006) ............................................................................ 4

*In re LLS Am., LLC*,
No. 09-06194-PCW11, 2013 WL 2896887,  (Bankr. E.D. Wash. June 12, 2013) ........... 15

*In re Oracle Corp. Sec. Litig.*,
627 F.3d 376 (9th Cir. 2010) .......................................................................................... 34

*Jackson v. Jackson*,
67 Cal. 2d 245, 430 P.2d 289 (1967) .............................................................................. 33

*Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*,
306 F.3d 806 (9th Cir. 2002) .......................................................................................... 19

*Micron Tech., Inc. v. Rambus Inc.*,
917 F. Supp. 2d 300 (D. Del. 2013) ................................................................................. 4

45670.0013.12171209.13

*Moussouris v. Microsoft Corp.*,
　　311 F. Supp. 3d 1223 (W.D. Wash. 2018) ........................................................ 15

*Patton v. Wal-Mart Stores, Inc.*,
　　No. 2:12-CV-02142-GMN, 2013 WL 6158467 (D. Nev. Nov. 20, 2013). ....................... 3

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*,
　　685 F. Supp. 2d 456 (S.D.N.Y. 2010) .............................................................. 33

*Rojas v. Marko Zaninovich, Inc.*,
　　No. 1:09-CV-00705 AWI, 2011 WL 4375297 (E.D. Cal. Sept. 19, 2011) ..................... 15

*United States v. Westinghouse Elec. Corp.*,
　　648 F.2d 642 (9th Cir. 1981) ......................................................................... 3

**Statutes**

IDAHO CODE ANN. § 28-2-711 .............................................................................. 31

**Other Authorities**

BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................................. 33

John H. Wigmore, *A Student's Textbook of the Law of Evidence* 454 (1935) ............................ 33

45670.0013.12171209.13

## I.  INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff Dickinson Frozen Foods, Inc. ("Dickinson"), respectfully submits this Memorandum in Support of Its Motion for Reconsideration of this Court's May 21, 2019 Memorandum Decision and Order (Dkt. No. 69) (the "Order"). At the time Defendant FPS Food Process Solutions Corporation ("FPS") filed its Motion for Sanctions for Spoliation of Evidence (Dkt. 39) ("Motion"), discovery had only begun and no depositions had been taken. In fact, only one deposition was completed by the time briefing closed. Dickinson has now completed depositions of individuals who were personally involved in efforts to determine why the freezer sold to Dickinson ("Freezer") was not performing and has obtained other highly relevant evidence not previously considered by the Court. The evidence proves the lack of prejudice to FPS by Dickinson's actions and shows that Dickinson does have reasonable explanations for its conduct that the Court previously found indicated culpability on the part of Dickinson but were not explained.

Although the Court found that Dickinson did not act in bad faith and expressly stated in its Order that "the Court is not persuaded that dismissal is appropriate here," the sanction ordered by Court was tantamount to a dismissal of Dickinson's claim. In particular, the Court ordered it will instruct the jury with a non-rebuttable inference, in relevant part, that:

> As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement.

(Dkt. 69 at p. 39.)

Dickinson's claim in this case is that FPS breached the Parties' Agreement by failing to install a freezer that would freeze 8,000 pounds of potatoes per hour for 20-22 hours per day as specified in the Parties' Agreement. In particular, Dickinson is prepared to introduce expert testimony that the Freezer was not performing and would never have been capable of performing at the levels specified in the Parties' Agreement because of several significant deficiencies in the design of the Freezer. Thus, by following the jury instruction, the jury will be prohibited from

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 1

finding that FPS breached the Parties' Agreement. However, the Court's reasoning discussed in the Order strongly suggests the Court did *not* intend to issue a sanction that will prevent Dickinson from prevailing on its claims. A reconsideration of the Order is appropriate for that reason alone.

The Court also found that FPS was prejudiced by the fact that Dickinson disassembled the Freezer and altered the Refrigeration System. In particular, the Court appeared to be persuaded by the Declaration of Eduardo Ford, FPS's expert witness, in which he stated that additional testing was necessary. Dickinson has now taken Ford's deposition as well as the depositions of the engineers who conducted tests and have explained in detail why the tests already performed are accurate and reliable. Dickinson was also able to obtain highly relevant documents through discovery from the third-parties involved in the effort to determine the reasons why the Freezer was not able to meet contract specifications and whether there were any deficiencies in the Refrigeration System. Ford testified that he was never provided with the data obtained from tests conducted during the period when the Freezer was installed and operational. Dickinson has also provided additional expert evidence in the Declaration of Charles Taylor, in which he further explains complex engineering principles relevant to the Motion and why the additional testing suggested by Ford has already been completed or is otherwise unnecessary. The record in this case now includes undisputed facts strongly supporting the conclusion that FPS is not prejudiced by its stated need to conduct additional testing or for any other reason.

The Court also found that Dickinson "significantly altered the Refrigeration System" and suggested that those alterations made it impossible for FPS to test the Refrigeration System for relevant data. Dickinson has supplemented the record to demonstrate that, contrary to FPS's assertion, the Refrigeration System remains substantially the same as it was when the Freezer was installed, including the fact that both compressors remain installed and are fully operational. Indeed, per multiple witnesses, FPS could test the capacity and performance capabilities of both compressors on the Refrigeration System to this very day.

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 2

The Court also found that after the Freezer was removed, it suffered damage that prevented FPS from collecting data on it. However, the record evidence shows that most of FPS's complained-of "damage" pre-existed Dickinson's removal process and was caused, not by Dickinson, but by FPS's faulty design of the Freezer. More importantly, none of the alleged "damage" to the Freezer itself is relevant here because none of it relates to Dickinson's defective design theory or prevents FPS from mounting its theory of the case.

Dickinson has also supplemented the record to more fully explain the reasons for its actions demonstrating that Dickinson's actions were not culpable. Based on all of the available evidence in this record, Dickinson submits that the Court will find either no sanctions or substantially less harsh sanctions are appropriate.

## II.    STANDARDS OF LAW

As discussed in prior email correspondence to the Court, the Court's Order is an interlocutory order, and therefore, this Court has the authority to revisit it for any sufficient reason. *See United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 651 (9th Cir. 1981) ("[O]rders imposing sanctions under Rule 37 are interlocutory."). Federal courts have routinely found that the standard for granting a motion to reconsider an interlocutory order, such as orders regarding spoliation sanctions, are governed by Rule 54(b) and are reviewed under the court's "inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *Patton v. Wal-Mart Stores, Inc.*, No. 2:12-CV-02142-GMN, 2013 WL 6158467, at *1 n.2 (D. Nev. Nov. 20, 2013).[1]

In the Order, the Court held that a "finding of spoliation shifts the burden of proof 'to the guilty party to show that no prejudice resulted from the spoliation' because that party 'is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing.' *Apple Inc. v. Samsung*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012)." (Dkt. 69 at p.

---

[1] On June 13, 2019, at the request of this Court's clerk, Dickinson submitted an email with its position regarding the applicable standard for a Motion for Reconsideration. (*See* Dkt. 74-2, Bolinger Decl. at ¶ 19, Exh. H.) Dickinson respectfully incorporates those legal standards by reference as if set forth in full herein.

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 3

28.) While the *Apple* case does support that position, Dickinson believes that *Apple*'s burden-shifting holding has been overturned and is poorly decided. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1341 (Fed. Cir. 2011) (overturning *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038, 1060 (N.D. Cal. 2006), the authority relied upon in *Apple* for the burden-shifting principle.) Moreover, Dickinson could locate no authority from the U.S. Court of Appeals for the Ninth Circuit recognizing the burden-shifting rule, and there appears to be little support for it in the other federal appellate courts. *See e.g. Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) (affirming trial court's refusal to shift the burden to the allegedly spoliating party, and noting, "The mere fact that some evidence remained unavailable to [the party asserting spoliation] does not lessen his burden of proof.")[2] Accordingly, Dickinson respectfully reserves all rights and arguments that FPS bears the burden of proving all elements of a spoliation claim. However, as discussed below, Dickinson has demonstrated with substantial record evidence that FPS suffered no prejudice, and therefore, while Dickinson disputes that it carries the burden, it has now met that burden.

## III.   ADDITIONAL BACKGROUND

As the Court is no doubt aware, this case and the present dispute involve complicated issues of industrial refrigeration and freezer engineering and design. With this present motion, Dickinson submits the Declaration of its refrigeration and freezer engineering expert, Charles R. Taylor. (*See* Taylor Decl.) Taylor's Declaration sets forth detailed additional points regarding some of the important engineering principles at issue in this case. For efficiency's sake, Dickinson refers the court to those materials for additional information.

---

[2] Some federal district courts have held that when the court finds that the spoliating party acted *in bad faith*, then the burden of proof shifts to the spoliating party to demonstrate an absence of prejudice. *See e.g. Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 319 (D. Del. 2013). However, the Court here expressly found that Dickinson did *not* act in bad faith, making it inappropriate to shift the burden here.

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 4

## IV.    ARGUMENT

**A.    The Jury Instruction Sanction Ordered by the Court Is Tantamount to a Dismissal With Prejudice, Which Does Not Appear to Be the Result Intended by the Court.**

### 1.    *The Jury Instruction That FPS Would Have Been Able To Prove That the Freezer Was Capable of Performing At the Levels Specified by the Parties Agreement Would Preclude the Jury from Finding that FPS Breached the Parties' Agreement.*

The Court found that Dickinson did not act in bad faith and expressly stated in its Order that "the Court is not persuaded that dismissal is appropriate here." (Dkt. 69 at pp. 36-37). Similarly, the Court stated it would be inappropriate to bar Dickinson from presenting evidence about the Freezer and the Refrigeration System because that would "negat[e] the need for a trial" and, "[e]xcluding any evidence regarding the destroyed evidence would thus be tantamount to dismissal, which the Court has already determined is not warranted." (Dkt. 69 at pp. 37-38.)

However, the jury instruction sanction is tantamount to a dismissal of Dickinson's claims. The Court ordered it will instruct the jury with a non-rebuttable inference, in relevant part:

> As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement.

(Dkt. 69 at p. 39.)

Dickinson's claim in this case is that FPS breached the Parties' Agreement because the Freezer was never capable of freezing 8,000 pounds per hour to 0° for 20-22 hours per day because of significant deficiencies in the design of the Freezer that could not be corrected. Thus, if the jury is required to presume (and Dickinson cannot rebut that presumption) that "FPS would have been able to prove that the Freezer was capable of performing at levels specified by the Parties Agreement," the jury must find against Dickinson.

### 2.    *The Court's Discussion of the Reasons Supporting the Order Indicates the Court Did Not Intend to Enter a Case-Terminating Sanction.*

Despite the harshness of the jury instruction, other portions of the Court's decision strongly indicate that the Court did *not* intend to enter a case-terminating sanction against

Dickinson. The Court found that FPS never objected to removal of the Freezer after Dickinson

served the Complaint and advised FPS of the precise date of removal, stating in relevant part:

> Despite multiple subsequent communications between counsel, FPS never
> objected to the removal. While the Court determined such notification did not
> provide FPS with an adequate opportunity to inspect the FPS Freezer, FPS
> does not attempt to explain, much less even acknowledge, its apparent failure
> to take any steps to prevent removal and disassembly when it had notice of
> Dickinson's intent to do so. Because it had already been served with
> Dickinson's Complaint and had notice of the precise date the unit would be
> removed, FPS's failure to request that Dickinson refrain from removal until
> FPS's expert could conduct an inspection weighs against the harsh sanction of
> dismissal.

(Dkt. 69 at pp. 33-34.)

The Order also envisions that the jury should be allowed to hear the evidence and decide

the case. (*See* Dkt. 69 at pp. 30-31. ("there is also a great deal of data regarding the FPS Freezer

and Refrigeration System obtained by both parties before the unit was disassembled. . . . Such

evidence will undoubtedly be supplemented at trial. Thus, although FPS has been prejudiced by

Dickinson's conduct, it is not without evidence to support its claims.")). The Court also

acknowledged Dickinson's position that it acted from a desire to mitigate damages. (Dkt. 69 at

32 ("The Court certainly understands Dickinson's need to remove the FPS Freezer to make room

for the new GEA freezer, and to alter the Refrigeration System to support the GEA freezer in

order to resume desired levels of production and mitigate damages.")). The Court also found and

repeatedly noted that Dickinson did not act in bad faith, and found that Dickinson did not

"mount[] a knowing and concerted effort to destroy the FPS Freezer." (Dkt. 69 at 35-37, 40.) The

Court also stated that a "drastic" sanction would be inappropriate under the circumstances. (*Id*. at

40, quoting *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012)).

The language of the jury instruction quoted above is identical to the language proposed

by FPS in its Memorandum. (Dkt. 39-1 at p. 20). FPS described that language as: "This least

severe of the available spoliation sanctions does not fully cure the prejudice, but it at least puts

FPS on a slightly more level playing field and prevents Dickinson from entirely profiting from

its discovery abuses." (*Id.*) However, the jury instruction does not merely result in a slightly more level playing field to FPS: it is instead "game over" for Dickinson.

The Court's reasoning discussed in the Order strongly suggests the Court did *not* intend to issue a sanction that will completely bars Dickinson from prevailing on its claims. A reconsideration of the Order is appropriate for that reason alone.

**B.**      **FPS Has Not Suffered Prejudice From the Current Condition of the Freezer and the Reconfiguration of the Refrigeration System Because There Is Accurate and Reliable Test Data Available to Both FPS and Dickinson That Was Obtained Prior to the Filing of the Lawsuit that Precludes Any Need for Additional Testing of the Freezer or the Refrigeration System.**

As the Court clearly recognized in the Order, the severity of the sanction depends in substantial part on the amount of prejudice suffered by the other party from the spoliation. At the time the briefing was filed for the Motion, the parties were in the early stages of discovery and only the deposition of James Peterson had been taken. Since then, numerous depositions have been taken and documents have been produced clearly showing that accurate and reliable test data exists obtained from testing performed from May through September 2017.

Since the Order, Dickinson has taken the deposition of Eduardo Ford, FPS's refrigeration system expert whose declaration was filed in support of the Motion in which Ford claimed that FPS was precluded from conducting necessary tests as a result of the disassembly of the Freezer and the reconfiguration of portions of the Refrigeration System. However, in his deposition, Ford admitted that he had not been provided with or made aware of almost all of the accurate and reliable test data obtained from May to September 2017. Thus, Ford's declaration that additional testing was necessary was made without any knowledge or analysis of the test data that already existed, and that data was never provided to Ford by FPS. For that reason alone, Ford's assertions that additional testing is necessary should be given little or no consideration.

Moreover, the same tests that Ford suggests should be performed were performed during May through September 2017. As Taylor has explained, there is no reason to believe that any of the tests suggested by Ford, if properly conducted, would be different from the data already

available. As discussed below, there is substantial evidence in this record showing that FPS has

not been prejudiced because Ford cannot conduct the testing referenced in his declaration.

      1.      ***The Inspection and Test by Taylor in November 2017 Was Not Done Because Dickinson Felt More Data Was Necessary and FPS is Not Prejudiced by the Test Conducted by Taylor.***

The Court seemed particularly concerned about prejudice to FPS because Taylor

conducted a test on the Freezer before it was disassembled, stating in relevant part as follows:

> Clearly, Dickinson felt more data was necessary to prosecute its claims, as Dickinson's expert, Taylor, inspected the FPS Freezer and Refrigeration System after the relationship between the parties deteriorated to the point where litigation was imminent, and also ran additional tests on January 8, 2018—just five days before Dickinson disassembled the unit. Dkt. 46-1, at 4, 18. FPS has been prejudiced because Dickinson's expert had the opportunity to run tests and analyze the FPS Freezer and Refrigeration System as it existed at the time the Complaint was filed, while FPS's expert cannot.

(Dkt. 69 at 28-29.)

First, Taylor's only visit to Sugar City occurred on November 18, 2017, which was the

only day that Taylor conducted a test. Taylor's reference in his expert report to a January 8, 2018

visit to the site was made in error. (Taylor Decl. at ¶¶ 163-168.) Second, there is no support for

the Court's conclusion that "Dickinson felt more data was necessary to prosecute its claims." No

one from Dickinson ever suggested that Taylor should gather more data. (Schossberger Decl. at

¶¶ 30-32.) Taylor's site visit was made primarily to get background information and for Taylor

to meet some of Dickinson's representatives. (Taylor Decl. at ¶ 166; Schossberger Decl. at ¶ 31.)

Taylor gathered data on his own accord. (Taylor Decl. at ¶ 167; Schossberger Decl. at ¶¶ 31-38.)

At that time, Taylor was not aware of all of the substantial data that had been gathered by

Nestle, Kemper, Colmac, and FPS from May through September 2017. (Taylor Decl. at ¶¶ 165-

167.) After reviewing that data, Taylor has confirmed that the data obtained from the test he

performed, which only took approximately thirty minutes, was merely duplicative and not

necessary to support his expert opinions. (*Id.* at ¶ 167.) Thus, any prejudice to FPS can be easily

eliminated by not allowing Taylor to testify about the test he conducted at his site visit.

**2.**       ***The Deposition Testimony of Ford Confirms That Ford Was Never Provided With the Data Obtained From Tests Conducted During the Period From May Through September 2017 and That the Additional Tests That Ford Claimed Should Be Performed in His Declaration Have Already Been Performed with Calibrated Instrumentation Ensuring the Accuracy and Reliability of the Data.***

In support of its Motion, FPS relied almost exclusively on the Declaration of Ford to support its argument that FPS has suffered prejudice because of Dickinson's disassembly of the Freezer and reconfiguration of the Refrigeration System. In particular, Ford suggested in paragraphs 20-27 of his Declaration (Dkt. 40) that he was prohibited from conducting tests on the Refrigeration System to determine whether the Refrigeration System was capable of providing the contract specifications of 210 TR and -40° at the coil. However, it is now clear from Ford's deposition testimony, that those tests have either already been performed or are unnecessary.

Furthermore, as discussed in detail below, it is now demonstrated by Ford's deposition testimony, that he was never provided with, and therefore, did not review the substantial accurate and reliable data that was obtained by conducting well recognized engineering tests conducted during May 2017 through September 2017 that were considered appropriate by Nestle representatives, Kemper representatives, Colmac, FPS's consultant James Peterson, and FPS to determine whether the Refrigeration System was meeting contract specifications. (*See* Bolinger Decl., Exh. PPP, Ford Depo. at 74:22-25.)

Ford testified that he reviewed the Colmac data from June 2017 and acknowledged that the Colmac data was reliable and accurate. (*Id.*, Exh. PPP, Ford Depo. at 90:21-91:3.) Ford expressed familiarity with the testing procedure used by Colmac on June 21, 2017 that was overseen by FPS and acknowledged there was adequate instrumentation and accuracy of the data. (*Id.*, Exh. PPP, Ford Depo. at 91:5-14, 92:2-15.) Ford admitted that, based off of the Colmac Coil data, the Refrigeration System was able to provide 210 TR and reach -40° F at the coils. (*Id.*, Exh. PPP, Ford Depo. at 89:25-90:13.)

However, Ford was not aware of the data that was obtained and provided to FPS from tests conducted by Colmac on September 20 and 21, 2017 that Peterson relied upon in

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 9

concluding that the Refrigeration System was meeting the contract specifications. That data and all of the other data gathered from May through September 2017 was never provided to Ford by FPS. (*Id.*, Exh. PPP, Ford Depo. at 230:24-234:11; Exhs. HHHH to MMMM, Depo. Exs. 224-233.)

Ford was never provided with the data gathered by Kemper during tests on May 31, 2017, June 1, 2017, June 21, 2017 and September 20-22, 2017, although he did review the report prepared by Kemper on September 26, 2017 summarizing the data gathered on September 22, 2017. (*Id.*, Exh. PPP, Ford Depo. at 224:11-227:14; Exhs. Exhs. DDDD to FFFF, Depo. Exs. 217-219; Exh. GGGG, Depo. Ex. 221.) Ford dismissed the Kemper data as not reliable based on his erroneous conclusion that the tests had not been performed with calibrated instrumentation. However, Ford acknowledged that if a GEA representative had calibrated the compressor, that it would not have been necessary for a third party to perform another calibration. (*Id.*, Exh. PPP, Ford Depo. at 140:21-141:8.). As discussed below, the record in this case now shows that the instrumentation used by Kemper and Colmac was properly calibrated and that the test data that Ford never considered is both reliable and accurate.

Ford was retained as an expert witness in this case on September 5, 2018. (*Id.*, Exh. PPP, Ford Depo. at 10:8-10.) Ford considers himself an expert in refrigeration systems, but not in the design of freezers. (*Id.*, Exh. PPP, Ford Depo. at 25:24-26:8.) Ford has never designed a freezer. (*Id.*)

Ford never considered how many hours per day the Freezer should operate in the intended duty. Ford described the "intended duty" of the Freezer as 8,000 pounds per hour of diced and shredded potato from an infeed temperature of 130° to an equilibrated temperature of 0°. (*Id.*, Exh. PPP, Ford Depo. at 202:12-25.) Ford did not have an understanding of what Dickinson was experiencing with respect to the operation of the Freezer that caused Dickinson's dissatisfaction, other than not freezing 8,000 pounds per hour and seeing a need for regular defrost. (*Id.*, Exh. PPP, Ford Depo. at 203:1-10.) Ford admitted in his deposition that he did not

have any idea how many hours per day the Freezer was to operate at 8,000 pounds per hour. (*Id.*, Exh. PPP, Ford Depo. at 36:8-18.)

As discussed below, accurate and reliable data was obtained from tests that were done by Colmac and Kemper with the involvement of FPS during the period from May through September 2017. The same tests that Ford vaguely referred to in his Declaration have already been performed with calibrated instruments and equipment to assure the reliability and accuracy of the data obtained from those tests. As explained by Taylor, there is no reason to believe the proper performance of additional tests would obtain any different results. (Taylor Decl. at ¶ 180.)

It is now clear in the record that Ford was never provided with and, therefore never considered, the accurate and reliable data that was gathered from May through September 2017 that FPS knew existed. FPS should not be allowed to withhold that reliable and accurate data from Ford, thereby causing Ford to claim that additional testing is necessary. There is no support for the conclusion that FPS was prejudiced because Ford was not able to perform more tests.

The lack of prejudice to FPS is further demonstrated by Ford's admission in his deposition that it is not necessary for him to conduct any of the identified tests to testify under oath to each of the four opinions in his expert reports. (Bolinger Decl., Exh. PPP, Ford Depo. at 47:21-48:4.) Ford explained that he was able to arrive at his first opinion that the Refrigeration System provided by Kemper to support the Freezer was not properly designed and engineered to provide the FPS duty requirement of 210 TR at -40° F. SST at the coils by making engineering calculations that did not require testing. (*Id.*, Exh. PPP, Ford Depo. at 80:17-85:2.)

Ford explained that his first opinion was focused on whether the GEA 800 GLX compressor had the capacity to provide 210 TR. Ford was able to make calculations using the compressor manufacturer's rating system to determine that the compressor by itself was not capable of providing 210 TR. (*Id.*, Exh. PPP, Ford Depo. at 165:7-166:6.) Ford calculated the 700 HP Compressor as having a capacity of 175.8 TR. (*Id.*, Exh. PPP, Ford Depo. at 169:12-15.) Dickinson does not dispute Ford's calculations or his conclusion, but does contend that Ford's

opinion has little relevance because any under capacity of the GEA 800 GLX compressor was addressed in 2016 when Dickinson reinstalled a second compressor.

Ford did not address in his expert report whether the addition of the second compressor, that was reinstalled at Dickinson's Sugar City factory at the end of 2016 and used in tandem with the GEA 800 GLX, would allow the Refrigeration System to meet specifications. (*Id.*, Exh. PPP, Ford Depo. at 80:17-85:2.) However, Ford did calculate the capacity of the second compressor and found that with the use of the slide valve adjustments on both compressors, the combined capacity is 175.8 TR plus 149.7 TR for a total of 325.5 TR. (*Id.*, Exh. PPP, Ford Depo. at 166:18-171:24.)

Ford's second opinion is that Dickinson's personnel did not operate the Freezer properly to avoid moisture-laden air and water from entering the Freezer. Ford has never identified a test that could be used to test his theory. Moreover, when FPS suggested Dickinson's operation of the Freezer was causing problems, tests were performed during which Dickinson personnel were prohibited from operating the Freezer in the manner identified by FPS and the results did not change. (*See Id.*, Exh. KK, Provard Depo. at 235:11-236:20.)

Ford's third opinion is that the original Refrigeration System had problems caused by using the wrong lubricating oil and not having properly sized suction risers. However, Ford admitted in his deposition that no testing was needed for the lubricating oil issue because the issue was resolved a few months after Nestle became involved. (*Id.*, Exh. PPP, Ford Depo. at 177:17-178:13, 254:2-25.)

Ford also acknowledged that he was able to calculate that the suction risers should have been four inches in diameter, rather than five inches in diameter. (*Id.*, Exh. PPP, Ford Depo. at 175:1-22.) However, this issue is not in dispute. (*Id.*, Exh. PPP, Ford Depo. at 176:19-177:16.) As Ford testified, Taylor and Ford are essentially in agreement about the effect of suction risers. (*Id.*, Exh. PPP, Ford Depo. at 175:1-22.)

Ford's fourth opinion is his response to an issue identified by Nestle that the Freezer should have included two more coils. Ford did not do any independent analysis of the design of

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 12

the Freezer other than addressing that issue. (*Id.*, Exh. PPP, Ford Depo. at 196:2-14; 197:12-15). However, no testing is needed to address this issue. Dickinson does not claim in this case that the Freezer should have had two more coils. (Taylor Decl. at ¶ 136.)

As discussed above, it is clear from the Order that the Court was influenced by the fact that Taylor conducted a test in November 2017, thereby gaining an unfair advantage. Ford did review the results of Taylor's test and correctly stated that Taylor was only reading data for 23 minutes on one day. (Bolinger Decl., Exh. PPP, Ford Depo. at 131:2-132:2.) Ford then testified: "So, I don't know that his tests were sufficiently conclusive to arrive at the conclusion that the freezer required more than 210 tons that it required over 325 tons of refrigeration." (*Id.*) Thus, it certainly appears that Ford will claim the Taylor test is not accurate or reliable. Moreover, any unfair advantage from that test can be addressed by precluding Taylor from testifying about that test.

During his deposition, Ford was questioned about paragraphs 20 to 27 of his Declaration, which the Court appeared to rely upon in concluding that FPS was prejudiced because Ford was not able to conduct the tests that he identified. His responses provide further support for the conclusion that additional tests are unnecessary and that FPS has not been prejudiced.

The Court quoted from Paragraphs 20-23 of Ford's Declaration at the top of page 12. However, in his deposition Ford clarified that the "significant meaningful discrepancies [that] exist within the various paper records" was merely that the drawings of Freezer and the Refrigeration System that was originally installed are different than the GEA Freezer and reconfigured Refrigeration System, which is the system Ford saw on October 16, 2018, shortly after being retained by FPS. (*Id.*, Exh. PPP, Ford Depo. at 95:14-98:20.). Thus, Ford was not suggesting that the detailed plans and drawings of both the Freezer and the Refrigeration System originally installed to support the Freezer no longer existed. (*See id.*)

In Paragraph 23, Ford stated that he would have engaged a third party certifier to calibrate the refrigeration infrastructure. As discussed above, Ford acknowledged in his deposition that the Colmac data was accurate and reliable and acknowledged that if a GEA

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 13

representative had calibrated the compressor, which the record now shows was done, that additional calibration would not have been necessary. There is nothing in this record supporting a conclusion that FPS has been prejudiced by a lack of calibration.

In Paragraphs 24 through 27, Ford makes conclusory statements about how he would have run tests on the Freezer interfacing with the Refrigeration System under controlled conditions without providing any explanation of how those tests would be conducted or how the contemplated tests would be different from the testing that occurred from May to September 2017. However, when Ford was examined in his deposition two things were apparent. First, the only tests that he could identify were already performed during May to September 2017, and second that Ford could not identify a test that still needed to be performed. For example, Ford testified "I perhaps would have been able to explain where the load [in excess of 210 TR] was coming from and why it was occurring." (*Id.*, Exh. PPP, Ford Depo. at 136:3-16.) However, when asked to identify the test that he would have performed to make that determination, Ford stated: "That's very specific. At this point, I can't tell you exactly what specific test I would have conducted had I had the opportunity to test the freezer at that time." (*Id.*, Exh. PPP, Ford Depo. at 137:6-11.)

In Paragraph 24 of his Declaration, Ford stated: "I would have run the FPS Freezer attached to the refrigeration infrastructure under controlled conditions to identify any and all deficiencies occurring between the refrigeration system and the FPS Freezer interfacing together." The controlled conditions that Ford was referring to was running the system at 8,000 pounds per hour with the product entering the Freezer at 130°. (*Id.*, Exh. PPP, Ford Depo. at 145:20-147:15.) However, the record in this case clearly shows that the tests in May to September 2017 were conducted in that manner.

Ford also admitted that he would not have conducted any of the testing personally. Instead, he said that the parties would have agreed to a written protocol and then have an independent third party conduct the test. (*Id.*, Exh. PPP, Ford Depo. at 149:1-150:8.) When asked about his statement in Paragraph 26 of his Declaration that he would have "tested the FPS

Freezer independently from the refrigeration infrastructure for inefficiencies," he simply responded that he would have run the freezer under controlled conditions measuring entering and leaving temperatures from the freezer. (*Id.*, Exh. PPP, Ford Depo. at 152:4-24.) All of the tests conducted from May to September 2017 involved such measurements. When asked what the name of the test he was suggesting, Ford was not able to provide one and then stated again that he would not have performed the test, he would have reached an agreement with Dickinson's expert and established a written protocol for an independent third party to conduct the test. (*Id.*, Exh. PPP, Ford Depo. at 153:1-20.)

Finally, when questioned about his statement in Paragraph 27 of his Declaration that he would have removed the Freezer to have it tested by a third-party testing facility and whether he could identify such a facility, he initially identified a facility that "may" exist in Ohio. (*Id.*, Exh. PPP, Ford Depo. at 153:22-157:18.) However, after a break, Ford admitted that he did not know whether such a test could be done at that facility. (*Id.*, Exh. PPP, Ford Depo. at 162:4-22.)

The fact that Ford signed a declaration in this case in which he stated a belief that he needed to conduct additional testing, when he had never been provided with the substantial, accurate and reliable test data gathered from May to September 2017, shows that the statements in his declaration are not credible. It is completely inappropriate for an expert witness to provide opinions without at least considering all of the relevant data and would certainly provide a basis for excluding an opinion at trial that the test data was insufficient to support the testimony of other expert witnesses in this case. *See In re LLS Am., LLC*, No. 09-06194-PCW11, 2013 WL 2896887, at *5 (Bankr. E.D. Wash. June 12, 2013) (holding an expert's opinion that "insufficient evidence" exists cannot be admitted when the expert has not reviewed all the available evidence); *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018) (excluding expert opinion where "the expert offer[ed] opinions without a full understanding or knowledge of the facts of the this case.")); *see also Rojas v. Marko Zaninovich, Inc.*, No. 1:09-CV-00705 AWI, 2011 WL 4375297, at *6 (E.D. Cal. Sept. 19, 2011) (granting a motion to strike portions of an expert's testimony and noting that "[w]hen the lawyers maintain control of the

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 15

information and parse out only what they choose, this presents a real risk of sandbagging; not by the expert, but by the attorneys[.]").

There are other reasons why this Court should conclude that Ford is not a credible witness. First, Ford testified that he has seen documents indicating the MT5-6 model freezer, which is the model sold to Dickinson, has been used numerous times to freeze potato products. (Bolinger Decl., Exh. PPP, Ford Depo. at 28:13-24.) When asked to provide those documents Ford stated that he had not identified them in his report. That is not surprising because there is no evidence that the MT5-6 model freezer was ever previously used to freeze potato products. The evidence is that the MT5-6 model sold by FPS was intended to freeze blueberries, an entirely different product. (*See id.* at Exh. OOO-1, Chang Depo. at 58:10-59:7 (Chang testifying that while the Freezer sold to Dickinson is larger, and the other MT5-6 blueberry freezers lacked sequential defrost systems, the general concept is similar).

Second, Ford also testified to having seen documents showing that Peterson visited Dickinson's factory in July 2017 and ran a test on one compressor. (*Id.*, Exh. PPP, Ford Depo. at 173:6-13.) That never occurred. As discussed below, Peterson's only visit to Sugar City was in September 2017 to observe the tests being performed by Colmac and Kemper, along with Kwok.

Third, Ford testified that it took ten months to fix the Refrigeration System. (*Id.*, Exh. PPP, Ford Depo. at 102:12-22.) However, as discussed below, the record in this case shows that after Nestle arrived in early April 2017 that the issues of concern with the Refrigeration System were identified and resolved by May of 2017.

Fourth, Ford stated in his expert report that, "based on three allegedly under-performing freezers in a row, a reasonable conclusion can be drawn that the alleged deficiencies of the FPS Freezer are in error or beyond conclusions ably supported by rational engineering analysis." (*Id.*, Exh. PPP, Ford Depo. at 207:7-23.) Ford testified he saw correspondence that there may have been three freezers that did not perform that preceded the Freezer. (*Id.*, Exh. PPP, Ford Depo. at 207:24-210:8.) However, there is no evidence that there were three under-performing freezers in a row. Again, Ford is shown to make statements without any support.

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 16

As discussed above, the only person with refrigeration system expertise that has suggested that additional testing is necessary is Ford. All of the other refrigeration experts in this case, including FPS's own refrigeration engineering consultant Peterson, concluded that the data obtained from testing conducted from May to September 2017 was accurate and reliable to show that the Refrigeration System was meeting contract specifications. Certainly, this Court should not find Ford's declaration statements that additional testing is necessary to be more credible than the testimony of all of the other experts without, at least, holding an evidentiary hearing.

3.    ***The Deficiencies Identified in the Refrigeration System Were Systematically Identified and Eliminated.***

In April 2017, Nestle USA sent two well-qualified refrigeration engineering experts, Bent Wiencke and Kris Hinds, to investigate the Refrigeration System and the Freezer to determine why the Freezer could not provide contractual minimum performance specifications. (*Id.* at Exh. S, Wiencke Depo. at 11:24-14:21, 17:15-24, 18:13-20:5, 21:13-22:18, 229:23-231:8; Exh. Y, Hinds Depo. at 12:1-13:2, 21:23-23:7, 15:16-19:5, 191:1-3.) Nestle just wanted to figure out the problem and solve it so that it could reestablish its potato product supply from Dickinson. (*See id.*) In that regard, Wiencke and Hinds did not care one way or the other if the Refrigeration System or the Freezer itself (or both) was the culprit. (*See id.*) Their only goal was to identify the problem and then solve it. (*See id.*) Wiencke and Hinds are *objective* qualified experts and there is no valid reason to suspect their investigation was biased.

In conducting their analysis, Wiencke and Hinds set out to evaluate *all* potential problems in the Refrigeration System (including by way of analyzing performance data), and based on that data, to rule them out as causal culprits by either concluding they were not in fact problems (i.e., that the data indicated the equipment was functioning correctly) or to make mechanical adjustments to fix them. For example, Wiencke and Hinds systematically analyzed and eliminated: 1) problems with oil in the Refrigeration System by replacing the oil; 2) problems with the "check valves" (by replacing them to a different brand); and 3) eliminating that the Refrigeration System suffered from a "false load". (*Id.* at Exh. S., Wiencke Depo. at 36:10-39:4,

59:1-60:8, 177:1-14; Exh. NNNN, Depo. Ex. 240; Exh. OOOO, Depo. Ex. 287; Exh. Y, Hinds

Depo. at 57:24-58:10, 114:14-116:13, 129:24-131:8, 160:18-162:9; Exh. PPPP, Depo. Ex. 252;

Exh. DD, Depo. Ex. 277, Exh. QQQQ, Depo. Ex. 336; Exh. KK, Provard Depo at 56:19-61:10,

126:23-130:17; Exh. LL, Depo. Ex. 431; Exh. QQ, Depo. Ex. 446; Exh. RR, Depo. Ex. 223.)

By process of elimination, by June 29, 2017, based on the results of the data from the

June 20-22, 2017 site visit (discussed further below), Wiencke had concluded that "all major

refrigeration system issues we identified have been resolved by the refrigeration contractor [i.e.,

Kemper]." (*Id.* at Exh. S, Wiencke Depo. at 70:13-76:21; Exh. T, Depo. Ex. 327.) Wiencke also

reported that the "freezer throughput is still well below design specification and the only major

remaining issue is the freezer itself." (*Id.*) Wiencke reached that conclusion because the data

indicated that there was an additional heat load (i.e., the Parasitic Heat Load) being generated

from inside the Freezer itself from a number of design defects, including FPS's hot gas defrost

system. (*Id.*)

Based on this extensive evidence, FPS and its expert Ford suffered little to no prejudice

in being able to rule out issues in the Refrigeration System that could affect the accuracy of the

system's performance data because an exhaustive effort to do so was already performed by well-

qualified refrigeration engineers. Indeed, at his deposition, Ford admitted that the oil issue was

investigated and resolved. (*Id.* at Exh. PPP, Ford Depo. at 177:17-178:13.)

### 4.     *The Test Data Obtained From May 2017 Through September 2017 is Accurate and Reliable.*

The record in this case, including the deposition testimony of all of the individuals who

participated in conducting the tests and reviewing the data obtained, clearly shows that the data

gathered from May to September 2017 was accurate and reliable. Indeed, contrary to Ford's

unsupported allegations to the contrary, no additional testing of the Freezer and the Refrigeration

System is necessary because any test that could be performed would be duplicative of the tests

that were already conducted by numerous qualified engineers and professionals. Those tests are

well-supported by actual performance data of *both* the Freezer (by measurements and data from

inside the Freezer and of the evaporator coils) *and* the Refrigeration System (by measurements from the compressors). Accordingly, this Court should follow *Med. Lab. Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 823 (9th Cir. 2002), and hold that because of this overwhelming amount of alternative evidence, FPS suffered no prejudice (or at least insufficient prejudice to issue a harsh sanction to Dickinson).

In *Med. Lab*, the Ninth Circuit affirmed the district court's decision denying spoliation sanctions where the party requesting sanctions, Medical Laboratory, did not explain why it failed to pursue alternative and secondary evidence sources that would have still allowed it to mount its case. *Id*. at 823-825. Specifically, the Court found that there were digital copies of the lost data available and multiple other experts had already inspected the data and offered opinions regarding the same—but Medical Lab simply failed to pursue or inspect this available evidence and instead insisted on a spoliation sanction. *Id*. at 823-24. Accordingly, the Ninth Circuit affirmed that no sanction was warranted. *Id*. at 825.

Here, just as in *Medical Laboratory*, FPS has failed to explain why the existing data is insufficient for it to be able to conduct a sufficient analysis. Indeed, when objectively reviewing the data, it becomes clear that the evidence is more than sufficient to analyze the Refrigeration System's performance capabilities. FPS and Colmac expressly agreed at the June 20-22, 2017 site visit that data should be collected on certain system performance metrics, including 1) the air temperature entering the coils; 2) the air temperature leaving the coils; 3) the face velocity of the air on the coils; 4) the suction pressure of the coils; 5) the suction temperature of the coils; 6) and the return bend temperatures from the top the bottom of the coils. (*Id*. at Exh. J, Nelson Depo. at 85:11-91:12; Exh. K, Depo. Ex. 380.) The Colmac engineer who performed that testing, Trever Pope, was well-qualified and trained on how to use that equipment, FPS personally assisted Pope in gathering that data, and *substantial* performance data from calibrated equipment exists from that test. (*Id*. at Exh. N, Pope Depo. at 13:25-17:14, 18:24-22:22, 26:6-29:6, 53:17-60:5, 61:2-65:10; Exh. Q, Pope Depo. Ex. 398; Exhs. R1 to R9; Exh. R22.) Indeed, FPS's Kwok had copies of all that performance data from the time it was gathered. (*Id*.)

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 19

Moreover, compressor performance data for nearly every day that the 800GLX Compressor operated in 2017 and for critical dates when the 500 HP Compressor was operating (such as June 20-22, 2017) was all produced by Kemper (and others). (*Id.* at Exh. KK, Provard Depo. at 72:15-74:21, 75:9-77:12, 85:7-13, 96:10-13, 104:14-108:10, 146:6-20, 158:12-165:23; Exh. NN, Depo. Ex. 219; Exh. XX, Depo. Ex. 449; Exh. YY, Depo. Ex. 450; Exh. ZZ, Depo. Ex. 451; Exh. DDD, Depo. Ex. 440.). All of the objective facts also indicate that the data from the compressors is accurate and reliable because the equipment was repeatedly calibrated. As to the 800GLX Compressor, Jan Clarke, one of GEA's Systems Diagnostic Engineers, personally inspected and calibrated it. (*Id.* at Exh. EE Clarke Depo. at 19:9-12; 22:3-5; 27:16-21; 35:17-36:4; 50:11-57:22; Exh. FF, Depo. Ex. 411.) Nestle's Kris Hinds also testified that the 800 GLX Compressor had been properly calibrated. (*Id.* at Exh. Y Hinds Depo. at 97:20-102:17, 128:4-132:17; Exh. BB, Depo. Ex. 309; Exh. CC, Depo. Ex. 276; Exh. DD, Depo. Ex. 277.) As to the 500 HP compressor, Kemper's Eric York testified in detail that Kemper calibrated that equipment on a routine basis. (*Id.* at Exh. SS, York Depo. at 19:22-22:18; 37:2-16.) Thus, the factual record indicates that the compressors were both calibrated and providing accurate and reliable data from May of 2017 through September of 2017.

FPS itself also gathered data on the compressors and at the Freezer. For example, around July 5-6, 2017, FPS's Jason Kwok conducted a site visit where he gathered and analyzed data sets from both the Refrigeration System (the data available on the compressor control panels and pressure gauges on the refrigeration system suction lines) and also the Freezer itself (the data from the Freezer's HMI control panel). (*Id.* at Exh. KK, Provard Depo. at 104:1-108:10; Exh. DDD, Depo. Ex. 440.) Indeed, for all of the data gathered directly off of the Freezer's HMI control panel, Kemper calibrated the RTDs inside the freezer coils themselves and found that they should have been reading *colder* (i.e., the Refrigeration System was performing *better* than the readings indicated). (*Id.* at Exh. SS, York Depo. at 31:9-35:10; Exh. TT, Depo. Ex. 443; Exh. UU, Depo. Ex. 445.)

A vast quantity of performance data of both the Freezer and the Refrigeration System also exists from the September 20-22, 2017 site visit, and FPS was intrinsically involved in deciding the data-gathering and testing procedures and protocols for that visit. (*Id.* at Exh. KK, Provard Depo. at 136:15-140:10, 141:12-143:9, 144:24-146:20.) Colmac collected performance data on the Freezer, including using pressure transducers and air sensor to collect data. (*Id.* at Exh. J, Nelson Depo. at 117:17-126:12; Exh. N, Pope Depo. at 61:2-65:10, 67:6-78:25; Exh. AAAA, Depo. Ex. 399; Exh. BBBB, Depo. Ex. 400., Exhs. R10 to R21.) Moreover, on September 22, 2017, Provard and Kwok remained on-site to run additional tests and collect additional performance data. (*Id.* at Exh. KK, Provard Depo. at 151:4-12.) Provard collected data on the incoming and outgoing product temperatures, the Freezer's HMI control panel, and data from both the 800GLX and 500 HP compressors. (*Id.* at Exh. KK, Provard Depo. at 151:13-165:7; Exh. WW, Depo. Ex. 448; Exh. XX, Depo. Ex. 449; Exh. YY, Depo. Ex. 450; Exh. ZZ, Depo. Ex. 451.) All of the data that Provard gathered is accurate and reliable. (Exh. KK, Provard Depo. at 165:20-23; 175:10-16.) Provard also testified that all of the equipment from that test had been calibrated. (Exh. KK, Provard Depo. at 171:15-175:9; Exh. AAA, Depo. Ex. 455.) Kwok also gathered data on September 21-22, 2017. (Exh. EEE, Peterson Depo. 145:14-147:22; Exh. GGG, Depo. Ex. 19; Exh. HHH, Depo. Ex. 20; Exh. III, Kwok Depo. at 231:1-5, 253:20-254:9.)

As discussed in detail in Taylor's Declaration, this data and evidence was collected by qualified professionals using accepted methods, from equipment that was calibrated within reasonable industry-accepted tolerances, such that the data derived from the equipment is sufficiently reliable and is of the type reasonably relied upon by refrigeration experts in the field to complete a reliable analysis and reach sound engineering opinions regarding the performance capabilities of the Refrigeration System. (Taylor Decl. at ¶¶ 42, 128, 132-133, 137, 138, 142, 168, 180.) The existing data is more than sufficient for any reasonable refrigeration engineer to complete a full and accurate determination of whether this Refrigeration System was performing adequately. (*Id.*)

5.      ***There Are Numerous Design Deficiencies that Have Been Identified by Taylor, Both a Refrigeration and Freezer Design Expert, Without the Necessity of Testing.***

Dickinson's primary liability theory is that FPS breached its contract to design and to build a Freezer for Dickinson that would freeze 8,000 lbs. per hour of potatoes for 20-22 hours per day with a specified minimum of 210 Tons of Refrigeration in cooling power from the Refrigeration System, because, in actuality, FPS designed the Freezer in such a defective way that it *never* had any chance of working properly with only 210 Tons of Refrigeration (and would have required **at least 290 Tons of Refrigeration** in cooling power) (*See* Taylor Decl. at ¶¶ 9-40.) Accordingly, Dickinson's primary theory of liability is a *design theory* that asserts that this Freezer would never have worked *regardless* of the Refrigeration System's performance.

Thus, the performance capabilities of the Refrigeration System itself are at best marginally – if at all – relevant to rebutting Dickinson's design defect theory because any qualified engineer could make a professional assessment of Dickinson's liability theory based solely on the design of the Freezer itself. Other federal courts have correctly held that spoliation claims do not apply (or are at least of a lesser concern) in cases involving allegedly defectively designed products. *See e.g., Green v. Ford Motor Co.*, No. 1:08-CV-0163-LJM-TAB, 2008 WL 5070489, at *3 (S.D. Ind. Nov. 25, 2008). Such courts correctly reason that in design defect cases, the party asserting spoliation has not suffered any prejudice because the design itself can be assessed by alternative means other than the subject product itself. *See id*. at *3-*4 (holding that loss of vehicle in question did not affect manufacturer's ability to defend design defect claim because the design of the vehicle still existed).

Suppose a company hires an engineer to design and build a working airplane. Suppose further that the engineer creates drawings and schematics for the new airplane, but in the design drawings, the engineer fails to include any wings for the plane. In that situation, a second qualified engineer could review the plane's design drawings and opine whether the design is inherently flawed or not without ever needing to review flight tests or data from the actual finished plane. Such performance tests or data *might* reveal additional information as to the

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 22

specific flaws of the design, but they would not inherently rebut the second engineer's opinion as to the adequacy of the design itself, as that engineer could opine on "paper alone" whether or not the plane could possibly fly. The same analogy holds true here.

On paper, the Freezer had no chance of working properly with only 210 Tons of Refrigeration in cooling power. (Taylor Decl. at ¶¶ 35-36.) Therefore, the issue of whether the Refrigeration System was capable of or indeed did provide a minimum of 210 Tons of Refrigeration sheds little light on whether FPS's design of this Freezer could ever meet the contractual performance specifications. (Taylor Decl. at ¶¶ 37-38.) For similar reasons, the current physical condition of the Freezer sheds little light – if any – on Dickinson's design theory. (*Id.*) There appears to be no dispute that the Freezer as-built matches exactly with FPS's design drawings and schematics. (*Id.*) Moreover, the parties all know from various design and production documents what the component parts of this Freezer were, and in all material ways, the Freezer's various component parts functioned mechanically correctly. Thus, this is not a case where the Freezer's physical condition bears much – if any – relevance. (*Id.*)

For whatever reason, FPS elected not to retain a Freezer design expert and has offered no expert opinions to rebut Dickinson's defective design theory. (*Id.*) But that does not mean such an analysis is inherently impossible or that FPS suffered prejudice in its ability to do so. (*Id.*) Indeed, even if the physical condition of this Freezer was somehow relevant to rebutting Dickinson's theory that FPS defectively designed it (it is not), FPS should be fully capable of either re-furbishing this Freezer to its original design specifications or simply building another one that matches the original design drawings and schematics. (Taylor Decl. at ¶ 37.)

For similar reasons, it does not matter that certain FPS representatives were allegedly prohibited from watching and photographing the disassembly and removal of the Freezer, because nothing could have been learned by either party from watching the disassembly of the Freezer that would in any way relate to Dickinson's design theory or allow FPS to collect Refrigeration System data. (Taylor Decl. at ¶¶ 38-40.)

6. ***The Refrigeration System is Substantially the Same as When the Freezer was Installed, and Ford Can Still Test the Two Compressors.***

The Court appears to have relied on Ford's Declaration in holding that "significantly meaningful discrepancies exist" in the Refrigeration System. (Dkt. 60 at pp. 11-12.) However, Ford's Declaration on this point is, at best, of questionable validity and is disputed by significant contrary evidence. Kemper's Eric York testified that, contrary to Ford's testimony, the Refrigeration System remains substantially the same as it was when the Freezer was installed, and that the only things that have changed other than pipe sizes and locations are the flooded vessel for the precool and the suction risers. (*Id.* at Exh. SS, York Depo. at 52:7-20.) Both the 800 GLX Compressor and also the 500 HP Compressor are both still installed, as is the evaporative condenser. (*Id.* at York Depo. at 52:21-53:9.) Kemper's Drew Provard also testified that accurate drawings and schematics exist to track the make-up of the Refrigeration System over all relevant time periods. (Exh. KK, Provard Depo. at 28:18-36:23; Exh. RRR, Depo. Ex. 412; Exh. SSS, Depo. Ex. 413; Exh. TTT, Depo. Ex. 414.)

Moreover, any minor changes to the Refrigeration System as it was comprised when the Freezer was installed compared to its current state do not prevent substantial testing of the system. For instance, one of Ford's contentions is that the compressors were unable to provide at least 210 Tons of Refrigeration in cooling capacity. (Taylor Decl. at ¶ 148.) There is no legitimate reason why Ford cannot test both compressors to assess that assertion *to this very day*. (*Id.*; *see also id.* at Exh. SS, York Depo. at 30:23-31:8.) Indeed, Ford was provided an opportunity to conduct such a test at his site inspection in October of 2018, but for whatever reason, he chose not to do so. (Taylor Decl. at ¶ 148.) Yet any reasonable refrigeration engineer could operate either the 800 GLX Compressor or the 500 HP Compressor (separately or in tandem) on the *current* Refrigeration System, collect data regarding that performance, and then utilize the manufacturer's software to determine its ultimate cooling capacity measured in Tons of Refrigeration. (*Id.*) Despite opportunities to conduct such tests, Ford and FPS have failed to do so, but that is not because Dickinson prohibited them from doing that test.

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 24

C.   **Additional Evidence and Further Clarification of the Reasons for Dickinson's Decision to Install the GEA Freezer and Reconfigure the Refrigeration System Show that Dickinson Did Not Willfully or Culpably Destroy Evidence.**

1.   ***The Court Was Unduly Influenced by Taylor's Inspection and Testing in November 2017.***

In entering the Order, the Court seems to have been unduly influenced by the fact that Taylor was able to conduct a test on November 18, 2017 prior to the disassembly of the Freezer and Ford, who was not retained until September 2018, was not able to conduct a similar test, which the Court found prejudicial to FPS. The Court also concluded that Dickinson must have concluded that additional testing was needed. As discussed above, Dickinson never concluded that additional testing was needed and never asked Taylor to conduct any tests. Taylor conducted those tests on his own accord before he became aware of the substantial testing conducted from May to September 2017, with the direct involvement of FPS. In any event, any prejudice from the Taylor test can be completely eliminated by not allowing Taylor to testify about that test and the data obtained from that test. The Taylor test is merely duplicative of the prior test data.

2.   ***The Court Was Unduly Influenced by Jason Kwok's Misleading Declaration, as the Record Now Shows that FPS Was Actually Investigating the Adequacy of the Refrigeration System Well Prior to the Lawsuit.***

In the Order, the Court found that FPS's purpose in attending the September 20-22, 2017 site visit was to "resolve performance issues" or to merely "troubleshoot" the system, as opposed to evaluating whether the Refrigeration System was capable of providing 210 Tons of Refrigeration and reaching -40° F. at the coils. In so holding, the Court appears to have relied on the Declaration of Jason Kwok wherein he asserts that FPS service technicians were not at Dickinson's facility "to inspect the refrigeration infrastructure" and that they were merely there to "troubleshoot" the Freezer. (Dkt. 41 at ¶¶ 7, 11.) At his deposition, taken after briefing on the Motion closed, Kwok provided a much different story.

On January 8, 2019, Kwok was deposed in this case and testified at length regarding his personal experience collecting performance data on this Freezer and Refrigeration System. Kwok testified that FPS's president Jeffrey Chang expressly instructed him to evaluate the

Refrigeration System, including collecting data and readings on air temperature and pressure sensor readings, in order to compare that to the data that had been collected by Colmac Coil in June of 2017. (Bolinger Decl. at Exh. III, Kwok Depo. at 189:21-191:25; Exh. KKK, Depo. Ex. 92.) FPS's Kwok and Chang also expressly asked Peterson to help analyze Wiencke's position that the Refrigeration System was adequate and that the problems were with the design of the Freezer. (*Id.* at Exh. III, Kwok Depo. at 213:10-25; Exh. LLL, Depo. Ex. 93.)

Kwok testified that the purpose of the September 20-22, 2017 site visit was to allow FPS's refrigeration engineering consultant Peterson to look at the actual installation of the Refrigeration System. (*Id.* at Exh. III, Kwok Depo. at 231:1-5; 231:25-232:5; 236:5-13.) Chang also testified that one of the goals of the site visit was to make a determination and reach agreement as to how many Tons of Refrigeration the Refrigeration System was supplying to the Freezer and whether the system could reach -40°F at the coils. (*Id.* at Exh. OOO-2, Chang Depo. at 168:14-19; 169:12-18; 191:16-192:5.) Indeed, Kwok *admitted* that at that meeting, Peterson told the entire group that the Refrigeration System was providing 240 Tons of Refrigeration in cooling capacity and was reaching -40° F at the coils. (*Id.* at Exh. III, Kwok Depo. at 245:11-247:17.) Based on the results of the site visit, Kwok also agreed with Peterson that the Refrigeration System was providing 240 Tons of Refrigeration in cooling capacity and was reaching -40° F at the coils. (*Id.* at Kwok Depo. at 247:20-23.) Kwok also recalled that Wiencke stated at that meeting that the Refrigeration System was hitting those performance metrics, and Kwok agreed with Wiencke's statement. (*Id.* at Kwok Depo. at 247:24-248:23.)

It is therefore disingenuous of Kwok to represent to this Court that he was only on-site to "troubleshoot" and not to "resolve performance issues," when he testified at length and repeatedly that the purpose of his multiple visits was to collect performance data and to evaluate whether the Refrigeration System was performing properly. Moreover, despite Kwok's admission that during the September 20-22, 2017 site visit, the Refrigeration System was capable of providing 210 TR and reaching -40° F. at the coils, the Court's jury instruction would

preclude the jury from hearing and considering that admission. That is a particularly harsh result to Dickinson in light of the existing evidence.

Moreover, the Court also appears to have relied on Kwok and Peterson in finding that FPS was not provided an adequate opportunity to investigate because of a pre-litigation and post-litigation distinction. No case law supports that distinction as being important. What is relevant is that FPS suffered no prejudice in terms of its ability to assert that the Refrigeration System was purportedly incapable of providing 210 Tons of Refrigeration and reaching -40°F at the coils, when considerable evidence exists that FPS was asserting *the exact same theory* from at least June of 2017 through September of 2017. FPS cannot reasonably be seen to have been deprived of the opportunity to investigate that theory now, when it *already* investigated the exact same theory with Kwok and Peterson (and gathered an abundance of existing data on that point) in the summer and early fall of 2017, *more than six months* before the Freezer was disassembled. The fact that a lawsuit was filed by Dickinson in the interim does not change that FPS had the ability and opportunity (and in fact did) evaluate the Refrigeration System in detail. *See Gaffield v. Wal-Mart Stores E., LP*, 616 F. Supp. 2d 329, 338 (N.D.N.Y. 2009) (finding that because plaintiff had ample time *before* the complaint was filed to inspect the evidence no sanctions were warranted.)

Indeed, given Peterson's admission that the Refrigeration System was performing correctly, it is not at all surprising that FPS chose not to retain or to disclose him as a retained testifying expert. Certainly, the rules of procedure do not require FPS to do so, but rather allow a party in that scenario to retain a different testifying expert. But that does not mean that FPS was inherently prejudiced because its first consulting refrigeration engineer provided them with an adverse opinion when FPS had a full opportunity to investigate Ford's current theory and, indeed, that theory is what FPS has asserted all along and continues to assert to this day.

### 3. *Dickinson's Decision to Disassemble and Remove the Freezer was Made Based on the Good-Faith Belief that FPS Had Obtained All the Performance Data from the Freezer that It Could Possibly Ever Need.*

In the Order, the Court appears to have concluded that Dickinson intentionally gave FPS the mistaken impression that from July 24, 2017 through September 2017, Dickinson was giving

FPS additional opportunities to fix the Freezer. (*See* Dkt. 69 at p. 20.) Dickinson respectfully submits that the objective evidence does not support that FPS was even under the subjective belief that it was being given additional cure opportunities in that time frame, but regardless, the evidence is clear that – notwithstanding what FPS may have subjectively believed – from July 13, 2017 through to the disassembly of the Freezer, Dickinson's representations to FPS were consistent: Dickinson had revoked acceptance of the Freezer, was making a claim against FPS for substantial damages, and would be replacing the defective Freezer with another freezer. Dickinson submits contemporaneously with this brief the Declaration of its in-house counsel Steve Schossberger. In that Declaration, Schossberger explains that by late June of 2017, he was personally aware that: 1) extensive performance data had been gathered by Colmac, Nestle, Kemper, and FPS, including the June 20-22, 2017 site visit data; 2) all purported problems with the Refrigeration System (such as the oil problems and the check valves) had been resolved or eliminated as potential causes of the Freezer's inability to perform; 3) that according to Nestle's engineers Wiencke and Hinds and Kemper's engineering supervisor Provard, the performance data definitively indicated that with two compressors running, the Refrigeration System was functioning adequately; and 4) the only remaining source of the Freezer's inability to perform properly was the design of the Freezer itself (which was creating significantly more than 210 Tons of Refrigeration in Parasitic Heat Load). (Schossberger Decl. at ¶ 5.) That is why Schossberger sent a letter on July 13, 2017 to FPS revoking Dickinson's acceptance of the Freezer and asserting a claim for damages. (*Id.* at ¶ 6.) In that letter, Schossberger also expressly noted that Dickinson would be ordering a new replacement freezer. (*Id.*)

While true that on July 24, 2017, Shewfelt sent Schossberger a letter claiming that there were issues that had not been fully investigated regarding the Freezer's failure to perform, those allegations were false, had *already* all been investigated thoroughly by Nestle, Kemper, Colmac *and FPS*, and Wiencke had specifically ruled all of them out as potential causation problems. (*Id.* at ¶¶ 7-8.) Schossberger therefore interpreted Shewfelt's letter as: 1) being uninformed about the facts of the investigation to date; and 2) as being consistent with FPS's prior stubborn refusals to

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 28

Wiencke's conclusion that the Refrigeration System was adequate and that the problem was the Freezer's faulty design. (*Id.*) Schossberger did not interpret Shewfelt's letter as a request for additional opportunities for FPS to cure the defects in the Freezer, and indeed, nothing in the letter says that. (*Id.*) Schossberger did not intend (and nothing in his communications indicates otherwise) that he was offering FPS additional opportunities to fix the Freezer. (*Id.* at ¶ 8.)

The Court appears to have misunderstood Dickinson's motivations in that regard by relying in part on a September 27, 2017 email from *Bent Wiencke* in finding that, "As late as September 27, 2017, *after* the September 21, 2017, site visit, Dickinson asked FPS to 'outline a plan [sic] what FPS intends to do . . . for all modification you are planning to perform' on the FPS Freezer, implying FPS should continue with its repair attempts, rather than prepare for litigation. Dkt. 44-41, at Exhibit 15-1." (Dkt. 69 at p. 21; *see also id.* at p. 7 ("On September 27, 2018 [*sic*], Dickinson asked FPS to outline a plan for what it intended to do to modify the FPS Freezer.") However, the email cited by the Court as support for this finding is from Bent Wiencke of Nestle, *not* Dickinson. (Schossberger Decl. at ¶¶ 15-17.) Wiencke is a Nestle employee, and therefore his statement cannot be imputed to Dickinson. (*Id.*)

Furthermore, the Court also appears to have misunderstood Dickinson's motives and the manner in which Dickinson purchased the replacement GEA freezer. First, Dickinson informed FPS on July 13, 2017 that it intended to purchase a replacement freezer. (*Id.* at ¶ 6.) Thus, while true that Dickinson did not inform FPS that it had ordered a replacement freezer *from GEA* in September of 2017 (not August as this Court found), FPS knew months before that Dickinson would be ordering a replacement freezer *from someone*. (*Id.* at ¶¶ 24-29.) And Dickinson never indicated, expressly or impliedly, to FPS that it had or would vary from that position. (*Id.*) Thus, it should not have come as any surprise whatsoever to FPS that Dickinson had ordered a replacement freezer in September of 2017, even if FPS was not aware of the GEA freezer purchase until sometime later. (*Id.*)

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 29

**4.     *The Court Was Unduly Influenced by Dickinson's Decision to Not Allow FPS to Observe the Disassembly of the Freezer.***

A review of the Court's decision strongly suggests that the Court was unduly influenced by Dickinson prohibiting FPS from observing the disassembly of the Freezer in January 2018. Dickinson's decision was not made with any intent to deprive FPS of access to evidence. (*Id.* at ¶¶ 33-36.) First, it is important to understand that FPS's request to monitor the disassembly was made at the eleventh-hour and through confusing communication channels. (*Id.* at ¶ 34.) On December 22, 2017, Dickinson's outside counsel, Dane Bolinger of Hawley Troxell, sent a letter to FPS's attorney John Shewfelt. (*Id.*) That letter does say that FPS could take the uninstalled Freezer and store it at FPS's expense, but nothing in that letter "invited" FPS to monitor the disassembly, and, critically, the letter also tells Shewfelt to "please coordinate with [Bolinger's] office so [Bolinger and Shewfelt] can make the necessary arrangements." (*Id.*) However, instead of coordinating with Bolinger, FPS instead waited until January 12, 2018, the very day before disassembly was scheduled, to reach out to Dickinson, and then only did so not by communicating through counsel (the manner that had been requested) but rather by merely emailing one of Dickinson's managers, Todd Campbell. (*Id.*) Thus, FPS bears some responsibility for communicating its request in a confusing and last-second manner.

Moreover, Dickinson did not believe that there was any basis for FPS to need to monitor the removal because it did not see (and does not see to this day) what information FPS could possibly glean from merely watching the removal of the Freezer. (*Id.* at ¶ 35.) In that regard, Dickinson was relying on the representations from Peterson that the Refrigeration System was sufficient, and it reasonably believed that FPS had conceded there was no longer any need for additional testing. (*Id.*) Moreover, FPS did not ask to *participate* in the removal of the Freezer, and indeed, given that it waited until the eleventh-hour to even reach out to Dickinson, there could have been no practical way that it could have done so, because Dickinson at that point had already spent several weeks planning the technical arrangements for the specialized contractors to complete that work. (*Id.*)

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 30

Additionally, Dickinson was aware of the very real safety concerns with allowing any personnel to be present for the disassembly work other than those that there were truly necessary and had already been previously approved and planned for. (*Id.* at ¶ 36.) Given that the date had been arranged for extensively in advance, Dickinson could not realistically cancel and re-schedule a mere half-day beforehand without extreme expense to Dickinson, and Dickinson was concerned that the contractors would not have sufficiently planned in their safety protocols for additional "observers." (*Id.*) Dickinson was also concerned with the liability concerns of FPS employees or representative being injured during the construction work. (*Id.*) Thus, Dickinson's decision to deny FPS its eleventh-hour request to monitor the disassembly of the Freezer was made in good faith and not with any intent to deprive FPS of access to relevant evidence.

5.     ***The Court Was Unduly Influenced by Dickinson's Decision to Retain Possession of the Freezer.***

It also appears that the Court was unduly influenced by Dickinson's decision to retain possession of the Freezer, given that it had previously suggested that FPS would be allowed to take possession of the Freezer. However, it is important to remember that Dickinson had already paid over $800,000.00 for the Freezer. (*Id.* at ¶ 37.) Dickinson was further aware that based on principles of the Uniform Commercial Code, a buyer who has rightfully revoked acceptance of non-conforming goods, but who has also already paid for those goods, retains a security interest in them. *See e.g.* IDAHO CODE ANN. § 28-2-711(3); (*Id.* at ¶ 37.) Dickinson was also already concerned that FPS could be "judgment proof" and might be financially incapable of paying a large settlement or judgment to Dickinson. (Schossberger Decl. at ¶ 37.) Thus, Dickinson became concerned that if FPS took possession of the Freezer, FPS might then sell the Freezer and, despite Dickinson's lien interest, retain the sale proceeds without ever paying them to Dickinson. (*Id.*) Accordingly, based on that concern, Dickinson decided that instead of returning the Freezer to FPS, Dickinson would instead (as it believes it was and is legally entitled to do) retain possession of the Freezer in order to enforce its security rights. (*Id.*) Indeed, it appears Dickinson's concerns were well justified, as in correspondence produced by FPS, on January 12,

2018, FPS's Jason Kwok stated that FPS wanted to take possession of the Freezer to sell it (not to preserve it or inspect it further for evidence). (*Id.* at ¶ 38; *See also* Schossberger Decl. Exh. K.) Critically, Kwok's email was sent *after* FPS had been notified that Dickinson's lawsuit had been filed, demonstrating FPS was concerned with *selling* the Freezer, *not* retaining it as evidence. (*See* Dkt. 69 at pp. 8-9 (finding that Dickinson's counsel notified FPS's counsel of the lawsuit and of its intent to remove the Freezer by letter dated December 22, 2017)). Accordingly, Dickinson kept possession of the Freezer in order to protect its security interest, and not out of any desire to harm FPS's ability to defend the case or access relevant evidence.

**D.      Although Dickinson Contends That No Sanctions for Spoliation Are Appropriate in the Case, There Are Less Harsh Alternative Sanctions Available.**

  **1.      *The Instruction is Overbroad in that it Awards FPS Relief That Goes Far Beyond Its Theory That It Could Not Evaluate the Refrigeration System.***

  The current sanction is a non-rebuttable presumption in the form of a jury instruction, instructing, in relevant part, that: "As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement." (Dkt. 69 at p. 39.) The current instruction is overly broad in that it awards FPS an instruction about the performance capabilities of the Freezer, when FPS's only complaint is that it was precluded from collecting data on the *Refrigeration System*. That is, FPS's only expert witness is Ford, who is a refrigeration expert, not a freezer design expert. FPS's defense is that the Refrigeration System was inadequate (a causation defense) – not that the Freezer was properly designed. However, without presenting any evidence regarding the adequacy of the design of the Freezer, the current instruction directs a finding that the *Freezer* "was capable of performing at the levels specified" in the contract. Such an instruction is overly broad, particularly in light of the fact that Ford has now testified that the Refrigeration System was capable of 210 TR (*see supra*), and the Freezer's production was substantially less than as represented to Dickinson by FPS's Justin Lai of 8,000 pounds of product per hour for 20 to 22 hours per day, seven days a week." (Bolinger Decl. at Exh. G, Depo. Ex. 105 at DFF1741.) Any

instruction based on Ford's purported inability to inspect the Refrigeration System, should be limited to the Refrigeration System.

> **2.** *A "Non-Rebuttable Presumption" is Particularly Harsh and is Not Supported by the Case Law.*

The type of instruction that was given—a non-rebuttable presumption—is the harshest type of adverse jury instruction available. The fact that the presumption is "non-rebuttable" means that rather than a true presumption (which may be overcome),[3] it is a direct statement of what the jury *must* find.[4] Because the instruction cannot be rebutted, such an instruction is the equivalent of directing the jury "that certain facts are deemed admitted and must be accepted as true." *See Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal. 2012) ("*Apple I*") (noting that such adverse instructions are the harshest and appropriate only in cases of bad faith); *accord Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 470 (S.D.N.Y. 2010). That is too harsh a result on this record.

Moreover, a close reading of *Apple I* shows that it does not support a "non-rebuttable presumption," but rather it allows for a mandatory presumption, and despite the somewhat confusing terminology, a mandatory presumption is *rebuttable*. "When a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption." (Dkt. 69 at 39 (quoting *Apple I* (*quoting Pension Comm.*, 685 F. Supp. 2d at 470))). But in the *Pension Comm* case, the Court correctly held that "Even a mandatory *presumption,* however, is considered to be rebuttable." *Pension Comm.*, 685 F. Supp. 2d at 470 (italics in original).

Moreover, *Apple I* was overturned because the adverse instruction was too harsh. In *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 888 F. Supp. 2d 976, 995 (N.D. Cal. 2012) ("*Apple II*"),

---

[3] "A presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption." PRESUMPTION, BLACK'S LAW DICTIONARY (11th ed. 2019).

[4] "'Conclusive presumptions' or 'irrebuttable presumptions' are usually mere fictions, to disguise a rule of substantive law . . . and when they are not fictions, they are usually repudiated by modern courts." CONCLUSIVE PRESUMPTION, BLACK'S LAW DICTIONARY (11th ed. 2019) (quoting John H. Wigmore, *A Student's Textbook of the Law of Evidence* 454 (1935)); *see also Jackson v. Jackson*, 67 Cal. 2d 245, 247, 430 P.2d 289, 290 (1967) ("[T]he so-called conclusive [or irrebuttable] presumption is really not a presumption but rather a rule of substantive law.").

DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 33

the district court overturned the magistrate's instruction in *Apple I* because the moving party failed to make a "showing of prejudice to warrant a strong adverse inference instruction that permits the jury to find [the allegedly spoliating party's] spoliation 'determinative' of all issues in the case." *Id.* at 995. The basis for this finding was due to the fact that the moving party had access to other evidence and "'should have been able to glean' much material evidence 'from the documents actually produced, the extensive deposition testimony, and the written discovery between the parties.'" *Apple II*, 888 F. Supp. 2d at 994 (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010). The new instruction crafted in *Apple II* was significantly less restrictive. *See Apple II*, 888 F. Supp. 2d at 995; *see also Beck v. Test Masters Educ. Servs., Inc.*, No. CV 04-1391 (JDB), 2012 WL 10817176, at *7 (D.D.C. Sept. 25, 2012) and *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 380 (D.D.C. 2013) (modifying mandatory non-rebuttable presumption as too harsh in the absence of bad faith and holding that federal courts uniformly favor a permissive rather than mandatory instruction).

Dickinson respectfully submits that – at minimum – the same should happen here. That is, given the lack of bad faith on Dickinson's part, the fact that FPS has never argued or presented any evidence regarding the design of the Freezer, and the amount and quality of evidence available to FPS, even if the Court finds that an adverse instruction is warranted: (1) any such instruction should be rebuttable and permissive and; (2) if there is any question regarding the sufficiency or reliability of the evidence available to FPS, the Court should wait to issue any such instruction and consider whether an evidentiary hearing is merited.[5]

**E.     This Court Should Allow Oral Argument and Should Consider Whether an Evidentiary Hearing or a Jury Instruction Conference Are Necessary.**

As noted above, Dickinson respectfully requests that this Court conduct oral argument on this Motion. Moreover, as discussed above and on the prior motion, there are serious questions of

---

[5] An example of a less harsh instruction might be similar to the one given in *Apple II*. *See Apple II*, 888 F. Supp. 2d at 995 ("[The offending party] has failed to preserve evidence for [non-offending party's] use in this litigation after its duty to preserve arose. Whether this fact is important to you in reaching a verdict in this case is for you to decide.").

fact involved on these spoliation issues, and the Court may be required to weigh the credibility and admissibility of expert opinions from FPS, Dickinson, and third-parties. As such, the Court may wish to consider conducting an evidentiary hearing on this matter, as courts often correctly conduct evidentiary hearings to determine the merits of a spoliation claim. *See e.g. Diabetes Centers of Am., Inc. v. Healthpia Am., Inc.*, CIV. H-06-3457, 2008 WL 336382, at *1 (S.D. Tex. Feb. 5, 2008). Moreover, as the Court sets forth in its "Trial Procedures" on the Court's website, the Court often works with the parties to "try to conduct at least 2 or 3 informal jury instruction conferences off the record to try and resolve most differences by agreement." Dickinson respectfully requests that if the Court is inclined to revisit the language of its adverse instruction, a hearing or informal jury instruction conference would be appropriate.

## V.   <u>CONCLUSION</u>

For the reasons stated above, this Court should reconsider its Order and either vacate any sanctions against Dickinson or modify that decision appropriately.

DATED THIS 6th day of September, 2019.

HAWLEY TROXELL ENNIS & HAWLEY LLP


By <u>/s/ John F. Kurtz, Jr.</u>
    John F. Kurtz, Jr.
    Attorneys for Plaintiff/Counter-Defendant

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th day of September, 2019, I electronically filed the foregoing DICKINSON'S MEMORANDUM ISO MOTION FOR RECONSIDERATION with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Elijah M. Watkins                 Megan A. Olmstead
Elijah.watkins@stoel.com         megan.olmstead@stoel.com


<u>/s/ John F. Kurtz, Jr.</u>
John F. Kurtz, Jr.
Dane Bolinger


DICKINSON'S MEMO. IN SUPP. OF MOT. FOR RECONSIDERATION - 35