IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DICKINSON FROZEN FOODS, INC., )<br>)<br>Plaintiff, )<br>)<br>)<br>vs. )<br>)<br>FPS FOOD PROCESS SOLUTIONS )<br>CORPORATION, )<br>)<br>Defendant. )<br>) | Case No: 1:17-cv-00519-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court is a Third Motion for Protective Order by Defendant FPS Food Process Solutions Corporation (Dkt. 73); as well as a Motion for Leave to Take Additional Depositions (Dkt. 74) and Motion for Reconsideration (Dkt. 81) by Plaintiff Dickinson Frozen Foods, Inc. Having reviewed the record, the Court finds that the facts and legal argument are adequately presented in the briefs. Accordingly, in the interest of avoiding further delay, and because the Court finds the decisional process would not be significantly aided by oral argument, the Court decides the Motions on the record without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons set forth below, the Court GRANTS in PART and DENIES in PART FPS's Third Motion for Protective Order (Dkt. 73); DENIES Dickinson's Motion for Leave to Take Additional Depositions (Dkt. 74) as MOOT; and DENIES Dickinson's Motion for Reconsideration.

MEMORANDUM DECISION AND ORDER - 1

## II. BACKGROUND

### A. Factual Background

The factual background of this case is set forth in this Court's Order (Dkt. 69) ("Sanctions Order") granting a Motion for Sanctions for Spoliation of Evidence filed by Defendant FPS Food Process Solutions Corporation ("FPS"). Such facts are incorporated by reference. In brief, Plaintiff Dickinson Frozen Foods, Inc. ("Dickinson") owns and operates a vegetable processing facility located in Sugar City, Idaho. FPS designs, manufactures, and sells large industrial tunnel freezers internationally to the food processing industry. This case arises out of the purchase and sale of an industrial freezer built by FPS for Dickinson.

On March 11, 2016, Dickinson and FPS entered a written contract (the "Agreement") for Dickinson's purchase of an FPS freezer. Dickinson agreed to pay FPS $926,000 in exchange for an FPS model MT5-6 IQF Tunnel Freezer (the "FPS Freezer"). Under the Agreement, FPS promised to build Dickinson a freezer that would freeze 8,000 pounds of diced and shredded potatoes an hour to 0°F. Dkt. 1-1, Ex. A, at 2. The Agreement also required Dickinson to provide a refrigeration infrastructure sufficient to support the FPS Freezer. Specifically, FPS represented the FPS Freezer would fully perform with a refrigeration infrastructure that provided 210 tons of refrigerant capable of cooling the refrigeration coils of the FPS Freezer to -40°F. *Id*. at 7.[1]

---

[1] Unlike a home freezer, industrial tunnel freezers do not have an independent ability to cool or freeze products. Instead, the freezers are supported by a refrigeration infrastructure fueled by a cooling liquid. In the food processing industry, customers who purchase an industrial tunnel freezer are responsible for designing and installing a sufficiently robust refrigeration infrastructure to support an industrial tunnel freezer.

MEMORANDUM DECISION AND ORDER - 2

On July 23, 2016, FPS delivered the FPS Freezer to Dickinson's Sugar City facility. Dickinson alleges the FPS Freezer failed to meet contract specifications as soon as it started operating. For instance, instead of producing 8,000 pounds of frozen potatoes an hour, the FPS Freezer produced a maximum of 4,000 pounds per hour.[2] Dickinson immediately notified FPS of the performance issues. Over the next year, FPS sent numerous field service technicians to Dickinson's Sugar City facility to attempt to resolve the issues.

During the course of these visits, the parties disagreed over whether the FPS Freezer was incapable of meeting contract specifications, or whether Dickinson's refrigeration system ("Refrigeration System") was instead inadequate. FPS contends its technicians repeatedly alerted Dickinson that the Refrigeration System appeared incapable of meeting the Agreement's specifications, and that Dickinson's employees were harming the FPS Freezer's efficiency by spraying hot water on the unit to clean it, by constantly opening the door to look inside, and by using the wrong oil to run the FPS Freezer. FPS claims Dickinson largely dismissed these warnings. Dickinson, on the other hand, maintains it made each of FPS's suggested modifications to its Refrigeration System, but that the FPS Freezer still failed to meet performance specifications.

After more than a year of attempted collaboration to resolve such issues proved unsuccessful, Dickinson ultimately filed the instant suit against FPS on December 21, 2017. Dickinson's Complaint alleges claims for breach of contract and, in the alternative, breach of express warranty, violation of the implied covenant of good faith and fair dealing,

---

[2] Dickinson's Complaint details a number of the FPS Freezer's other alleged defective performance issues. Dkt. 1, at 4.

and promissory estoppel. Dkt. 1. On January 13, 2018—a little over three weeks after filing suit—Dickinson dismantled the FPS Freezer and Refrigeration System, cut the FPS Freezer in half, and deposited the FPS Freezer, its component parts, and its control panel under a tarp in Dickinson's dirt parking lot.

Dickinson barred FPS from accessing the Sugar City Facility between January 12, 2018—the day before the disassembly—and October 16, 2018, when a site inspection occurred pursuant to FPS's discovery requests. During the October 16, 2018 site visit, FPS's technical expert determined there were multiple tests he could not run due to the disassembly and subsequent storage of the FPS Freezer. FPS's expert also learned that the Refrigeration System had been significantly altered in order to support a new GEA freezer Dickinson had purchased to replace the FPS Freezer.

On October 30, 2018, FPS filed a Motion for Sanctions, seeking dismissal as a sanction for Dickinson's destruction of the key evidence in this suit.

## B. Procedural Background

### 1. Pre-Sanctions Order Discovery

On March 2, 2018, the parties held their discovery conference pursuant to Federal Rule of Civil Procedure 26(f). On March 21, 2018, pursuant to the parties' Stipulated Discovery Plan, the Court entered its Case Management Order (Dkt. 18) setting a fact discovery deadline of January 10, 2019.[3] Dickinson served its First Set of Interrogatories and Requests for Production of Documents upon FPS on March 21, 2018. Dkt. 22-1, at 2.

---

[3] The Court extended this deadline several times pursuant to stipulation by the parties. Dkts. 28, 37, 48, 68. The discovery deadline has since been stayed pending resolution of Dickinson's Motion for Reconsideration. Dkt. 73-10, Ex. H, at 2.

The parties mutually agreed to allow brief extensions to each other to respond to the other side's discovery requests. However, by May 29, 2018, FPS had produced approximately 5,800 documents to Dickinson. *Id*. at 4; Dkt. 29, at 2.

FPS filed its Motion for Sanctions on October 30, 2018. Dkt. 39. The Motion for Sanctions became ripe on December 21, 2018. Although FPS retained its expert, Eduardo Ford, in September of 2018, and produced Ford's expert report to Dickinson on November 16, 2018, Dickinson did not ask to depose FPS's expert at any time before the Sanctions Order issued. Dkt. 44-26, at ¶¶ 31-32; Dkt. 44-46, Ex. 20; Dkt. 86-2, Ex. PPP, at 247:1-5.

After FPS filed its Motion for Sanctions, Dickinson took the depositions of six fact witnesses—James Peterson, Alex Chen, Danny Hu, Justin Lai, Jeffrey Chang, and Jason Kwok—between November 12, 2018, and January 10, 2019.[4] Dkt. 73-2, at ¶ 3. The parties appear to have engaged in discovery throughout the five-month period the Motion for Sanctions was pending, and at times sought the Court's intervention through formal discovery motions. Dkt. 52; Dkt. 57. Neither FPS nor Dickinson sought to supplement the record with discovery obtained during pre-Sanctions Order discovery.

///

///

///

///

---

[4] James Peterson is an independent consultant for Cold Solutions, LLC. FPS hired Peterson as a refrigeration consultant in November of 2016 to provide consulting on numerous FPS projects. Alex Chen, Danny Hu, Justin Lai, Jeffrey Chang, and Jason Kwok are employees or executives of FPS.

2. *Sanctions Order*

On May 21, 2019, the Court granted FPS's Motion for Sanctions under its inherent discretionary power[5] to levy sanctions in response to the destruction or spoliation[6] of relevant evidence. Dkt. 69, at 13. The Court did so after finding FPS had met its burden of proving sanctions were appropriate because: (1) Dickinson destroyed relevant evidence; (2) it had a duty to preserve; (3) with a sufficiently culpable state of mind. Dkt. 69, at 14-25. Although, as addressed below, Dickinson contests aspects of the aforementioned determination in its Motion for Reconsideration, its primary challenge is to the specific sanction the Court awarded.

In considering which sanction, if any, was appropriate, the Court first found Dickinson's destruction of evidence was willful because Dickinson knew the FPS Freezer was relevant to the litigation before it was destroyed.[7] Dkt. 69, at 26. The Court next considered the five nonexclusive factors articulated by the Ninth Circuit in *Anheuser-Busch, Inc. v. Nat. Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995), to determine

---

[5] The Court relied on its inherent power, rather than Federal Rule of Civil Procedure 37, because Dickinson's conduct was not in violation of any discovery order governed by Rule 37. Dkt. 69, at 12-13.

[6] Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence[,] in pending or reasonably foreseeable litigation." *Reinsdorf v. Skechers U.S.A.*, 296 F.R.D. 604, 625 (C.D. Cal. 2013) (bracket in original) (citations omitted). The Court determined Dickinson at least significantly altered, if not totally destroyed, the FPS Freezer and Refrigeration System. Dkt. 69, at 14-16.

[7] The FPS Freezer and Refrigeration System were not only relevant to this case but were integral to Dickinson's theory of liability and to FPS's defense. Dickinson also illustrated that it was aware of this relevance when, one day after it filed suit, Dickenson warned FPS that if FPS should obtain possession of the FPS Freezer, FPS would "remain obligated to preserve it as evidence during the pendency of Dickinson's dispute with FPS," and cautioned, "[f]ailure to adequately preserve the Freezer Machine, or any other documents or evidence relevant to the parties' dispute, may constitute spoliation of evidence or subject FPS to sanctions." Dkt. 39-11, Ex. G, at 3.

whether case dispositive sanctions were just.[8]

After finding the first two *Anheuser-Busch* factors supported dismissal, and the fourth weighed against dismissal, the Court noted factors three and five—the prejudice suffered by FPS and the availability of less drastic sanctions—were dispositive. Dkt. 69, at 27 (citing *Valley Engineers v. Electric Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998)).

While the Court held FPS had been significantly prejudiced by Dickinson's conduct, it ultimately determined a less harsh sanction than full dismissal was appropriate because, although Dickinson had acted willfully in destroying evidence it had a duty to preserve, it did not act in bad faith. Dkt. 69, at 27-39. However, the Court also held a non-rebuttable adverse inference jury instruction was the least severe sanction available that would adequately mitigate the prejudice FPS had suffered as a result of Dickinson's spoliation. *Id*. at 27-30, 38-39. As such, the Court determined it would instruct the jury:

> Dickinson has failed to preserve relevant evidence for FPS's use in this litigation. This is known as the "spoliation of evidence." Specifically, Dickinson destroyed the FPS Freezer and Refrigeration System after its duty to preserve this evidence arose. As a result of this spoliation, you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement.

*Id*. at 40.

In its Motion for Reconsideration, Dickinson argues the aforementioned instruction is tantamount to a dismissal of its case.

---

[8] Before imposing the harsh sanction of dismissal as a sanction for discovery abuse, the Ninth Circuit in *Anheuser-Busch* instructed that a district Court must weigh: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions. *Id*. at 348.

### 3. *Post-Sanctions Order Discovery*

Approximately two weeks after the Court entered its Sanctions Order, counsel for Dickinson contacted the Court to discuss certain scheduling and procedural issues. Dkt. 73-10, Ex. H, at 8. The Court's law clerk held an informal conference call with counsel for Dickinson and counsel for FPS on June 10, 2019. During this call, Dickinson's counsel advised that they were going to seek reconsideration of the Sanctions Order, at least in part, because they believed it may be possible to reconstruct the FPS Freezer and Refrigeration System. Dickinson's counsel stated they had spoken to their expert and an outside vendor, who confirmed reassembly was possible. In support of their theory of reconsideration, Dickinson's counsel noted they would like to depose Ford (FPS's expert), and witnesses from Colmac Coil, Kemper, Nestle, and GEA.[9] Dickinson's counsel requested that the Court allow them until August 30, 2019, to take such depositions and file their Motion for Reconsideration.[10]

During the call, the Court's law clerk questioned whether the Motion for Reconsideration would be brought under Federal Rule of Civil Procedure 59(e) or 60(b)(2). Counsel for Dickinson responded that reconsideration of interlocutory orders is governed by Rule 54(b) and the law of the case doctrine, while FPS argued Rule 59(e) should apply.

---

[9] Colmac Coil is an industrial and commercial coil manufacturer. While the FPS Freezer and Refrigeration System were still intact, Colmac Coil pulled data during "'performance tests' of the FPS Freezer." Dkt. 44-13, at ¶ 12. Kemper Northwest, Inc. ("Kemper") is the company Dickinson used to build the Refrigeration System. Nestle USA ("Nestle") is one of Dickinson's largest customers and was involved with performing tests on the FPS Freezer and Refrigeration System. Finally, Dickinson purchased a new tunnel freezer from GEA Food Solutions North America ("GEA") in September, 2017.

[10] Pursuant to a stipulation between the parties, the due date for Dickinson's Motion for Reconsideration was eventually extended to September 6, 2019.

The Court's law clerk requested that the parties submit an email regarding the appropriate standard of review the Court should apply to Dickinson's proposed Motion for Reconsideration. Both parties submitted emails outlining their respective positions. *Id*. at 2-3, 4-7.

In its response to Dickinson's email submission, FPS noted that "[p]articipating in the five depositions Dickinson has requested to take in order to support its forthcoming motion to reconsider" would make it difficult for FPS to comply with the discovery deadline of July 31, 2019. *Id*. at 2. Accordingly, FPS requested "that, as part of its forthcoming briefing schedule, the Court stay all other pending deadlines (including discovery and dispositive motions) until after the Court ruled on Dickinson's motion for reconsideration." *Id*.

The Court's law clerk subsequently emailed counsel and notified them that Dickinson's Motion for Reconsideration would be due on or before August 30, 2019, with the standard briefing schedule for FPS's response and Dickinson's reply. *Id*. The email also advised counsel that all case deadlines, including those for discovery and dispositive motions, would be stayed until the Court issued a decision on Dickinson's Motion for Reconsideration. *Id*.

### 4. *Discovery Motions*

Dickinson subsequently took Ford's deposition. On July 29, 2019, Dickinson noticed the deposition of Colmac Coil, pursuant to Federal Rule of Civil Procedure 30(b)(6), to occur on August 12, 2019, in Spokane, Washington. Dickinson also provided amended notices for depositions of two Nestle employees, Bent Wiencke and Kris Hinds,

to occur on August 7 and 8, 2019, in Salt Lake City, Utah. On August 6, 2019, Dickinson vacated the previously scheduled Rule 30(b)(6) deposition of Colmac Coil and noticed three fact witness depositions of Colmac Coil employees—Bruce Nelson, Trevor Pope, and Joe Fazzari—to occur on August 12, 2019. FPS notified Dickinson it objected to this change because it was beyond the ten depositions allotted to each party under Federal Rule of Civil Procedure 30(a)(2), was without leave of the Court or stipulation by the parties, and was without the proper fourteen-days' notice. FPS argued that Dickinson was attempting to take the depositions of fourteen witnesses—all without FPS's agreement and without having requested the required leave of the Court.[11]

On August 9, 2019, when the Court's law clerk was unavailable for an immediate discovery conference, FPS filed a Third Motion for a Protective Order to limit Dickinson to ten total depositions and to bar depositions scheduled without sufficient notice (Dkt. 73), and Dickinson responded with a Motion for Leave to Take Additional Depositions beyond the presumptive 10-deposition limit of Rule 30(a)(2) (Dkt. 74) (collectively "Discovery Motions"). The depositions of Nelson, Pope, and Fazzari occurred on August 12, 2019, before the Court had the opportunity to address the Discovery Motions.

5. *Motion for Reconsideration*

On September 6, 2019, Dickinson filed its Motion for Reconsideration. Dkt. 81. The Motion for Reconsideration included a 78-page declaration of Dickinson's expert witness,

---

[11] The fourteen-deposition total included the six depositions Dickinson took before the Sanctions Order, *supra* note 4, as well as Ford, Wiencke, Hinds, Nelson, Pope, Fazzari, Kemper, and GEA. Dickinson maintains that Wiencke and Hinds should only count as one deposition because they were 30(b)(6) witnesses for Nestle, and that Nelson, Pope, and Fazzari should also only count as one deposition because they were Colmac Coil's 30(b)(6) witnesses.

Charles Taylor, a 20-page declaration of Dickinson's General Counsel and Vice President, Steven Schossberger, and more than 7,000 pages of evidence.[12] Among other things, Dickinson submitted over 2,000 pages of deposition testimony; thousands of pages of testing data obtained through discovery from third parties; and extensive additional evidence from Taylor. In light of such evidence, Dickinson argued reconsideration was appropriate because the "record in this case now includes undisputed facts strongly supporting the conclusion that FPS is not prejudiced by its stated need to conduct additional testing or for any other reason." Dkt. 81-1, at 8.

FPS thereafter notified Dickinson that it would like the Court's guidance on responding to the Motion for Reconsideration because Dickinson's brief and significant evidentiary submission seemed to be asking the Court to make a ruling on the merits of which side should prevail, rather than seeking reconsideration of the Sanctions Order. After unsuccessfully attempting to resolve the issue via email, counsel for FPS requested a telephone conference with the Court.

On September 25, 2019, counsel for the parties participated in the aforementioned telephonic conference. During the call, the Court questioned Dickinson's reliance on an "expanded factual record" as an appropriate basis for reconsideration under either the law of the case doctrine or Rule 59(e). The Court also expressed concern over whether the substantial evidence Dickinson submitted with its Motion for Reconsideration—but did not submit in response to FPS's prior Motion for Sanctions—should be assessed on

---

[12] Dickinson's evidentiary submission is so extensive it requires Exhibits marked A through Z, AA-ZZ, AAA-ZZZ, and AAAA-QQQQ, in addition to R01-R22, Z01 and Z02, and over one hundred pages of declarations.

reconsideration of the Sanctions Order. The Court ultimately ordered the parties to brief the appropriate standard with respect to the evidence the Court could consider on Dickinson's Motion for Reconsideration. Dkt. 88.

6. *Briefing Regarding the Appropriate Standard of Review*

The parties thereafter submitted briefing on the appropriate standard of review and the evidence to be considered on review of Dickinson's Motion. Dickinson's memorandum addressed both the general standards of review applicable to a motion for reconsideration of an interlocutory order, and also generally explained how those standards should be applied on reconsideration of the Sanctions Motion. Dkt. 89.

## III.   ANALYSIS

### A.  FPS's Third Motion for a Protective Order (Dkt. 73)

FPS relies upon Federal Rule of Civil Procedure 30(a)(2)(A) as grounds for seeking a protective order from further depositions by Dickinson, and Federal Rule of Civil Procedure 32(a)(5)(A) as grounds for excluding the testimony of Nelson, Pope, and Fazzari. The Court addresses the latter issue first and will discuss the appropriate standard under Federal Rule of Civil Procedure 30(a)(2)(A) with respect to its analysis of Dickinson's Motion to Take Additional Depositions.

1. *Legal Standard*

Federal Rule of Civil Procedure 32(a)(5)(A) states that "[a] deposition must not be used against a party who, having received less than 14 days' notice of the deposition, promptly moves for a protective order under Rule 26(c)(1)(B) requesting that it not be

taken or be taken at a different time or place—and this motion was still pending when the deposition was taken." Fed. R. Civ. P. 32(a)(5)(A).

Rule 32(a)(5)(A) is the only provision of the Federal Rules that affirmatively requires exclusion of a deposition taken on short notice. *King v. O'Reilly Automotive Stores, Inc*., 2013 WL 4511476, at *2 (W.D. Wash. 2013). Ordinarily, a party does not obtain protection merely by filing a motion for a protective order under Rule 26(c). Instead, any protection is dependent on the court's ruling. However, "it appears that Rule 32(a)(5)(A) provides protection without regard to whether it is granted." 8A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2147.1 (3d ed. 2020 update) (citing Fed. R. of Civ. P. 32(a) Advisory Committee Notes to 1993 Amendment).

### 2. *Analysis*

On July 29, 2019, Dickinson noticed the Rule 30(b)(6) deposition of Colmac Coil, to take place on August 12, 2019, in Spokane, Washington. Dkt. 73-2, ¶ 18. On August 6, 2019, Dickinson notified FPS that it was vacating the Rule 30(b)(6) deposition and would instead take the depositions of Nelson, Fazzari, and Pope—in their individual capacity as officers or employees of Colmac Coil—on August 12, 2019. *Id*. at ¶ 25. At the time, counsel for FPS was in Salt Lake City, Utah, for the August 7, 2019 deposition of Nestle employee Bent Wiencke, as well as the August 8, 2019 deposition of Nestle employee Kris Hinds. Dkt. 73-14, Ex. L; Dkt. 73-15, Ex. M.

FPS filed its Third Motion for a Protective Order on August 9, 2019. Dkt. 73. In addition to seeking to limit Dickinson to ten total depositions, FPS argued it did not have

sufficient time to properly prepare for new fact witness depositions to occur a mere six days after they were noticed. FPS noted that it would be amenable to the Colmac Coil depositions "taking place if properly noticed and not in excess of the 10-deposition limit." Dkt. 73-1, at 8. Dickinson responded with its Motion to Take Additional Depositions (Dkt. 74) the same day but did not address FPS's arguments regarding Rule 32(a)(5)(A), and did not offer to reschedule the Nelson, Fazarri, or Pope depositions. The depositions of the latter three individuals took place on August 12, 2019, while FPS's Third Motion for a Protective Order was pending.[13]

As mentioned, the language of Rule 32(a)(5)(A) does not provide room for discretion. As such, several courts have held "the prohibition on testimony obtained from a deposition on short notice is mandatory." *Insurance Safety Consultants, LLC v. Nugent*, 2018 WL 4732430, at *7 (N.D. Tex. 2018); *see also King,* 2013 WL 4511476 at *2 (noting Rule 32(a)(5)(A) "affirmatively requires exclusion"); *Automated Transactions LLC v. First Niagara Fin. Grp., Inc.*, 2011 WL 13213256, at *1 (W.D.N.Y. 2011) (quoting *In re Settlement Facility Dow Corning Trust*, 2010 WL 1247839, *3 (E.D. Mich. 2010)) ("The word 'must' means that the requirement is mandatory and not discretionary."); *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) ("federal courts have no more discretion to disregard [a] Rule's mandate than they do to disregard constitutional or statutory provisions.").

---

[13] Dickinson later responded to FPS's Rule 32(a)(5)(A) arguments in its August 30, 2019 Opposition to FPS's Third Motion for a Protective Order. Dkt. 79.

Accordingly, because FPS's Third Motion for a Protective Order was pending at the time the depositions of Nelson, Fazzari, and Pope took place, FPS's Third Motion for a Protective Order (Dkt. 73) is **GRANTED** to the extent FPS seeks preclusion of the use of the August 12, 2019 depositions against it in this action.[14] As discussed below, the Motion is **DENIED** to the extent FPS seeks preclusion of Dickinson's depositions of Nestle, Kemper, or GEA.

### B. Dickinson's Motion for Leave to Take Additional Depositions (Dkt. 74)

Dickinson seeks leave to conduct additional depositions beyond the presumptive ten deposition limit of Federal Rule of Civil Procedure 30(a)(2)(A)(i).

#### 1. Legal Standard

Federal Rule of Civil Procedure 30(a) provides, in pertinent part:

(2) ***With Leave***. A party must obtain leave of court, and the court must grant leave to the extent consistent with Rule 26(b)(1) and (2):

(A) if the parties have not stipulated to the deposition and:

> (i)    the deposition would result in more than 10 depositions being taken under this rule . . . by the plaintiffs, or by the defendants, or by the third-party defendants.

Fed. R. Civ. Proc. 30(a)(2)(A)(i) (emphasis in original).

If, without the other's agreement, a party seeks leave to take more than ten depositions, the Court must limit the frequency or extent of discovery pursued if it

---

[14] However, should FPS first offer portions of the Nelson, Fazzari, or Pope depositions into evidence, then "other portions of the deposition[s] may become admissible under Rule 106 of the Federal Rules of Evidence, which permits an adverse party to require the introduction of any other part of a writing that ought in fairness to be considered with another portion that is received in evidence." 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 32.43[2] (3d ed. 1999).

determines that:

> (i)     the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)    the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii)   the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

### 2.  *Analysis*

The Advisory Committee Notes to Rule 30(a)(2)(A) clarify that this provision "provides a limit on the number of depositions the parties may take, absent leave of court *or* stipulation with the other parties. One aim of this revision is to assure judicial review under the standards stated in Rule 26(b)(2) before any side will be allowed to take more than ten depositions *in a case without agreement of the other parties*." Fed. R. Civ. P. 30(a)(2)(A) Advisory Committee Notes to 1993 Amendment (emphasis added). Thus, although FPS implies Dickinson was required to obtain both leave of the Court and FPS's agreement prior to taking more than ten depositions, the requirements are stated in the alternative. That is, a party may take more than ten depositions with either leave of the Court or through agreement of the parties. *See, e.g., Advanced Sterilization Products, etc. v. Jacob*, 190 F.R.D. 284, 286 n. 2 (D. Mass. 2000) (noting Rule 30(a)(2)(A) allows the parties to grant "themselves permission to take more than ten depositions per side by entering a stipulation").

Prior to FPS's Third Motion for a Protective Order, Dickinson believed FPS had agreed that Dickinson could take more depositions than the ten permitted under Rule 30 because, during the June 10, 2019 telephone conference with the Court's law clerk, Dickinson represented it would like to take five additional depositions, and FPS did not object. Since Dickinson had already taken six depositions at that point, an additional five depositions constituted eleven total depositions—one beyond the presumptive ten deposition limit of Rule 30(a)(2)(A). The parties also scheduled five additional depositions (one for Ford, as well as Rule 30(b)(6) depositions of Nestle, Colmac Coil, Kemper, and GEA)[15] following the June 10, 2019 telephone call without objection from FPS.[16]

---

[15] "A deposition under Rule 30(b)(6) should, for purposes of this [10-deposition] limit, be treated as a single deposition even though more than one person may be designated to testify." Fed. R. Civ. P. 30(a)(2)(A) Advisory Committee Notes to 1993 Amendment.

[16] FPS implies that it did not agree to five additional depositions, and that the Court instead issued an "oral ruling" allowing such depositions during the June 10, 2019 phone call. Dkt. 73, at 2. Dickinson responds that although it stated it would likely need to take a minimum of five depositions, it never implied it would only take five depositions, and that because the Court didn't rule otherwise during the June 10, 2019 phone call, it could take as many depositions as it deemed necessary prior to filing the Motion for Reconsideration. Dkt. 74-2, at ¶¶ 17-18. Both parties are mistaken. During the June 10, 2019, call, Dickinson did not request the Court's authorization to take additional depositions, and FPS did not seek the Court's protection from such discovery. Both sides instead proceeded as if such depositions were a foregone conclusion. Counsel for both parties appeared to request the Court's involvement only in scheduling the appropriate deadline for Dickinson's Motion for Reconsideration and extending the impending discovery deadline.

Further, the June 10, 2019 telephone conference was with the Court's law clerk, not the undersigned Judge. The Court's law clerk does not have the authority to issue an "oral ruling" during an informal discovery call. Dkt. 73, at 2. The Court's discovery dispute process clearly states that the Court will not issue discovery orders unless an informal mediation with the law clerk proves unsuccessful, and either a telephone conference with the Court (i.e., the Judge) then occurs, or formal motions are filed. http://id.uscourts.gov/district/judges/nye/Discovery_Disputes.cfm (last visited April 19, 2020). Neither occurred in this case. As such, both FPS's claim that the Court issued an oral ruling allowing Dickinson to take five additional depositions, and Dickinson's claim that it was entitled to unlimited depositions because the Court's law clerk did not state that "she or Judge Nye would order that future future discovery be limited solely to Dickinson's Motion to Reconsider" (Dkt. 74-2, at ¶ 18) are both somewhat disingenuous. Counsel for both parties are experienced litigators who frequently appear in Federal Court. Both sides know that they will not obtain formal rulings from the Court without either seeking a conference with the Judge or filing formal motions. For either side to suggest that a law clerk would issue an Order without the parties proceeding to a conference with the Judge or filing a motion is contrary to the local rules.

Dickinson claims it first became aware that FPS had *not* agreed to depositions beyond the presumptive limit when FPS objected to the depositions of Nelson, Fazzari, and Pope on August 6, 2019. Dkt. 74-1, at 2, n. 1. However, this is not consistent with Rule 30(a)(2), which requires leave of Court or a written stipulation of the parties. There is no such thing as an implicit agreement to exceed ten depositions.

Dickinson subsequently filed the instant motion to obtain leave of the Court to take additional depositions on August 9, 2019. Yet, without counting the three depositions the Court must exclude pursuant to Rule 32(a)(5)(A), leave of the Court is unnecessary at this time because Dickinson has only taken ten depositions: the six pre-Sanctions Order depositions, Ford, and Rule 30(b)(6) depositions of Nestle, Kemper, and GEA.[17]

Both Dickinson's Motion for Leave to Take Additional Depositions, and FPS's Third Motion for a Protective Order (to the extent it seeks enforcement of the deposition limits of Rule 30(a)(2)(A)) are accordingly **MOOT** and, therefore, **DENIED**.

### 3. *FPS's Request for Fees*

Federal Rule of Civil Procedure 37(a)(5)(A) applies to the issuance of a protective order. If the Court grants a motion for protective order, "the court must . . . require . . . the

---

[17] FPS scheduled and attended the August 7 and August 8, 2019, depositions of two Rule 30(b)(6) witnesses for Nestle—Hinds and Wiencke—without objection. Dkt. 73-1, at 4; Dkt. 74-20, Ex. R. FPS did not file its Motion for a Protective Order until August 9, 2019. While FPS argues Dickinson sought to depose three employees of Colmac Coil as fact witnesses, rather than as Colmac Coil's Rule 30(b)(6) designees, it does not explain why Hinds and Wiencke should not be considered Nestle's Rule 30(b)(6) designees, or why their depositions should count as more than one deposition. Further, even if Hinds and Weincke were not both Rule 30(b)(6) witnesses for Nestle, but were instead fact witnesses, FPS did not object to their depositions as such either when they were scheduled or on the record when the depositions took place. Dkt. 81-16, Ex. S, at 192:24-229:19; Dkt. 81-18, Ex. Y, at 171:1-225:15. The Court thus counts the Rule 30(b)(6) depositions of Hinds and Wiencke as a single deposition for purposes of Rule 30(a)(2)(A). *See*, *supra*, note 15.

party or attorney . . . or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). The Court may apportion the reasonable expenses for the motion even where, as here, only partial relief is granted. Fed. R. Civ. P. 37(a)(5)(C).

FPS seeks costs and fees but does not specify the "reasonable expenses incurred in making the motion." Fed. R. of Civ. Proc. 37(a)(5)(A). If FPS still seeks to recover its expenses, it shall file a short brief documenting the reasonable expenses incurred in making its Third Motion for a Protective Order within fourteen (14) days of the date of this Order, with the traditional briefing schedule to follow.

### C. Motion for Reconsideration (Dkt. 81)

Dickinson primarily seeks reconsideration because, although the Court found that Dickinson did not act in bad faith and expressly stated in its order that dismissal was not appropriate, the sanction ordered was purportedly tantamount to dismissal of Dickinson's case. In addition, Dickinson seeks reconsideration because the "evidence proves the lack of prejudice to FPS by Dickinson's actions and shows that Dickinson does have reasonable explanations for its conduct that the Court previously found indicated culpability on the part of Dickinson but were not explained." Dkt. 81-1, at 7. Before turning to such arguments, the Court first addresses the appropriate legal standard with respect to both the Motion for Reconsideration and the evidence considered upon reconsideration.

#### 1. Legal Standard

FPS argues that this case involves application of the standards of Federal Rule of Civil Procedure 59(e), which is the procedural mechanism for altering or amending

judgments in certain limited circumstances. Under Rule 59(e), reconsideration is an extraordinary remedy available only when: (1) the district court is presented with newly discovered evidence; (2) the court committed clear error or the initial decision was manifestly unjust; or (3) if there is an intervening change in the controlling law. *School Dist. No. 1J, Multnomah Cty. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

Dickinson counters that the Sanctions Order is not subject to Rule 59(e) because it is an interlocutory order. Federal Rule of Civil Procedure 54(b) allows a district court to revise any order, "which adjudicates fewer than all of the claims . . . at any time before entry of a judgment adjudicating all the claims[.]" Fed. R. Civ. P. 54(b). Further, the district court's inherent common law authority gives it discretion to rescind or modify any interlocutory order as long as the court retains jurisdiction over the matter. *Amato v. U.S.*, 94 F. Supp. 2d 1077, 1078 (D. Idaho 1999). As such, Dickinson suggests the Court can reconsider the Sanctions Order for any cause the Court deems sufficient.

In certain respects, both parties are correct. The Sanctions Order was not a final judgment but was instead an interlocutory order granting sanctions for Dickinson's willful spoliation of evidence. The Court, therefore, construes Dickinson's Motion as one brought pursuant to Rule 54(b), which can be revised at any time under the Court's inherent authority. *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.") (internal quotation marks and citation omitted).

However, although a court has the power to revisit its own decision for any reason,

MEMORANDUM DECISION AND ORDER - 20

"as a rule the court should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt. Indus. Operating Corp*., 486 U.S. 800, 817 (1988) (internal quotation marks and citation omitted). Regardless of the standard or rule under which they are brought, "motions for reconsideration are generally disfavored, and may not be used to present new arguments or evidence that could have been raised earlier." *America Rivers v. NOAA Fisheries*, 2006 WL 1983178, at *2 (D. Or. 2006) (citing *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1442 (9th Cir. 1991)).

Thus, while courts have the inherent authority to review interlocutory orders at any time prior to entry of final judgment, to determine the merits of a request to reconsider an interlocutory order, both this Court and district courts throughout the Ninth Circuit are frequently guided by substantially the same standards as those used to reconsider final orders pursuant to Rule 59(e). *See, e.g., Lindstrom v. Bingham Cty., Idaho*, 2018 WL 3186925, at *2 (D. Idaho 2018) (citing Ninth Circuit law applying Rule 59(e) when using court's inherent power to reconsider an interlocutory order); *Hathaway v. IPC*, 2017 WL 6268514 at *1 (D. Idaho 2017) (applying Rule 59(e) to motion for reconsideration of evidentiary rulings and sanctions issued prior to trial); *Thomason v. Moeller*, 2017 WL 3723638 at *1 (D. Idaho 2017) (noting that although a district court has the inherent power to modify its interlocutory orders prior to entry of judgment, absent highly unusual circumstances, a motion for reconsideration will not be granted "unless the district court is presented with newly discovered evidence, committed clear error, or there is an intervening change in the controlling law") (citing *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877,

890 (9th Cir. 2000)); *Balla v. Idaho State Bd. of Corr.*, 2014 WL 12614478, at *2 (D. Idaho 2014) ("In general, a court will grant a motion for reconsideration of an interlocutory order only when the movant demonstrates: (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order.") (citation omitted); *Santoro v. Ocwen Loan Servicing, LLC*, 2020 WL 97784, at *1 n. 1 (D. Or. 2020) (noting the considerations of Rule 59(e) "govern[] reconsideration of interlocutory orders under Rule 54(b).") (*citing Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmBH & Co.*, 571 F.3d 873, 880 (9th Cir. 2009)); *United States v. Lewis*, 2018 WL 1014172, at *2 (D. Or. 2018) (denying reconsideration of interlocutory order because "a motion for reconsideration may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation") (quoting *Kona*, 228 F.3d at 883) (emphasis in original); *HM Electronics, Inc. v. R.F. Technologies, Inc.*, 2015 WL 11234136, at *2 (S.D. Cal. 2015) ("To determine the merits of a request to reconsider an interlocutory order, the court applies the standard required under a Rule 59(e) reconsideration motion.") (citing *Hydranautics v. FilmTec Corp.*, 306 F. Supp. 2d 958, 968 (S.D. Cal. 2003)); *Rich v. TASER Intern., Inc.*, 917 F. Supp. 2d 1092, 1094 (D. Nev. 2013) (holding reconsideration of a non-final order may be appropriate if the district court is presented with newly discovered evidence, committed clear error or the initial decision was manifestly unjust, or there has been an intervening change in controlling law).

The Court is, accordingly, guided by the standards set forth in Rule 59(e) and considers whether reconsideration is warranted: (1) because of newly discovered evidence; (2) because the Court committed clear error or the Sanctions Order was manifestly unjust;

or (3) due to an intervening change in the law. [18]  *ACandS, Inc.*, 5 F.3d at 1263. As discussed

below, with respect to the evidence considered on reconsideration, the Court is also guided

by the public policy underlying the law of the case doctrine. However, ultimately,

"[w]hether or not to grant reconsideration is committed to the sound discretion of the

court." *Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian Nation*, 331

F.3d 1041, 1046 (9th Cir. 2003) (citing *Kona*, 229 F.3d at 883).

### 2. Evidence Considered

A motion for reconsideration "'may *not* be used to raise arguments or present

evidence for the first time when they could reasonably have been raised earlier in the

litigation.'" *Marlyn Neutraceuticals, Inc. v. Mucos Pharma GmbH*, 571 F.3d 873, 880 (9th

Cir. 2009) (emphasis in original) (quoting *Kona*, 229 F.3d at 890). When asking a court to

reconsider a prior ruling based on newly discovered evidence "the movant is '*obliged* to

show not only that this evidence was newly discovered or unknown to it until after the

hearing, but also that it could not with reasonable diligence have discovered and produced

such evidence at the hearing.'" *Frederick S. Wyle Prof'l Corp. v. Texaco, Inc*., 764 F.2d

604, 609 (9th Cir. 1985) (emphasis in original) (quoting *Engelhard Indus. v. Research

Instrumental Corp.*, 324 F.2d 347, 352 (9th Cir. 1963)). "Evidence is only newly

discover[ed] if it was in fact previously unavailable—i.e. the party asserting the evidence,

acting with reasonable diligence, could not have previously discovered the evidence."

*Vasquez v. City of Idaho Falls*, 2018 WL 1123865, at *3 (D. Idaho 2018) (citing

---

[18] Because Dickinson does not contend there has been an intervening change in the law, the Court limits its analysis to the first two categories. Dkt. 89, at 9 n. 2.

*Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001)).

FPS argues the Court should not consider the evidence Dickinson submitted with its Motion for Reconsideration because Dickinson could have obtained any of this evidence before the Sanctions Order was issued but failed to do so. Before addressing whether Dickinson's evidence is "new" or "newly discovered evidence" the Court should consider on reconsideration, the Court must first address whether it should instead consider an "expanded factual record" under the law of the case doctrine.

a. Law of the Case Doctrine

Although Dickinson suggests the only limit imposed by the controlling law on the Court's review of its Motion is one of sufficient cause, Dickinson argues the Court should, in the alternative, rely upon the "law for the case" doctrine in considering the merits of Dickinson's Motion for Reconsideration. Dkt. 89, at 10. Dickinson argues there are three major grounds that justify reconsideration under the law of the case doctrine: (1) an intervening change in controlling law; (2) the availability of new evidence *or an expanded factual record*; and (3) need to correct clear error or to prevent manifest injustice. *Id.* at 10-11 (emphasis added) (collecting cases); *but see Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n. 5 (9th Cir. 1989) (articulating the law of the case standard for review of interlocutory opinions as requiring that the moving party show: (1) an intervening change of controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice).

Even an interlocutory order becomes the law of the case. *Mangeac v. Armstrong*, 2010 WL 2697301, at *1 (D. Idaho 2010). The law of the case doctrine is based on two

principals: (1) error must be corrected; and (2) judicial efficiency demands forward progress. *Id*.; *Baugh v. Gale Lime Holdings, Inc*., 2009 WL 2823656, at *1 (D. Idaho 2009). With respect to the former, "[t]he only sensible thing for a trial court to do is to set itself right as soon as possible when convinced that the law of the case is erroneous. There is no need to await reversal*." In re Airport Car Rental Antitrust Litigation*, 521 F. Supp. 568, 572 (N.D. Cal. 1981). However, the need to be right must co-exist with the need for forward progress. A court's opinions "'are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.'" *Mangeac*, at 2010 WL 2697301 at *1 (quoting *Quaker Alloy Casting Co. v. Gulfco Indus., Inc*., 123 F.R.D. 282, 288 (N.D. Ill. 1988)).

Dickinson contends review of the entirety of its evidentiary submission, as well as Dickinson's arguments related to such evidence, is appropriate under the "expanded factual record" ground of the law of the case doctrine. Dkt. 89, at 10-11, 16-19. In support of this position, Dickinson argues the District of Idaho has repeatedly recognized "an expanded factual record" as a basis for reconsideration of an interlocutory order. *Id*. at 10-11. Although this language is cited in multiple Idaho cases involving a party's request to reconsider an interlocutory order, the justification for granting reconsideration due to an "expanded factual record" is less helpful to Dickinson's position.

The language "expanded factual record" appears to have been first adopted in *Kern-Tulare Water Dist. v. City of Bakersfield*, 634 F. Supp. 656, 665-66 (E.D. Cal 1986). All of the cases Dickinson relies upon that use the "expanded factual record" language in articulating the law of the case doctrine cite *Louen v. Twedt*, 2007 WL 915226, at *4 (E.D. Cal. 2007), which quotes *Kern-Tulare*. *See, e.g., Mangeac*, 2010 WL 2697301, at *1 (citing

*Louen*); *Portfolio FB-Idaho, LLC v. Fed. Deposit Ins. Corp.*, 2011 WL 901176, at *1 (D.

Idaho 2011) (same); *Wang v. Chertoff*, 676 F. Supp. 2d 1086, 1104 (D. Idaho 2009) (same);

*Vonbrethorst v. Washington Cty., Idaho*, 2008 WL 3465262, at *1 (D. Idaho 2008) (same);

*Hunstman Advanced Materials LLC v. OneBeacon Am. Ins. Co*., 2012 WL 480011, at *2

(D. Idaho 2012) (same); *Baugh v. Gale Lim Holdings, Inc*., 2009 WL 2823656, at *1 (D.

Idaho 2009) (same); *Fleming v. Escort, Inc*., 2011 WL 2173796, at *1 (D. Idaho 2011)

(same); *Vanzant v. Wilcox*, 2016 WL 6986133, at *1  (D. Idaho 2016) (same).[19]

    In *Kern-Tulare*, the Eastern District of California adopted language from the

Seventh Circuit regarding when it is appropriate to revisit a denial of summary judgment

and integrated this language into its general rule regarding a federal court's inherent power

to reconsider a prior ruling. 634 F. Supp. at 665. Most of the Idaho cases Dickinson cites

that reference an "expanded factual record" as a basis for reconsideration under the law of

the case doctrine also involved a party's request for reconsideration of an order denying

summary judgment. *Mangeac*, 2019 WL 2697301, at *1 (denying reconsideration of denial

of defendant's motion for summary judgment); *Portfolio*, 2011 WL 901176, at *1 (denying

reconsideration of denial of plaintiff's motion for summary judgment); *Huntsman*, 2012

WL 480011, at *11 (granting in part and denying in part reconsideration of denial of

defendants' motions for summary judgment); *Baugh*, 2009 WL 2823656, at *3 (denying

reconsideration of denial of defendant's motion for summary judgment); *Vonbrethorst*,

---

[19] Dickinson also cites this Court's order referencing an "expanded factual record" in *Hathaway v. Idaho Pacific Corp*., 2017 WL 6268514, at *2 (D. Idaho 2017). Dkt. 89, at 17. However, in *Hathaway*, although this Court referenced an "expanded factual record," it applied Rule 59(e) (not the law of the case doctrine) to defendants' Motion for Reconsideration of a sanctions order and denied reconsideration, in part, because "nothing new" had been brought forward in the motion to reconsider. *Id*. at *2.

2008 WL 3465262, at *3 (denying reconsideration of denial of defendant's motion for summary judgment).

In the context of a successive motion for summary judgment, the "expanded factual record" language makes sense. Given that the goals of judicial expediency and efficiency are furthered whenever a party can show that a court may dispose of a case on summary judgment, a successive motion for summary judgment "is particularly appropriate on an expanded factual record." *Hoffman v. Tonnemacher*, 593 F.3d 908, 911-912 (9th Cir. 2002). Significantly, the Ninth Circuit has never published an opinion where it relied on an "expanded factual record" as a basis for reconsidering a non-summary judgment order.

Further, as FPS notes, "if 'expanded factual record' is applied such that reconsideration of any interlocutory ruling is appropriate whenever a party can show an expanded factual record, then the prohibition of 'new facts' that could have been discovered through reasonable diligence would be rendered meaningless." Dkt. 90, at 18. Under such a scheme, parties seeking reconsideration could simply file evidence they had, or could have obtained previously, and force a court to repeatedly readdress the same issues. Such a practice would be a waste of judicial resources and would thwart the need for forward progress.

The "law of the case" doctrine, as well as public policy, dictate that the efficient operation of the judicial system requires the avoidance of re-arguing questions that have already been decided or evidence that could have been presented. *See Pyramid Lake*, 882 F.2d at 369 n. 5 ("the orderly administration of lengthy and complex litigation . . . requires the finality of orders be reasonably certain. This policy is served by the doctrine of the law

MEMORANDUM DECISION AND ORDER - 27

of the case, which counsels against reopening questions once resolved in ongoing litigation."); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP.*, 322 F.3d 147, 167 (2d Cir. 2003) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again. Thus [interlocutory decisions] may not usually be changed unless there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.") (citation omitted); *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016) (holding the law of the case doctrine permits a court to decline the invitation to reconsider issues that could have been resolved earlier in the litigation).

Thus, while an "expanded factual record can, in some circumstances, be a basis to reconsider an interlocutory order, a motion for reconsideration should not be used as a vehicle to identify facts or raise legal arguments which could have been, but were not, raised or adduced during the pendency of the motion of which reconsideration was sought." *Creech v. Ramirez*, 2017 WL 1129938, at *2 (D. Idaho 2017) (internal quotation marks and citations omitted); *see also Inclusion, Inc. v. Armstrong*, 2012 WL 1231855, at *2 (D. Idaho 2012) (reviewing summary judgment findings under the "law of the case" doctrine, but declining to consider evidence that was "not new" where "[d]efendants have not shown, nor do they argue, that the evidence was unavailable or could not have been discovered at the time the parties submitted stipulated facts to the Court."); *Marlyn Nutraceuticals*, 571 F.3d at 880 (holding district court did not abuse its discretion in refusing to consider evidence on motion for reconsideration that could have been presented before the court

entered its order).

     b.  <u>Dickinson's evidence is not new</u>

     Dickinson suggests the extensive evidence it submits on reconsideration was not previously available because, when "FPS filed its Motion for Sanctions, discovery in the case was still in its early stages, with no expert disclosures having been made, no depositions having been taken, and little third-party discovery having been completed." Dkt. 89, at 24. For several reasons, the Court agrees with FPS that the evidence Dickinson attempts to introduce in support of its Motion for Reconsideration was not previously unavailable and could have been—but was not—submitted during the pendency of the Sanctions Motion.

     First, the discovery period commenced on March 2, 2018, when the parties held their Rule 26(f) conference. Dickinson could have begun taking depositions and propounded written discovery at any time after that. Fed. R. Civ. P. 26(d)(1). By September 5, 2018, Dickinson had already obtained some 5,800 documents from FPS in response to Dickinson's discovery requests. Dkt. 29, at 2. Dickinson could have deposed witnesses based on such documents but did not. The Sanctions Order did not issue until May 21, 2019. Thus, Dickinson had a total of 445 days to take discovery before the Court issued its decision. That it failed to do so is not a reason for the Court to consider evidence Dickinson could have obtained and submitted prior to the Sanctions Order.

     Second, Dickinson also took significant discovery that it could have—but did not— submit to supplement the record on the Sanctions Order after the Motion for Sanctions was filed but before the Court issued its decision. For instance, Dickinson took six depositions,

MEMORANDUM DECISION AND ORDER - 29

disclosed its own expert, and obtained FPS's expert report during this time period. Despite such discovery, Dickinson did not pursue any of the discovery it now seeks to present until after the Court issued its Sanctions Order. Dkt. 89-1, at ¶ 13 (discussing for the first time after the Sanctions Order the need to take additional discovery "to fully develop an adequate record for the Motion"). The record should have been fully developed *before* the Court "spent significant time investigating and resolving the spoliation issue." Dkt. 69, at 27. If Dickinson needed more time to develop the record, it should have asked the Court to stay its decision on the Motion for Sanctions until it could obtain discovery to sufficiently address FPS's allegations.

Third, Dickinson could have obtained any of the evidence it now asks the Court to review prior to the Sanctions Order but did not. Specifically, all of the deponents for whom Dickinson now submits deposition transcripts[20] testified that nothing about which they testified occurred after the date of the Court's decision, that they could have given the same testimony had Dickinson asked them to sit for a deposition before May 21, 2019, and that Dickinson did not request to take their deposition prior to that date. Dkt. 86-2, Ex. PPP, at 246:17-25, 247:1-13 (Ford Dep.); Dkt. 90-3, Ex. B, at 8:13-25 (E. York Dep.); 20:9-22, 21:18-22 (J. Clark Dep.); 42:7-25, 43:1-22, 44:4-14 (K. Hinds Dep.); 64:6-9, 65:1-8, 11-17 (D. Provard Dep.); 82:9-25, 83:1-13 (B. Wiencke Dep.). Indeed, several of these witnesses even confirmed that none of the facts about which they testified occurred after Dickinson filed suit against FPS on December 21, 2017. *Id*., at 43:1-25 (K. Hinds); 64:6-

---

[20] The Court does not consider the deposition transcripts for Nelson, Fazzari, and Pope given its ruling on FPS's Third Motion for a Protective Order.

9, 65:1-8 (D. Povard); 84:3-10 (B. Wiencke).

Fourth, Dickinson admits that it knew of the existence of the evidence it now seeks to place before the Court long before May 21, 2019. Specifically, Schossberger filed a declaration in support of Dickinson's Motion for Reconsideration stating:

> By late June of 2017, as in-house counsel for Dickinson, I had become personally aware from correspondence and conversations with various witnesses that: 1) extensive performance data had been gathered by Colmac Coil ('Colmac'), Nestle USA ('Nestle'), Kemper Northwest ('Kemper'), and FPS, including the June 20-22, 2017 site visit; 2) all purported problems with the Refrigeration System (such as oil problems and the check valves) had been resolved or eliminated as potential causes of the Freezer's inability to perform; 3) that according to Nestle's engineers Bent Wiencke and Kris Hinds and Kemper's engineering supervisor Drew Provard, the performance data definitively indicated that with two compressors running, the Refrigeration System was functioning adequately, *i.e.*, +210 tons of refrigeration; and 4) the only remaining source of the Freezer's inability to perform properly was the design of the Freezer itself[.]

Dkt. 81-2, ¶ 5.

Despite being aware of performance data from Colmac Coil and the engineering opinions of Wiencke, Hinds, and Provard, Dickinson did not depose Colmac Coil or the aforementioned individuals until after the Sanctions Order issued. As FPS notes, Dickinson not only knew of the existence of the data it now asks the Court to review on reconsideration, but also knew where to get it and whom to speak with about what it contained. Dkt. 90, at 16. That it failed to do so does not mean the evidence Dickinson now asks the Court to review is "newly discovered" or "new evidence."

Fifth, Dickinson had a collaborative business relationship with Kemper and Nestle and could have easily obtained information from both companies to submit in support of its Opposition to FPS's Motion for Sanctions. For instance, when preparing for the

MEMORANDUM DECISION AND ORDER - 31

deposition of Kemper representatives, Dickinson's counsel realized that Kemper's discovery production seemed incomplete. Dkt. 89-1, at ¶ 17. Rather than undertaking a lengthy discovery process, Dickinson's counsel simply called Kemper's counsel, who promptly sent over 200 pages of additional documents. *Id*. Engineers from Nestle (those whose deposition testimony Dickinson now asks the Court to consider) also collaborated with Schossberger in private meetings about FPS (without FPS's presence) on multiple occasions. Dkt. 90-3, Ex. B, at 37:7-25, 77:2-8. In light of its relationship with such parties, Dickinson could have obtained the evidence it now asks the Court to consider at any time prior to the May 21, 2019 Sanctions Order. Again, its failure to do so does not mean its evidence is new or newly discovered. *ACandS, Inc*., 5 F.3d 1255, 1263 ("The overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late filed documents into newly discovered evidence.").

Finally, even if the evidence Dickinson now submits was unavailable to Dickinson prior to the Court's Sanctions Order, the Court declines to wade through 7,000 pages of evidence in attempt to find support for rewriting its prior decision. Dickinson contends the majority of documents it submitted fall into one of two categories: (1) complete deposition transcripts; or (2) testing and performance data from the FPS Freezer and Refrigeration Systems when the unit was operational. Dkt. 89, at 18. However, Dickinson itself notes it "only cited to 514 pages of deposition testimony," in the 2,304 pages of the thirteen deposition transcripts submitted. Dkt. 89, at 18. Dickinson also submitted thousands of pages of data pulled from the FPS Freezer, Refrigeration System, and Compressors, with only a handful of pin cites to relevant pages. Deposition excerpts and an expert's

explanation of the testing and performance data would have been far more efficient than attempting to bury both the Court and FPS with discovery documents.

Dickinson also criticizes FPS for contending that the Court "would be required to review every page" of its 7,000-page filing. *Id*. But Dickinson does not identify which evidence the Court should consider and which it should feel free to disregard, begging the question: if certain evidence does not require the Court's review, why file it? While the Court understands that Dickinson's lawyers seek to zealously advocate for their client, the metaphorical "spaghetti approach" of throwing all of the evidence at the wall and hoping something sticks is not an effective means of doing so. *Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (declining to "sort through the noodles" of plaintiff's "spaghetti approach" in order to locate a valid claim); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982) (noting a party may not prevail on a motion without identifying which evidence is relevant or "by simply overwhelming the district court with a miscellany of unorganized documentation.")

In sum, the Court does not find sufficient cause to consider Dickinson's belatedly submitted evidence, and thus declines to reconsider the Sanctions Order under its inherent authority. The Court is instead guided by both Rule 59(e) and the law of the case doctrine. With respect to the latter, the Court finds an "expanded factual record" is not an appropriate basis for reconsideration of a discovery order, where, as here, all of the evidence in the expanded record could have been, but was not, submitted prior to the Sanctions Order. The Court thus does not further address the evidence in the "expanded factual record," or Dickinson's arguments regarding the same, and instead turns to Dickinson's contention

that reconsideration is warranted to correct clear error and to prevent manifest injustice.[21]

### 3. Prejudice to FPS

Dickinson first implies the Court committed clear error because it relied on *Apple Inc. v. Samsung*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012) when holding that a "finding of spoliation shifts the burden of proof 'to the guilty party to show that no prejudice resulted from the spoliation' because that party 'is in a much better position to show what was destroyed and should not be able to benefit from its wrongdoing.'" Dkt. 69, at 28 (citing *Apple*, 888 F. Supp. 2d at 998). Dickinson suggests *Apple's* burden-shifting holding has been overturned because *Hynix Semiconductor Inc. v. Rambus, Inc.*, 591 F. Supp. 2d 1038, 1060 (N.D. Cal. 2006) ("*Hynix I*"), one of the cases relied upon in *Apple* for the burden-shifting principal, was overruled by *Hynix Semiconductor Inc. v. Rambus, Inc.*, 645 F.3d 1336, 1341 (Fed. Cir. 2011) ("*Hynix II*").[22] Dkt. 81-1, at 10. While the Federal Circuit in *Hynix II* vacated the sanctions order in *Hynix I* because it found the district court erred in

---

[21] Dickinson requested both oral argument and an evidentiary hearing in its Motion for Reconsideration and brief on the appropriate legal standard for reconsideration, but did not request either on the Motion for Sanctions itself. Dkt. 44; Dkt. 81-1; Dkt. 89. Just as Dickinson only now submits thousands of pages of evidence it failed to provide in opposition to the Motion for Sanctions, it belatedly requests an evidentiary hearing and oral argument it apparently deemed unnecessary before the Court entered its Sanctions Order. Further, the Court typically only hears oral arguments on dispositive motions to dismiss, motions for summary judgment, or when the Court feels oral argument would aid it in the decision process. *See* Dist. Idaho Loc. Civ. R. 7.1(d). Because, as explained below, the Court disagrees that the adverse jury instruction it ordered was case-dispositive, this case does not fall under any of these categories and the Court declines to hear oral argument or hold an evidentiary hearing on the pending motions.

[22] Notably, although Dickinson argues in its Motion for Reconsideration that *Apple* was "poorly decided," it urges the Court to adopt the reasoning in *Apple* in its Memorandum Regarding the Appropriate Standard of Review. *Compare* Dkt. 81-1, at 10 *with* Dkt. 89, at 15. While the *Apple* Court ultimately modified the adverse jury instruction the Magistrate Judge awarded as a sanction for defendant's spoliation of evidence in *Apple Inc. v. Samsung Electronics. Co., Ltd.*, 881 F. Supp. 2d 1132, 1150 (N.D. Cal 2012), the Court did so because plaintiff had not made a showing of prejudice sufficient to warrant the strong adverse inference instruction awarded. By contrast, FPS has made a sufficient showing that it was significantly prejudiced by Dickinson's conduct in this case.

applying too narrow of a standard for determining when the duty to preserve evidence was triggered, the Federal Circuit specifically stated that it had not considered the district court's findings with respect to prejudice. *Hynix II*, 645 F.3d at 1347 n. 2 ("This court does not consider the correctness of [the district court's] determinations on prejudice and good faith, or the propriety of any particular sanction on this record. Those questions all remain for consideration by the district court on remand."). As such, the burden-shifting framework relied upon in *Apple* has not been overturned.

Dickinson next suggests it could not locate any Ninth Circuit authority recognizing the burden-shifting rule. Dkt. 81-1, at 10. However, this principle has been recognized by many courts within the Ninth Circuit—including the District of Idaho—as the appropriate standard when it comes to analyzing spoliation. *See, e.g., Fleming v. Escort, Inc.*, 2015 WL 5611576, at *2 (D. Idaho 2015) (citing *Apple*, 888 F. Supp. 2d at 993); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1076 (N.D. Cal. 2006) (noting the party that fails to preserve evidence typically "bear[s] the consequences of [the] uncertainty" as to the relevance of the evidence and the resulting prejudice); *Jerry Beeman & Pharmacy Services, Inc. v. Caremark Inc.*, 322 F. Supp. 3d 1027, 1037 (C.D. Cal. 2018) ("Once spoliation has been shown, as here, the burden shifts to the spoliating party to demonstrate that the non-spoliating party suffered no prejudice."); *Kische USA LLC v. Simsek*, 2018 WL 620493, at *7 (W.D. Wash. 2018) (citing *Apple*, 888 F. Supp. 2d at 993).

Further, in *Leon v. IDX Systems Corp.*, 464 F.3d 951, 960 (9th Cir. 2006), the Ninth Circuit implicitly recognized the burden-shifting principle, holding that the district court did not err in finding prejudice because "any number of the 2,200 files could have been

relevant to [defendant's] claims or defenses, although it is impossible to identify which files and how they might have been used" as a result of plaintiff's willful spoliation. Thus, although the defendant in *Leon* could not prove prejudice due to plaintiff's destruction of evidence, the Ninth Circuit affirmed the district court's finding that defendant had been prejudiced.

Finally, this Court did not simply hold that Dickinson's willful spoliation shifted the burden of proof to Dickinson to establish FPS had not been prejudiced, but also found FPS had demonstrated specific prejudice it suffered due to Dickinson's destruction of the FPS Freezer and Refrigeration System. Dkt. 69, 27-30, 39. Although Dickinson suggests its post-Sanctions Order deposition of Ford shows FPS was not prejudiced, Ford repeatedly confirmed throughout his deposition (despite Dickinson's claims to the contrary) that he could not adequately evaluate and test the FPS Freezer and Refrigeration System due to Dickinson's destruction of evidence. *Compare* Dkt. 81-1, at 15-23 *with* Dkt. 86-2, Ex. PPP, at 96:13-25; 97:1-22; 100:9-21; 121:3-126:5; 139:2-24; 142:1-145:18; 158:13-160:4; 182:5-184:1; 186:6-188:5; 222:19-25; 236:1-25; 238:1-24; 240:3-20.

Because of Dickinson's willful destruction of the key evidence at issue in this suit, there is no way for Ford to conduct his own tests of the FPS Freezer or Refrigeration System, or to do anything other than rely upon information gathered for Dickinson. Dkt. 86-2, Ex. PPP, at 122:2-7 ("There is information that was gathered by others, and you are asking me to rely upon that information without giving me the benefit of conducting these tests and instrumentation on my own."); *Id*. at 125:12-14; ("I would not rely upon tests gathering . . . data that was done by others [and] is questionable, and I'm asked to accept

that."); *Id*. at 240:18-20 ("There is no freezer. And the refrigeration system as it existed is

no longer.")[23] The Court thus rejects Dickinson's claim that the Court erred in finding FPS

was prejudiced by Dickinson's conduct. *Leon*, 464 F.3d at 960 ("Because of the obvious

relevance of [destroyed evidence] to the litigation and the harm to IDX caused by Leon's

destruction of [this evidence], the district court did not clearly err in its finding of

prejudice.").

### 4. *The adverse inference instruction is not tantamount to dismissal*

Dickinson next argues that the non-rebuttable jury instruction sanction the Court

ordered is tantamount to a dismissal of Dickinson's claims. As mentioned, the Court

ordered it will instruct the jury with a non-rebuttable inference, stating, in relevant part:

"As a result of this spoliation, you are to presume that had Dickinson not destroyed the

FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS

Freezer was capable of performing at the levels specified by the Parties' Agreement." Dkt.

69, at 39.

---

[23] Dickinson faults the Court for relying on the fact that Dickinson's expert—Chuck Taylor—had an opportunity to inspect the FPS Freezer and Refrigeration System when Dickinson knew litigation was imminent, while Ford did not. Dickinson suggests that the Court could simply exclude the test Taylor conducted in November 2017 to thereby prevent any unfair advantage to FPS, since Taylor primarily relied upon data gathered for Dickinson between May and September 2017 in forming his opinion. Dkt. 81-1, at 14. Taylor's conclusion that the data obtained from testing conducted from May to September 2017 was accurate and reliable to show that the Refrigeration System was meeting contract specifications does not mean FPS must also simply accept such data without the opportunity to verify it through its own expert's tests.

Dickinson also suggests the Court erred because it noted, "[c]learly, Dickinson felt more data was necessary to prosecute *its* claims, as Dickinson's expert . . . inspected the FPS Freezer and Refrigeration System" prior to Dickinson's spoliation. Dkt. 81-1, at 14 (citing Dkt. 69, at 28-29). Dickinson argues Taylor "gathered evidence of his own accord" when he inspected the FPS Freezer and Refrigeration System and did not do so because anyone from Dickinson directed him to gather more data. *Id*. at 14, 31. This does not change the fact that Dickinson's expert had the opportunity to inspect and test the unit prior to disassembly, while FPS's expert did not.

In its Motion for Reconsideration, Dickinson argues:

> Dickinson's claim in this case is that FPS breached the Parties' Agreement because the Freezer was never capable of freezing 8,000 pounds per hour to 0° for 20-22 hours per day because of significant deficiencies in the design of the Freezer that could not be corrected. Thus, if the jury is required to presume (and Dickinson cannot rebut that presumption) that 'FPS would have been able to prove that the Freezer was capable of performing at levels specified by the Parties Agreement,' the jury must find against Dickinson.[24]

Dkt. 81-1, at 11.

However, Dickinson's Complaint includes four claims: breach of contract, and, in the alternative, breach of express warranty under Idaho law, breach of the implied covenant of good faith and fair dealing under Idaho law, and promissory estoppel. The Court's adverse inference instruction only presumptively ends Dickinson's ability to establish its breach of contract claim because, while the Parties' Agreement states that the FPS Freezer would be capable of freezing 8,000 pounds per hour to 0°, it does not contain a clause requiring the FPS Freezer to operate 20-22 hours per day. Dkt. 1, Ex. A.

Dickinson acknowledges in its Reply brief that the Agreement did not include express language stating how many hours per day the FPS Freezer was to perform, but contends that the Agreement should be construed to require that the FPS Freezer could operate 20-22 hours per day due to a January 17, 2016 email from FPS's Vice President of

---

[24] The language of the jury instruction is identical to the language proposed by FPS in its Motion for Sanctions. Dkt. 39-1, at 20. FPS described this language as the least severe of the available spoliation sanctions that, while not curing the prejudice to FPS, "at least puts FPS on a slightly more level playing field and prevents Dickinson from entirely profiting from its discovery abuses." *Id.* The Court determined this instruction was the "least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by [FPS]." Dkt. 69, at 31-39 (citing *Reinsdorf*, 296 F.R.D. at 626 and considering available sanctions).

Sales and Marketing, Jason Lai, to Dickinson's representative, Todd Campbell, stating, in relevant part: "The [FPS Freezer] is designed with all the freezer coils on sequential hot gas defrost to allow for continuous operation for up to 20-22 hours per day." Dkt. 91, at 9 n. 4 (citing Dkt. 79-1, Ex. G, Dep. Ex. 105).

Dickinson does not address how Lai's email could revise the express terms of the Agreement under the limits of the parol evidence rule. Regardless, because Dickinson's claim that its breach of contract claim rests not on whether the FPS Freezer could freeze 8,000 pounds an hour, but instead upon whether the FPS Freezer could operate 20-22 hours a day, was first raised in Dickinson's Reply brief in support of reconsideration, and was never substantively addressed in the briefing on the Motion for Sanctions, the Court finds Dickinson has waived this argument, and will not construe the Agreement as requiring that the FPS Freezer could operate 20-22 hours a day. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (holding a "district court need not consider arguments raised for the first time in a reply brief.").[25]

FPS contends that the Court's adverse inference instruction only directly impacts

---

[25] For the first time in its Reply, Dickinson "concedes the Freezer would freeze 8,000 pounds per hour for the first several hours of operation, but never achieved anywhere close to the additional metric of 20-22 hours per day, seven days a week." Dkt. 91, at 10, n. 4. Although Dickinson noted the FPS Freezer was intended to operate 20-22 hours per day based on Lai's email in its Opposition to the Motion for Sanctions, it never argued the parties' Agreement required that the FPS Freezer could do so. Dickinson also repeatedly claimed that the FPS Freezer *could not* freeze 8,000 pounds per hour in its Complaint and Opposition to the Motion for Sanctions. Dkt. 1, at ¶ 18; Dkt. 44, at 9, 10, 20, 23, 26. It was not until its Motion for Reconsideration that Dickinson alleged "Dickinson's claim in this case is that FPS breached the Parties' Agreement by failing to install a freezer that would freeze 8,000 pounds per hour for 20-22 hours per day as specified in the Parties Agreement" (Dkt. 81-1, at 7), and not until its Reply that Dickinson clarified the FPS Freezer could freeze 8,000 pounds per hour, but not for 20-22 hours per day. By outlining this history, the Court is not criticizing Dickinson, but simply clarifying why it will not now read a 20-22 hour per day operating requirement into the Parties' Agreement.

Dickinson's breach of contract claim. Dkt. 90, at 23. In its Reply brief, Dickinson argues its other three claims rest on whether the FPS Freezer could reach the performance metric of operating 20-22 hours a day. Dkt. 91, at 6-7. However—whether or not Dickinson's other three claims rest on a 20-22 hour performance metric—this issue was not addressed by either party in the briefing on the Motion for Sanctions, has not been substantively briefed on the Motion for Reconsideration, and is not appropriately before the Court. At this point, Dickinson can still claim that FPS breached an express warranty under Idaho law, can argue it was damaged under a good faith and fair dealings theory, and can attempt to assert promissory estoppel against FPS.

Moreover, even if the non-rebuttable presumption did directly impact all four of Dickinson's claims, the Court rejects Dickinson's claim that a non-rebuttable presumption effectively ends its case. First, the Court has already declined to dismiss Dickinson's case in its entirety and has also declined to preclude all evidence of the FPS Freezer and Refrigeration System from coming in during trial. Dkt. 69, at 31-38. Dickinson's case is not "game over" in light of such rulings. Dkt. 81-1, at 13. Second, unlike dismissal, the Sanctions Order allowed Dickinson the opportunity to amend, to attempt to negotiate a settlement, or to seek reconsideration. That Dickinson declined to take the first two options and has not convinced the Court that reconsideration is appropriate does not mean that the Sanctions Order ended Dickinson's case. *See, e.g., Apple*, 888 F. Supp. 2d at 994 ("Certainly, an adverse inference instruction is a 'lesser' sanction than dismissal or default.").

MEMORANDUM DECISION AND ORDER - 40

Third, and most importantly, once a court determines sanctions for spoliation of evidence are appropriate, the sanction imposed must be sufficient to cure the prejudice to the opposing party. *Miller v. Four Winds Int'l Corp*., 827 F. Supp. 2d 1175, 1181 (D. Idaho 2011); *Reinsdorf*, 296 F.R.D. at 626; *Apple*, 888 F. Supp. 2d at 992. Although Dickinson suggests FPS is not prejudiced because it can simply rely upon the "accurate and reliable data . . . obtained from tests that were done by Colmac and Kemper with the involvement of FPS during the period from May through September 2017" (Dkt. 81-1, at 17), FPS never ran its own tests or analysis prior to the FPS Freezer's destruction to defend against Dickinson's claims. *See, e.g.,* Dkt. 49-3, Ex. B, at 25:11-24. Further, despite Dickinson's claims to the contrary (Dkt. 81-1, at 26-27) there is evidence in the record that the gauges used to conduct prior tests were not calibrated and were putting off inaccurate data, and were done without protocols or controls, so it is impossible to determine how the FPS Freezer or the Refrigeration System were actually performing based off a historical review of the monitoring data*. See, e.g*., Dkt. 49-3, Ex. B, at 15:4-17; 35:9-37:4. Thus, as this Court held in *Evans v. Avista Corp*., 2012 WL 4140649, at *15 (D. Idaho 2012), because FPS's expert cannot test the key evidence at issue in this suit, "it matters not that other entities may have already [tested] it[.]"

Finally, under Dickinson's argument, the only sanction the Court could award that would not "effectively end" its case would be a permissive adverse inference instruction. Dkt. 81-1, at 40. However, Dickinson itself created this bind, and is not entitled to a lesser sanction simply because the sanction awarded makes its case more difficult. Moreover, given Dickinson's spoliation, a permissive adverse inference instruction could work as a

non-rebuttable instruction *against* FPS. That is, because Dickinson destroyed the key evidence in this suit before FPS's expert had an opportunity to examine it, FPS would be unable to rebut the evidence Dickinson obtained before it disassembled the FPS Freezer and Refrigeration System. Awarding less than a non-rebuttable presumption would be manifestly unjust to FPS under such circumstances.

   *5. Dickinson's design defect theory does not support reconsideration*

   Dickinson also argues (for the first time on reconsideration) that FPS designed the FPS Freezer in such a defective way that it never had any chance of working properly. Dkt. 81-1, at 28. Because Dickinson did not raise this issue previously it cannot do so now. As the Court exhaustively explained above, motions for reconsideration are not occasions for raising arguments for the first time or developing previously undeveloped arguments. *See Marlyn Neutraceuticals, Inc.,* 571 F.3d at 880; *Kona*, 229 F.3d at 890. However, even assuming arguendo that this argument was properly before the Court, it does little to help Dickinson's case.

   Dickinson suggests its primary theory of liability is a design theory that the FPS Freezer would never have worked regardless of the Refrigeration System's performance. Dkt. 81-1, at 28. As such, Dickinson suggests federal courts "have correctly held that spoliation claims do not apply (or are at least of a lesser concern) in cases involving allegedly defectively designed products." *Id*. (citing *Green v. Ford Motor Co*., 2008 WL 5070489, at *3 (S.D. Ind. 2008). Dickinson argues "courts correctly reason that in design defect cases, the party asserting spoliation has not suffered any prejudice because the

design itself can be assessed by alternative means other than the subject product itself." *Id*. (citing *Green*, at \*3-4).

In *Green*, the plaintiff was involved in a single car rollover accident that left him paralyzed. Green sought damages from Ford because it allegedly defectively designed his 1999 Ford Explorer Sport ("Explorer"). Green lacked both the ability and the financial resources to purchase his wrecked vehicle and have it stored. As a result, the Explorer was kept at a wrecker service until the service sold it for scrap metal (without Green's knowledge) shortly before Green filed suit. Ford claimed the destruction of the Explorer prior to trial resulted in spoliation of evidence and that Green's case should be dismissed as a sanction. Green contended that case law prevented the Court from assessing sanctions for spoliation in a product design case, because "[n]o prejudice would exist in a design defect case because the design itself, and not the alleged defect in the original product, would be the focus of the case." *Id*. at \*3 (citations omitted).

The *Green* Court agreed, finding Ford had not been prejudiced because an examination "of the specific Explorer in question is essentially irrelevant to the issue of whether it, and the thousands of others like it, were designed improperly. Therefore, the destruction of the Explorer does not prejudice Ford." *Id*. at \*4. Here, by contrast, the FPS Freezer was *custom designed* by FPS for Dickinson, was designed to work with an adequate Refrigeration System provided by Dickinson, and was presumably the *only* freezer with that specific design. While Ford could test thousands of Explorers for the same design flaw in the *Green* case, FPS has lost its ability to test the only evidence with the specific design of the FPS Freezer, as well as the Refrigeration System as it existed at the time Dickinson

MEMORANDUM DECISION AND ORDER - 43

filed suit. *Id.* at *4. The Court accordingly rejects Dickinson's claim that spoliation sanctions are unavailable because it alleges a design defect.

Dickinson also somewhat outrageously argues "even if the physical condition of this Freezer was somehow relevant to rebutting Dickinson's theory that FPS defectively designed it (it is not), FPS should be fully capable of either refurbishing this Freezer to its original design specifications or simply building another one that matches the original design drawings and schematics." Dkt. 81-1, at 29. Dickinson provides no support or authority for shirking and shifting its responsibility to preserve relevant evidence onto FPS, the non-spoliating party.[26]

### 6. Dickinson's conduct was sufficiently culpable to impose a non-rebuttable adverse inference

Dickinson makes a number of arguments to justify its conduct and to suggest the Court was unduly influenced by certain evidence (or a lack of evidence) in the pre-Sanctions Order record. Dkt. 81-1, at 31-38; Dkt. 89, at 15.

Dickinson first faults the Court for relying on a pre-litigation and post-litigation distinction in finding FPS had not had an adequate opportunity to inspect the FPS Freezer and Refrigeration System.[27] Dkt. 81-1, at 33. In its Opposition to the Motion for Sanctions,

---

[26] Notably, Dickinson's counsel initially suggested reconsideration was appropriate in the first place because Dickinson believed it could possibly reconstruct the FPS Freezer and Refrigeration System. *See*, *supra*, Section II.B.3.

[27] Dickinson also makes arguments regarding Taylor's reason for inspecting the FPS Freezer and Refrigeration System and FPS employee Jason Kwok's deposition testimony. The Court has rejected the former*, see*, *supra*, note 23, and declines to consider the latter, as Dickinson took Kwok's deposition four months before the Court issued the Sanctions Order, but declined to supplement the record with his deposition testimony before the Court granted sanctions for spoliation of evidence.

Dickinson argued it discharged its duty to preserve the FPS Freezer and Refrigeration System by providing FPS with an adequate opportunity to inspect the unit between May and September, 2017. Dkt. 44, at 19-24 (citing Second Circuit authority).[28]

The Court rejected this argument because FPS's site visits during the aforementioned time period were made to work with Dickinson to resolve problems with the FPS Freezer and Refrigeration System, not in the anticipation of litigation. The Court also rejected Dickinson's contention that FPS's "expert" James Peterson, had already tested and inspected the FPS Freezer and Refrigeration System, thereby relieving Dickinson of any preservation obligations, because Peterson repeatedly confirmed in his deposition that he was not hired as FPS's expert, did not inspect the FPS Freezer and Refrigeration System "with an eye towards litigation," and never ran any of his own tests on the unit but instead simply observed tests conducted by Colmac Coil. Dkt. 69, at 18-20. As such, the Court held FPS did not have an adequate opportunity to run tests or analysis to defend against Dickinson's claims, and that Dickinson thus had not discharged its duty to preserve the FPS Freezer and Refrigeration System. Dkt. 69, at 18-21.

The distinction between a pre-litigation and post-ligation "opportunity to inspect" is logical where, as here, a party's spoliation of evidence precludes the other party's expert from inspecting relevant evidence. *Unigard*, 982 F.2d at 368 (9th Cir. 1992); *see also Silvestri v. Gen. Motors*, 271 F.3d 583, 587 (4th Cir. 2001) (dismissing case where

---

[28] Even this out-of-circuit authority did not necessarily support Dickinson's argument. For instance, in *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001), the Court held an opportunity to inspect evidence was relevant to the type of sanction awarded, and not to the finding of spoliation itself (*i.e.*, whether a party destroyed relevant evidence it had a duty to preserve).

plaintiff's retained experts were able to examine unaltered vehicle, but defendant's experts were not). Similar to the district court in *Unigard*, here, the Court determined Dickinson precluded FPS's expert from inspecting the FPS Freezer and Refrigeration System before it was destroyed, and that FPS was significantly prejudiced as a result. These findings "provide ample support" for the Court's discretionary sanctions award. *Id.*[29]

Dickinson next suggests the Court's Sanctions award was erroneous because Dickinson's decision to disassemble and remove the freezer was made "based on the good faith belief that FPS had obtained all the performance data from the Freezer that it could possibly ever need." Dkt. 81-1, at 33. Clearly, a party can't destroy the key evidence at issue in a suit—evidence it has a duty to preserve and that is in its exclusive possession— based on a unilateral belief that the opposing party has gathered sufficient information. Nor do Dickinson's arguments regarding its motivations for deconstructing the FPS Freezer and Refrigeration System and purchasing a new freezer from GEA support granting reconsideration. Dkt. 81-1, at 35-38. The Court has already addressed Dickinson's motivations and determined several of such factors weighed *against* finding that Dickinson had acted in bad faith. Dkt. 69, at 32-38.

---

[29] Courts within the Ninth Circuit have also delineated a pre-litigation and post-litigation distinction in determining whether a party has had an adequate opportunity to inspect evidence. *See Starline Windows Inc. v. Quanex Building Products Corp.*, 2016 WL 4485568, at *1-3, 12-14 (S.D. Cal. 2016) (holding plaintiffs had not discharged their duty to preserve evidence, and sanctions were appropriate, although defendants had inspected some of the evidence and conducted an investigatory site visit prior to litigation, but where defendants' experts did not have the opportunity to inspect the majority of the evidence underpinning plaintiffs' claims); *Ski Lifts, Inc., v. Schaeffer Mfg. Co.*, 2020 WL 1492676, at *5 (W.D. Wash. 2020) (finding plaintiff's argument that defendants could have inspected the relevant evidence during pre-litigation site visits did not discharge plaintiff's duty to preserve evidence); *Keyes v. Hyundai Motor America*, 2010 WL 11629638, at *2 (D. Nev. 2010) (finding defendant did not have an adequate opportunity to inspect relevant evidence when its expert did not have the opportunity to examine vehicle before it was destroyed).

Finally, Dickinson argues that because it did not act in bad faith, the Court should, at a minimum, make its adverse jury instruction permissive. Dkt. 81-1, 40. However, in the Ninth Circuit, bad faith is not required to impose sanctions even more harsh than a non-rebuttable presumption, including precluding expert testimony or even dismissal. *Unigard,* 982 F.2d at 368-70 & n. 2 (holding it was within the district court's discretion to determine that a rebuttable presumption would have been insufficient to cure prejudice and exclude expert testimony as a consequence of plaintiff's "fault" in destroying evidence, even though the district court did not find plaintiff acted in bad faith); *Glover v. BIC Corp*, 6 F.3d 1318, 1329 (9th Cir. 1993) (noting a finding of "bad faith" is not a prerequisite to issuing an adverse inference jury instruction against a party responsible for spoliating evidence. "Surely a finding of bad faith will suffice, but so will simple notice of 'potential relevance to the litigation.'") (citing *Akiona v. United States,* 938 F.2d 158, 161 (9th Cir.1991)); *In re Napster*, 462 F. Supp. 2d at 1066 (finding defendants were entitled to an adverse inference instruction where plaintiff deleted evidence he knew he had a duty to preserve, and that such "conduct amounts to gross negligence, if not willfulness, which is sufficient culpability to justify an adverse inference"); *Miller,* 827 F. Supp. 2d at 1181 (noting courts generally will not impose a significant sanction for spoliation *unless* there is a showing that the spoliation was willful and the loss of evidence prejudiced the opposing party); *Evans*, 2012 WL 4140649, at *13-15 (awarding non-rebuttable adverse inference instruction where destruction of evidence was intentional, although there was no evidence that the evidence was destroyed in bad faith).

Because Dickinson intentionally destroyed evidence it had a duty to preserve and

because FPS was significantly prejudiced as a result, the Court declines to change its adverse jury instruction into a rebuttable presumption.

### 7. Conclusion

The FPS Freezer and Refrigeration System were not only relevant to this case, but integral to Dickinson's theory of liability and to FPS's defense. Due to Dickinson's destruction of the unit, FPS is hamstrung—through no fault of its own—in rebutting the tests and evidence gathered before Dickinson destroyed the unit. Though the Court found Dickinson did not act in bad faith, Dickinson is nonetheless responsible for disassembling the FPS Freezer and Refrigeration System within weeks of filing its Complaint. The Sanctions Order, though harsh, was not tantamount to dismissal and was the least severe alternative that would adequately address the significant prejudice suffered by FPS as a result of Dickinson's conduct.

Despite Dickinson's arguments on reconsideration, the Court remains convinced that sanctions are warranted because Dickinson knowingly destroyed evidence it had a duty to preserve, and because anything less than a non-rebuttable jury instruction would be an ineffective alternative sanction. *Leon*, 464 F.3d at 960 (holding the district court did not err in refusing to fashion a non-rebuttable jury instruction where such sanction "would leave Defendants equally helpless to rebut any material that Plaintiff might use to overcome the presumption"). Dickinson's Motion for Reconsideration is, accordingly, **DENIED**.

### IV.   ORDER

NOW, THEREFORE, IT IS HEREBY ORDERED:

1.  FPS's Third Motion for a Protective Order (Dkt. 73) is **GRANTED IN PART**

and **DENIED IN PART**. The Third Motion for a Protective Order is **GRANTED** pursuant to Rule 32(5)(A) to the extent FPS seeks exclusion of the late-noticed depositions of Nelson, Pope, and Fazzari. Pursuant to Rule 37(a)(5)(A), FPS may also pursue fees associated with obtaining the aforementioned relief. *See, supra*, Section III.B.3. The Third Motion for a Protective Order is **DENIED** in all other respects;

2. Dickinson's Motion for Leave to Take Additional Deposition Beyond the Presumptive Limit of Rule 30(a)(2) is **MOOT** and therefore **DENIED**;

3. Dickinson's Motion for Reconsideration (Dkt. 81) is **DENIED**;

4. The parties shall confer and submit proposed dates for the remaining deadlines in this case, including for discovery and dispositive motions, within two weeks of the date of this Order.

DATED: June 1, 2020

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 49