## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| |
|---|
| DICKINSON FROZEN FOODS, INC., |
|     Plaintiff, |
| v. |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, |
|     Defendant. |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, |
|     Counterclaimant, |
| v. |
| DICKINSON FROZEN FOODS, INC., |
|     Counter-Defendant. |

Case No. 1:17-cv-00519-MMB

**OPINION AND ORDER DENYING MOTIONS TO AMEND**

This matter is before the court on Plaintiff's motion (ECF 98) and supplemental motion (ECF 112) for leave to file an amended complaint.[1] Defendant opposes both motions (ECF 102 and 115, respectively). No party has requested oral argument and the court finds that the decisional process would not be significantly aided by oral argument, so the court decides the motions on the papers. D. Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons that follow, the court **DENIES** both motions because (1) the motions are a bad-faith attempt to circumvent the court's prior order

---

[1] Plaintiff's original motion proffered a proposed first amended complaint. *See* ECF 98-3. Plaintiff's supplemental motion proffered a revised proposed first amended complaint. *See* ECF 112-12; *see also* ECF 112-13 (redline comparison of revised proposed first amended complaint to original proposed first amended complaint).

(ECF 93) denying reconsideration of its order on Defendant's motion for sanctions (ECF 69); (2) all of the proposed new claims would be futile; (3) the motion for leave to amend is untimely because Plaintiff contends that it has been asserting the claims it seeks to add "throughout the litigation in this case," yet it waited until the last day allowed under the scheduling order to file its motion for leave to amend; and (4) allowing extensive amendments at this late date would be prejudicial due to the additional discovery that would be required.

## Factual and Procedural Background

As a general matter, the history of this litigation is recounted in the court's prior orders granting Defendant FPS's motion for sanctions for spoliation of evidence (ECF 69) and denying Plaintiff Dickinson's motion for reconsideration of the order granting sanctions (ECF 93). A reasonably thorough reiteration of the relevant history is required, however, to provide the proper framework for the court's reasoning as to the present motions.

### A.      The court's sanctions order

This case arose from Dickinson's purchase of an industrial freezer FPS custom-built for Dickinson's vegetable processing facility in Sugar City, Idaho. The parties signed a written contract on March 11, 2016. As relevant here, Dickinson contends that the freezer never worked according to the contract

specifications.[2] After over a year of working with FPS to try to resolve the dispute, Dickinson filed this lawsuit on December 21, 2017, asserting claims for breach of contract and, in the alternative, breach of express warranty, violation of the implied covenant of good faith and fair dealing, and promissory estoppel. ECF 1.

Approximately three weeks later, Dickinson dismantled the FPS freezer and its related refrigeration system, cut the freezer in half, and deposited the freezer, its component parts, and its control panel under a tarp in Dickinson's dirt parking lot. ECF 93, at 4. Dickinson denied FPS access to the Sugar City facility for approximately ten months between the day prior to the disassembly and the day of a site inspection conducted in October 2018 pursuant to FPS's discovery requests. At the site inspection, FPS's technical expert determined that he could not run multiple tests due to the disassembly and storage of the freezer, and he also learned that the building's refrigeration system had been significantly altered to accommodate a new freezer Dickinson purchased to replace the FPS freezer. *Id.*

On October 30, 2018, two weeks after the site inspection and ten months after this lawsuit was filed, FPS moved to dismiss the case as a sanction for Dickinson's destruction of critical evidence, specifically the freezer and the

---

[2] As explained in much greater detail below, what exactly those contract specifications were is a central issue as to the motions for leave to amend.

refrigeration system. ECF 39. Dickinson opposed. ECF 44. On May 21, 2019, the court issued a ruling granting sanctions for spoliation of evidence but declining to dismiss the case. ECF 69. The facts of that ruling are foundational as to the instant motions, so the court will discuss them at length.

The ruling granting the motion for sanctions stated, "On March 11, 2016, Dickinson and FPS entered into a written contract (hereinafter the 'Agreement') for Dickinson's purchase of an FPS freezer." ECF 69, at 3. (The capitalized term "Agreement," and the alternate form "Parties' Agreement," are relevant to the present motion for reasons explained below.) The ruling further explained what the parties' "Agreement" provided.[3] In granting FPS's motion for sanctions, the court ruled that Dickinson had engaged in spoliation of evidence because the freezer was "at least significantly altered, if not destroyed," due to the means Dickinson used to remove it from the building and to alter the refrigerant infrastructure to accommodate the replacement freezer. *Id.* at 14–15. The ruling was not based solely on Dickinson's actions in removing

---

[3] "Dickinson agreed to pay FPS $926,000 in exchange for an FPS model MT5-6 IQF Tunnel Freezer. Under the Agreement, FPS promised to build Dickinson a freezer that would freeze 8,000 pounds of diced and shredded potatoes an hour to 0°F. FPS represented the FPS Freezer would fully perform with a refrigerant infrastructure that provided 210 tons of refrigerant delivering –40°F cooling 'at the coil.'" ECF 69, at 3 ("defined term" omitted). The court explained that the refrigerant infrastructure is a complex system—"[i]n the food processing industry, customers seeking to purchase an industrial tunnel freezer are responsible for designing and installing a sufficiently robust refrigeration infrastructure to support the freezer." *Id.* at 2.

and partially disassembling the freezer—it was also based on modifications to the building's refrigerant infrastructure because that system is critical to whether an industrial freezer will work as designed. *Id.* at 29–30.

The court declined to dismiss the case but concluded that "a non-rebuttable inference is appropriate. A rebuttable presumption would not be an effective alternative because it would leave Dickinson free to tell its own story, unchecked by the evidence it failed to preserve." *Id.* at 39. Accordingly, the court ordered that the jury will receive the following instruction:

> Dickinson has failed to preserve relevant evidence for FPS's use in this litigation. This is known as the "spoliation of evidence." Specifically, Dickinson destroyed the FPS Freezer and Refrigeration System after its duty to preserve this evidence arose. As a result of this spoliation, *you are to presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement.*

*Id.* at 39 (emphasis added).

## B.   Dickinson's motion for reconsideration

Approximately three months after the court issued the ruling on the motion for sanctions, Dickinson moved for reconsideration and argued, *inter alia*, that the jury instruction constitutes a case-terminating sanction. On June 1, 2020, the court denied the motion (ECF 93) for several reasons.

First, the court noted that none of the evidence Dickinson cited in its motion for reconsideration was new, such that it should have been—but was

not—submitted while the sanctions motion was pending. ECF 93, at 29 (". . . Dickinson had a total of 445 days to take discovery before the Court issued its decision.") and 31 (". . . Dickinson admits that it knew of the existence of the evidence it now seeks to place before the Court long before May 21, 2019.").

Second, the court noted that Dickinson filed 7,000 pages of material in support of its motion for reconsideration: "[E]ven if the evidence Dickinson now submits was unavailable to Dickinson prior to the Court's Sanctions Order, the Court declines to wade through 7,000 pages of evidence in [an] attempt to find support for rewriting its prior decision." *Id.* at 32.[4]

Third, the court explained that the "adverse inference instruction only presumptively ends Dickinson's ability to establish its breach of contract claim because, while the Parties' Agreement states that the FPS Freezer would be capable of freezing 8,000 pounds per hour to 0°, *it does not contain a clause requiring the FPS Freezer to operate 20–22 hours a day*. Dkt. 1, Ex. A." ECF 93, at 38. (As discussed below, the meaning of "Parties' Agreement" is now an issue in the motions to amend.) Significantly, the court noted that Dickinson acknowledged that the Parties' Agreement did not contain a "20–22 hour"

---

[4] Astonishingly, the exhibit numbers ran from "A" through "QQQQ." The court noted that Dickinson only cited to a small portion of the pages filed and provided "only a handful of pin cites to relevant pages." *Id.* ". . . Dickinson does not identify which evidence the Court should consider and which it should feel free to disregard, begging the question: if certain evidence does not require the Court's review, why file it?" *Id.* at 33.

clause but nevertheless contended that it should be "construed to require" that the freezer could operate in such a manner. *Id.* at 38–39. Referring to an exhibit to the motion for reconsideration, the court found as follows:

> Dickinson does not address how Lai's email could revise the express terms of the Agreement under the limits of the parol evidence rule. Regardless, because Dickinson's claim that its breach of contract claim rests not on whether the FPS Freezer could freeze 8,000 pounds an hour, but instead upon whether the FPS Freezer could operate 20–22 hours a day, was first raised in Dickinson's Reply brief in support of reconsideration, and was never substantively addressed in the briefing on the Motion for Sanctions, the Court finds Dickinson has waived this argument, and *will not construe the Agreement as requiring that the FPS Freezer could operate 20–22 hours a day.*

*Id.* at 39 (emphasis added) (citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), for the proposition that a "district court need not consider arguments raised for the first time in a reply brief").

Crucially, in a footnote the court explained that throughout the pendency of this case, Dickinson "repeatedly claimed that the FPS Freezer *could not* freeze 8,000 pounds per hour," *id.* at 39 n.25 (emphasis added) (citing ECF 1, ¶ 18, and ECF 44, at 9, 10, 20, 23, 26), but then in its *reply brief* in support of its motion for reconsideration Dickinson suddenly changed its tune and stated that it "concedes the Freezer would freeze 8,000 pounds per hour for the first several hours of operation, but never achieved anywhere close to the additional metric of 20–22 hours per day, seven days a week." *Id.* (citing ECF 91, at 10 n.4). The court continued:

It was not until its Motion for Reconsideration that Dickinson alleged "Dickinson's claim in this case is that FPS breached the Parties' Agreement by failing to install a freezer that would freeze 8,000 pounds per hour for 20–22 hours per day as specified in the Parties Agreement" (Dkt. 81-1, at 7), and not until its Reply that Dickinson clarified the FPS Freezer could freeze 8,000 pounds per hour, but not for 20–22 hours per day.

*Id.* The court explained that the reason for clarifying the procedural history in this manner was to explain why the court "will not now read a 20–22 hour per day operating requirement into the Parties' Agreement." *Id.*

Dickinson's motion for reconsideration also raised a new argument that FPS designed the freezer in such a way that it could never have worked properly, regardless of whether the building's refrigeration system was sufficient. *Id.* at 42 (citing ECF 81-1, at 28). The court refused to consider this argument because it was raised for the first time in a motion for reconsideration. *Id.* The court further noted, however, that the case law Dickinson cited in support of the new argument was inapposite because the case law involved a mass-produced product (a Ford Explorer SUV) and the question was whether the Explorer model itself (rather than a single customer's vehicle) was designed incorrectly, whereas the freezer at issue in this case "was *custom designed* by FPS for Dickinson, was designed to work with an adequate Refrigeration

System provided by Dickinson, and was presumably the *only* freezer with that specific design." *Id.* at 43–44 (emphasis in original).[5]

## C.    Dickinson's motion to amend

About two months after the court denied the motion for reconsideration, Dickinson moved for leave to amend its complaint via a 22-page motion and 303 pages of supporting materials that included a 35-page proposed first amended complaint with six new counts (in addition to the original four) and 50 pages of exhibits.[6]

The motion first asserts that the U.N. Convention on Contracts for the International Sale of Goods and the Uniform Commercial Code both allow the incorporation of parol evidence into the Parties' Agreement. Dickinson seeks to amend its complaint to assert parol evidence relating to various performance specifications:

- "While the 'Order Confirmation' signed by Dickinson and attached as Exhibit A to Dickinson's Complaint does not specify *for how long* the parties contemplated the Freezer would need to produce '8,000 lb/hr' of frozen potato product," various parol evidence indicates that "*both* FPS and Dickinson intended that the Freezer would operate for a significantly longer period of time than just *one hour* per day." ECF 98-1, at 5 (emphasis in original). Dickinson seeks to amend its complaint to allege that parol evidence demonstrates

---

[5] The court rejected as "outrageous" Dickinson's contention that FPS should either rebuild the destroyed freezer or build a new one that matched the original specifications. *Id.* at 44.

[6] The original complaint consisted of nine pages plus a single nine-page exhibit. *See* ECF 1.

that the freezer was expected to "operate continuously for at least 16 and up to 22 hours per day." *Id.* at 6.

- While the "Order Confirmation" attached to the original complaint references "diced and shredded potato," "Dickinson and FPS bargained and intended that the Freezer would meet performance specifications for *all* of the types of potato and 'cuts' of potato product that Dickinson intended to run through the Freezer." *Id.* at 7.

- "FPS both expressly and impliedly represented to Dickinson and to the refrigerator contractor Kemper that the maximum heat load of this Freezer would never exceed 210 Tons of Refrigeration. As a result of this representation, Dickinson and, by extension, Kemper designed the Refrigeration System to provide 210 tons of refrigeration in cooling power." *Id.* at 8 (cleaned up). Dickinson contends this parol evidence is necessary to allow the jury to understand what the "Order Confirmation" meant. *Id.*

- "[C]ontrary to FPS's express and implied representations that the Freezer's maximum heat load would never exceed 210 tons of refrigeration, the Freezer's maximum heat load was actually closer to 290 tons of refrigeration." *Id.* at 9. Dickinson once again contends that "a jury should consider this evidence in determining the scope, nature, and terms of the parties' bargain." *Id.*

Dickinson's motion to amend then seeks to allege what it refers to as "additional alternative claims":

- Dickinson seeks to add a claim under the U.N. Convention on Contracts for the International Sale of Goods provisions governing "non-conforming goods." As support, Dickinson contends that "substantial evidence" indicates the freezer was to have frozen potato product, in all of Dickinson's potato types and cuts, at 8,000 pounds per hour for 20–22 hours per day, would never have a maximum heat load in excess of 210 tons of refrigeration, and would contain a sequential hot gas defrost system that would function adequately with 210 tons of refrigeration in cooling power. "Dickinson contends that the FPS Freezer failed to conform to each and every one of these express or implied representations . . . ." *Id.* at 11–12.

OPINION AND ORDER DENYING MOTIONS TO AMEND—10

- Dickinson then essentially asserts the same grounds as a basis for adding a claim for breach of the implied warranty of fitness for a particular purpose and breach of the implied warranty of fitness for ordinary purpose/merchantability under state law. The basis is the same as that referenced in the preceding bullet point. *Id.* at 11–13. A clause on page 12 summarizes Dickinson's point: "the Freezer did not run within even kind and quality within the variations permitted by agreement."

- Dickinson seeks to add a claim for strict product liability or design defect under state law, claiming that the freezer was defectively designed, was always defective, and those defects "caused its defective performance." *Id.* at 13.

- Dickinson seeks to asserts a claim for unjust enrichment based on the theory that "the Freezer never performed as promised by FPS." *Id.* at 15.

- Dickinson seeks to assert a claim for violation of the Idaho Consumer Protection Act based on FPS's alleged "misleading, false, and/or deceptive acts and practices," *id.* at 15, all of which are premised on the same allegations about the freezer's failure to perform as promised (the exact same language referred to in the first bullet point about the U.N. Convention, *above*, including multiple references to "20–22 hours per day"). The gist of this count is that Dickinson and FPS had a contract based on representations about the freezer's performance and FPS provided a freezer that could not live up to those representations.

Dickinson further contends that it placed the court, and FPS, on notice of its claim that the contract required the freezer to operate for 20–22 hours per day "in its original opposition to FPS's Motion for Sanctions." ECF 98-1, at 18. In support of this argument, Dickinson provides the following block quote from its opposition to the sanctions motion:

> Dickinson and FPS's March 11, 2016[,] Contract obligated FPS to install the Freezer at Dickinson's potato processing plant in Sugar City, Idaho, and promised that the Freezer would have a

"throughput capacity" for Dickinson's "diced & shredded potato" products of 8,000 lb/hr." (Campbell Decl. at Exh. 1, Contract at p. 6); *see also id.* at Campbell Decl. Exh. 2 (***noting that Freezer could operate for at least 20–22 hours in succession***).

*Id.* at 18–19 ("defined terms" and brackets omitted; emphasis in original) (quoting ECF 44, at 7). Dickinson also argues that the Campbell Declaration referenced in the quotation refers to an agreement that the freezer would run for longer time periods than it actually did and contends that the reference in the declaration is sufficient to establish that Dickinson raised the issue in its opposition to the sanctions motion. *Id.* at 19.

### D.   Dickinson's motion to supplement

Subsequently, in February 2021, Dickinson filed two motions—a motion to supplement its motion for leave to amend its complaint (ECF 112) and a motion for judicial notice of two Canadian court decisions involving FPS (ECF 114). The court granted the latter motion in part and denied it in part (ECF 126) on June 24, 2021, and that order's significance for present purposes is discussed in the analysis below.

The motion to supplement, which included another 415 pages of supporting material, seeks to revise the proposed amended complaint "to address factual findings and holdings from two recently unsealed and publically [sic] available Canadian court decisions involving FPS." ECF 112-1, at 1. The core of Dickinson's motion is summarized in its second paragraph:

Dickinson now seeks leave to supplement and revise its proposed First Amended Complaint. Specifically, Dickinson contends that FPS's engineering incompetence and its failure adequately to research, to prototype, or to test the design of the Dickinson Freezer is why that freezer proved inherently incapable of ever freezing 8,000 pounds of diced and shredded potato product *for 20 to 22 hours per day*. Dickinson further contends that FPS's representations *regarding the Freezer's performance capabilities* were misleading, false, or deceptive, given that it had no real engineering basis upon which to base those promises. *For similar reasons*, Dickinson contends that FPS breached its implied covenant of good faith and fair dealing owed to Dickinson.

*Id.* (emphasis added). The bulk of the motion then summarizes the two Canadian court decisions at issue.

Dickinson argues that it is imperative that it be given leave to amend to address the Canadian decisions because it could not have done so earlier due to (1) the proceedings being under seal and (2) the Canadian courts' decision not to unseal the appellate decision and record, which included the trial court's judgment, until mid-December 2020. *Id.* at 13–14. Notably, Dickinson then repeatedly asserts that the Canadian decisions support its contention that FPS could not engineer a freezer capable of "freezing 8,000 lbs of diced and shredded potato product from an infeed temperature of 130° F. to an outfeed temperature of 0° F. continuously for 20–22 hours per day." *Id.* at 16, 18 (same), and 19 (same without the temperature references).

### E.    FPS's arguments in opposition

FPS opposes both the motion for leave to amend (ECF 102) and the motion to supplement (ECF 115) based on the general theme that it would be futile to allow the proposed amendments. FPS argues that under the spoliation order, "the jury must presume that had Dickinson not destroyed that key evidence FPS would have been able to prove that the Freezer was capable of performing at the levels specified by the parties' agreement," yet "Dickinson cannot prevail because all of its claims depend on a showing that the Freezer was *not* capable of performing at the levels specified by the parties' agreement—something that Dickinson will never be able to show due to the non-rebuttable jury presumption." ECF 102, at 1–2 (emphasis in original). FPS further argues that Dickinson's proposed amended complaint "focuses entirely on the Freezer's performance and nothing else. . . . Dickinson's significant changes all impermissibly focus on the performance of the Freezer and arise out of the same alleged representations extrinsic to the parties' written agreement—alleged representations that Dickinson admits it has known about for years." *Id.* at 5 (citing ECF 98-3).

### 1.    Opposition to motion to amend

FPS emphasizes that Dickinson focuses entirely on alleged extrinsic representations that all relate to "four main categories: (i) the Freezer would operate for 20–22 hours per day; (ii) the Freezer would perform at a specified

OPINION AND ORDER DENYING MOTIONS TO AMEND—14

capacity for additional potato types; (iii) the maximum heat load would never exceed 210 tons of refrigeration; and (iv) the Freezer's sequential hot gas defrost design would not create significant additional parasitic heat load." *Id.* at 7 (citing ECF 98-1, at 6–10). FPS asserts that because the court's mandatory jury instruction directs the jury to presume that the freezer was capable of operating as required per the Parties' Agreement, any claims relating to the freezer's performance are futile.

FPS further addresses each of Dickinson's proposed amendments as follows:

- FPS contends the amendments to the claim for breach of contract under the U.N. Convention are futile because they all relate to how the parties agreed the freezer was to perform, and because to the extent Dickinson is advancing legal theories about merger clauses and the U.N. Convention, Dickinson can make those arguments regardless of whether they are in the complaint. ECF 102, at 9.

- FPS argues that Dickinson cannot assert a claim that FPS provided "non-conforming goods" under the U.N. convention because, as Dickinson itself admits, the convention "requires a seller to deliver goods that are of the quantity, quality, and description 'required by the contract.' " *Id.* at 9–10 (citing ECF 98-1, at 10–12). FPS contends that if the jury must presume that the freezer satisfied the parties' agreement, there could be no claim under this theory. *Id.* at 10.

- FPS argues that Dickinson's proposed revisions to its breach of express warranty claim are futile because under Idaho law, any express warranty becomes part of the parties' agreement. "Because the jury must find that FPS satisfied its end of the bargain, it

cannot possibly find that FPS breached an express warranty." *Id.*[7] FPS raises the same argument as to breach of the implied warranty of ordinary purpose/merchantability and breach of the implied warranty of fitness for a particular purpose. *Id.* at 10–11.[8]

- FPS asserts that Dickinson cannot make a claim for a breach of the implied covenant of good faith and fair dealing under Idaho law because (1) the covenant is implied as part of a contract and requires that the parties perform their contractual obligations and (2) Idaho law provides that "[n]o covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties." *Id.* at 12 (citing *Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 750, 9 P.3d 1204, 1216 (2000), and *Clement v. Farmers Ins. Exch.*, 115 Idaho 298, 300, 766 P.2d 768, 770 (1988)). FPS argues that because the jury instruction requires the jury to find the freezer could perform according to the parties' agreement, they cannot find that FPS breached any implied covenant. FPS also contends that Idaho law follows the parol evidence rule and that Dickinson admits the alleged representations on which it claims it relied, such as the 20–22 hour statement, are not part of the parties' written contract. *Id.* (citing ECF 98-1, at 2–9, and ¶ 119 of the proposed amended complaint).[9]

- FPS notes that Dickinson's proposed strict liability claim relies on the allegation that the freezer could not perform as agreed and argues that the jury instruction precludes that contention. *Id.* at 13.[10]

- FPS argues that the addition of facts to the promissory estoppel claim is another way of trying to shoehorn in additional extrinsic

---

[7] The court notes that Dickinson's original complaint contains a claim for breach of express warranty and that denying leave to amend would not remove that claim.

[8] FPS also raises an argument about Dickinson's status as a sophisticated party for bargaining purposes. *Id.* The court believes that argument is a merits-related issue more properly addressed in a summary judgment motion or at trial.

[9] As with the breach of express warranty claim, Dickinson's original complaint already contains a claim for breach of the implied covenant of good faith and fair dealing that would not be removed by a denial of leave to amend.

[10] FPS's argument also addresses the economic loss rule, but the court regards that argument as a matter for a dispositive motion or trial.

representations not in the written contract. FPS notes that the proposed amended complaint alleges that FPS's promises were false because the freezer failed to perform, and FPS contends that such a contention is futile because the jury must find that the freezer performed as agreed. *Id.* at 15.[11]

- FPS notes that the proposed unjust enrichment claim is premised on the words "[g]iven that the freezer never performed as promised by FPS" and argues that the jury instruction requires a finding that the freezer performed as agreed. *Id.* (citing ECF 98-3, ¶ 154).

- Finally, FPS argues that the proposed Idaho Consumer Protection Act claim relies on the premise that FPS made performance representations that proved false, but the jury instruction requires a finding that the freezer performed as agreed. *Id.* at 15.

FPS concludes its "futility" argument by noting that Dickinson could, theoretically, have sought leave to amend its complaint to include claims not based on the freezer's performance but made no effort to do so. *Id.* at 15–16. FPS then argues that allowing Dickinson leave to amend would be highly prejudicial and is untimely, *id.* at 16–17 (prejudice), 19–20 (untimeliness),[12] and contends that Dickinson's motion to amend is a bad-faith effort to circumvent the adverse jury instruction because Dickinson's proposed new allegations "all relate to the performance of the Freezer and its alleged failure to live up to FPS's promises." *Id.* at 18.

---

[11] The original complaint contains a promissory estoppel claim.

[12] As to untimeliness, FPS quotes Dickinson's motion for leave to amend's references to the 20–22 hour issue in an expert witness report dated November 1, 2018, and notes that Dickinson waited until August 2020 to seek to amend based on those alleged facts. *Id.* at 20 (citing ECF 98-1, at 18–20).

OPINION AND ORDER DENYING MOTIONS TO AMEND—17

## 2.      Opposition to motion to supplement

FPS's opposition to Dickinson's motion to supplement its motion for leave to amend argues that amending to add the Canadian court decisions would be futile because they are inadmissible under the Federal Rules of Evidence,[13] and FPS further argues that they are another effort to circumvent the jury instruction by introducing performance-related matters. As to the circumvention issue, FPS argues that because of the jury instruction,

> it does not matter what Dickinson alleges about FPS's knowledge of refrigeration design or lack thereof. Whether or not those allegations are in the complaint, the jury must find that FPS satisfied its obligations under the parties' agreement. Dickinson's memorandum gives its ruse away: it wants to use the Canadian court findings to prove "why that freezer proved inherently incapable of ever freezing 8,000 pounds of diced and shredded potato product for 20 to 22 hours per day." But that is precisely what Dickinson is barred from proving.

ECF 115, at 7 (cleaned up) (quoting ECF 112-1, at 2). FPS then discusses how Dickinson's proposed claims all focus on some version of the words "freezer capable of freezing all of Dickinson's needed potato types and cuts at the rate of 8,000 pounds per hour for 20–22 hours per day." *Id.* at 8, 9; *see also id.* at 10 (noting the Idaho Consumer Protection Act claim would gain one sentence relating to whether the freezer could work as intended). FPS also reiterates its

---

[13] The court will not address the evidentiary issues as part of this ruling because they are not properly raised in opposition to a motion for leave to amend—rather, they are more properly raised via motions *in limine* as part of the pretrial process.

arguments as to prejudice, *id.* at 10–12, bad faith circumvention, *id.* at 12–13, and untimeliness, *id.* at 13–14.

### F.   Dickinson's replies

#### 1.   In support of motion to amend

In its initial reply brief, Dickinson argues that the jury instruction does not "precisely explain or define what was meant by the phrase 'Parties' Agreement,' and Dickinson was especially confused because the use of capitalized terms in legal writing often indicates an expressly defined term (which this was not)." ECF 104, at 2. Dickinson further contends that the court "ruled that Dickinson would be allowed to present evidence to the jury on claims and theories regarding performance representations and terms not reflected in the express written terms of the Order Confirmation, such as FPS's promise that the Freezer would operate continuously for 20–22 hours per day." *Id.* at 3 (citing ECF 93, at 34 n.21). Dickinson also asserts that the court was "mistaken[ ]" in finding that Dickinson had not raised this contention earlier. *Id.* at 3–4.

Notably, "Dickinson concedes that FPS's Freezer, working in tandem with Dickinson's refrigeration system, could freeze 8,000 pounds of potato product to 0° *for some unspecified amount of time*, consistent with the written terms of the Order Confirmation." *Id.* at 5 n.5 (emphasis in original) (citing ECF 91, at 6–7 n.4).

Finally, Dickinson argues there would be no prejudice if the court grants leave to amend because (1) all the proposed issues have been litigated all along, (2) FPS has cited no evidence to prove that additional discovery will be needed, (3) discovery remained open as of the date of Dickinson's reply brief, (4) there is no trial date and the date for dispositive motions has not passed, (5) FPS knew that Dickinson intended to assert the 20–22 hour issue, and (6) adding a new legal theory is not a reason to deny leave to amend. *Id.* at 5–8.

### 2.    In support of motion to supplement

Dickinson's reply in support of its motion to supplement first focuses on arguing that FPS's evidentiary arguments are improper in the context of a motion for leave to amend, ECF 117, at 1–4, and then argues that the Canadian court decisions are "highly probative" because Dickinson contends that "FPS's design contained *inherent defects* that—as a matter of engineering—inherently prevented the freezer from ever being able to perform at the rate promised by FPS." *Id.* at 4–5 (emphasis in original). Dickinson discusses the facts of the Canadian litigation and argues that they are relevant to "the false, inaccurate, or misleading claims and representations that FPS made to Dickinson *regarding the freezer's performance capabilities . . . ." Id.* at 6 (emphasis added). Dickinson then incorporates the argument from its reply in support of its motion to amend that the court's order purportedly allows Dickinson "to proceed with theories regarding terms not directly reflected in the written Order

OPINION AND ORDER DENYING MOTIONS TO AMEND—20

Confirmation," *id.* at 7, and contends that FPS's "prejudice" argument is base-less because "the Court fully intends to re-set the deadlines for discovery and dispositive motions." *Id.* at 8.[14]

## Standard of Review

Federal Rule of Civil Procedure 15 governs amendment of pleadings. As relevant here, it provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

While Rule 15(a) is "very liberal," "a district court need not grant leave to amend where the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006) (citing *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999), and *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1387 (9th Cir. 1990)). In the discussion below, because of this matter's procedural history and how that history relates to the

---

[14] The background for this statement is that on September 24, 2020, the court entered an order on the docket reading as follows: "Given the significant backlog of civil cases due to the COVID-19 pandemic and multiple criminal trials, the Court cannot imme-diately address the pending motions, including Dickinson's Motion for Discovery (Dkt. 100). The Court will accordingly hold the October 23, 2020[,] deadline for com-pletion of all discovery, and the November 6, 2020[,] deadline for dispositive motions, in abeyance until it issues its decision on the pending motions. The Court will set new deadlines for the close of discovery and dispositive motions at that time." ECF 107.

arguments Dickinson asserts in its motions to amend, the court addresses bad faith first, futility second, undue delay third, and prejudice last.

## Discussion

The court denies both of Dickinson's motions under all four aspects of the *AmerisourceBergen* test.

## I.

Dickinson's motions are a clear attempt to seek reconsideration of the court's sanctions order under the guise of motions for leave to amend the complaint—or, alternatively, the motions are a flat-out attempt to negate the sanctions order's effectiveness by circumventing it. FPS correctly notes that Dickinson's motions consistently focus on some version of the formulation "freezer capable of freezing all of Dickinson's needed potato types and cuts at the rate of 8,000 pounds per day for 20–22 hours per day." Dickinson gives the game away when it asserts, in its reply in support of its motion for leave to amend, that the court was "mistaken" in finding that Dickinson had not raised the "20–22 hours issue" as a ground for breach of contract prior to its reply in support of its motion for reconsideration. ECF 104, at 3–4. The word "mistaken" plainly indicates a desire to have the court correct an alleged error—i.e., to reconsider its prior ruling(s)—and indeed Dickinson makes no effort to explain how a theory that the court was "mistaken" is anything other than a backdoor motion for reconsideration.

OPINION AND ORDER DENYING MOTIONS TO AMEND—22

The court previously found that Dickinson waived the issue of whether the "20–22 hour" representation was a term of the parties' contract because the issue was not raised in any substantive fashion until Dickinson's reply in support of its motion for reconsideration. ECF 93, at 39. While Dickinson purports to disagree, in seeking to support its argument it offers a quotation from its opposition to the motion for sanctions. But that quotation actually proves that the court was correct:

> Dickinson and FPS's March 11, 2016[,] Contract obligated FPS to install the Freezer at Dickinson's potato processing plant in Sugar City, Idaho, and promised that the Freezer would have a "through-put capacity" for Dickinson's "diced & shredded potato" products of 8,000 lb/hr." (Campbell Decl. at Exh. 1, Contract at p. 6); *see also id.* at Campbell Decl. Exh. 2 (***noting that Freezer could operate for at least 20–22 hours in succession***).

ECF 98-1, at 18–19 ("defined terms" and brackets omitted; emphasis in original) (quoting ECF 44, at 7).[15]

Significantly, the parenthetical reference set in boldface and italics is the *sole* reference to this issue anywhere in Dickinson's brief opposing FPS's motion for sanctions, and the mere fact that one exhibit (out of at least 51 attachments)[16] apparently mentioned the issue is likewise not sufficient. As the

---

[15] To be clear, the language in this block quote originally appeared in Dickinson's opposition to the motion for sanctions, and Dickinson repeats it as a block quote in the motion for leave to amend.

[16] Dickinson's opposition to the motion for sanctions was accompanied by seven declarations; those declarations, in turn, had multiple exhibits of their own (as many as 25 in one instance).

OPINION AND ORDER DENYING MOTIONS TO AMEND—23

Ninth Circuit has explained, "a cursory mention of an issue in a footnote without citation to legal authority is insufficient . . . ." *Momox-Caselis v. Donohue*, 897 F.2d 835, 842 (9th Cir. 2021); *see also United States v. Zannino*, 895 F.3d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones . . . ."); *cf. John Wyeth & Bro., Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (Alito, J.) ("Arguments raised in passing . . . , but not squarely argued, are considered waived." (cleaned up)).

A passing reference to something in a mere *descriptive parenthetical* following a citation is even less of a "cursory mention" than placing something in a footnote, and the fact that an exhibit might be construed as mentioning an issue is not sufficient to preserve the issue without substantive argument in the party's brief citing the exhibit and discussing its alleged significance via something more than a descriptive parenthetical. The court has previously admonished Dickinson against the practice of loading up the court record with excessive exhibits and expecting the court to ascertain their significance. *See* ECF 93, at 33 ("While the Court understands that Dickinson's lawyers seek to zealously advocate for their client, the metaphorical 'spaghetti approach' of throwing all of the evidence at the wall and hoping something sticks is not an effective means of doing so." (citing, *inter alia*, *Zoslaw v. MCA Distrib. Corp.*,

OPINION AND ORDER DENYING MOTIONS TO AMEND—24

693 F.2d 870, 883 (9th Cir. 1982) (noting a party may not prevail on a motion without identifying which evidence is relevant or "by simply overwhelming the district court with a miscellany of unorganized documentation"))). The mere fact that a supporting declaration might mention an issue is not sufficient to call the issue to the court's attention without *actual, substantive* argument, but no such argument on this issue appeared in Dickinson's briefing prior to its reply in support of its motion for reconsideration.

Accordingly, the court concludes that Dickinson's motion to amend and motion to supplement are bad-faith attempts at backdoor motions to reconsider what the court has already declined to reconsider.[17]

## II.

Amendment is futile if, among other reasons, it "reasserts a claim on which the court previously ruled." 3 *Moore's Federal Practice—Civil* § 15.15 (2021). Dickinson's motions to amend are futile for reasons that are related to the reasons why its motions are in bad faith. The motions to amend advance various factual allegations that constitute an attempt to relitigate the court's sanctions order and are precluded by that order. The original motion to amend also seeks to add six new counts to the complaint, all of which are predicated

---

[17] The court also found that Dickinson waived its argument that FPS designed the freezer in such a defective way that it could not work properly. ECF 93, at 42. That, of course, is the very essence of a strict liability claim. Thus, Dickinson's proposed strict liability claim is a clear attempt to resurrect a theory the court already rejected.

on (1) the same central facts that constitute an attempt to relitigate the sanctions order and (2) the same central theory that the FPS freezer could not perform as agreed by the parties, a theory the court has expressly rejected.

### A.

The proposed allegations in the original proposed amended complaint all relate to attempting to show, via various parol evidence, that Dickinson ordered, and FPS agreed to provide, a freezer that could produce 8,000 pounds per hour of shredded and diced potato product for 20–22 hours per day with a maximum heat load of 210 tons of refrigeration. *See, e.g.*, ECF 98-11, ¶¶ 12–17. Dickinson further wishes to allege that FPS's promises were false and that FPS knew they were false: "Numerous design defects also prevented the FPS Freezer from being capable of producing anywhere near the 8,000 pounds per hour of frozen potato product for 20–22 hours per day specified by FPS, routinely missing that performance metric by an average of 42% to 47%." *Id.* ¶ 22. Dickinson further seeks to contend that the parties' written contract was not their entire agreement and was never contended to be the entire agreement. *Id.* ¶ 31.

The proposed supplemental amended complaint seeks to add numerous factual allegations about the Canadian litigation[18] discussing the case's background and the courts' findings. ECF 112-13, ¶¶ 12–28, 30. Dickinson's essential theory is that the Canadian courts' findings demonstrate that FPS lacked engineering knowledge and experience "sufficient to design a freezer capable of freezing all Dickinson's needed potato types and cuts at the rate of 8,000 pounds per hour for 20–22 hours per day, *id.* ¶ 140, 146–47, and that the lack of knowledge and experience "caused or substantially contributed to the inherent defects in the FPS Freezer and/or the defective or negligent design of the FPS Freezer," *id.* ¶ 156.

Every one of Dickinson's proposed factual amendments is based on the premise that the parties agreed on how the freezer would perform (including the 20–22 hour claim Dickinson seeks to add) and that FPS then "breached its bargain" with Dickinson, ECF 98-1, at 11; that the freezer did not run "by agreement," *id.* at 12; that the freezer suffered from "defective performance," *id.* at 13, or "never performed as promised by FPS," *id.* at 15; and that FPS's representations about how the freezer would perform were false because "the Freezer failed to meet" them, *id.* at 16. Every one of these contentions relates

---

[18] *GEA Refrigeration Canada Inc. v. Chang,* No. CA45068 (B.C. Ct. App. Dec. 14, 2020), ECF 112-3; *GEA Refrigeration Canada Inc. v. Chang*, No. S125293 (B.C. Sup. Ct. Jan. 18, 2018), ECF 112-4.

to whether the freezer operated as the parties agreed it would—i.e., whether it "was capable of performing at the levels specified by the Parties' Agreement."

All of these factual allegations are therefore futile because they seek to relitigate, at best, or to circumvent, at worst, the court's sanctions order. In response to the court rejecting Dickinson's argument that the parties' agreement required the freezer to operate for 20–22 hours a day, Dickinson now seeks to amend its complaint to allege that parol evidence shows that the parties agreed to exactly that. The entire point of Dickinson's attempt to rely on parol evidence is to establish exactly what the court has already expressly rejected—that the parties' agreement required the freezer to operate for that amount of time. If the court will not construe the parties' agreement as requiring that the freezer could operate for 20–22 hours per day, then it is irrelevant for purposes of the breach of contract claim whether the freezer could or could not operate for that amount of time. If, on the other hand, the court *does* construe the parties' agreement as imposing such a requirement, then the mandatory jury instruction forecloses Dickinson's argument, as the instruction requires the jury to "presume that had Dickinson not destroyed the FPS Freezer and Refrigeration System, FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement." ECF 69, at 39.

OPINION AND ORDER DENYING MOTIONS TO AMEND—28

## B.

As noted above, Dickinson's original motion for leave to amend seeks to add six new causes of action that it refers to as "additional alternative claims": Count 2—a claim for breach of Article 35 of the U.N. Convention on Contracts for the International Sale of Goods, ECF 98-3, ¶¶ 58–73; Count 4—an Idaho law claim for breach of the implied warranty of fitness for a particular purpose, *id.* ¶¶ 89–106; Count 5—an Idaho law claim for breach of the implied warranty of ordinary purpose/merchantability, *id.* ¶¶ 107–16; Count 7—a common-law strict liability/design defect claim, *id.* ¶¶ 131–40; Count 9—a common-law unjust enrichment claim, *id.* ¶¶ 151–55; and Count 10—a claim for violation of the Idaho Consumer Protection Act claim, *id.* ¶¶ 156–65.

*Every one* of Dickinson's proposed new causes of action is predicated on the same essential nucleus of factual allegations and the same overall theory of liability, namely, that the parties came to an extrinsic agreement (not memorialized in their written contract) about how the freezer was to perform and that FPS either breached that agreement or otherwise provided a freezer that did not, and was incapable of, performing as the parties agreed. The proposed U.N. Convention claims focus on the theory that FPS provided a freezer that did not perform as the parties agreed or that was not of the sort required by the parties' agreement. The various proposed breach of warranty claims likewise depend on a showing that the freezer did not perform as agreed. The

proposed strict liability claim is premised on the slightly different—but essentially similar—theory that the freezer *could not* perform as agreed. The proposed unjust enrichment claim relies on the words "[g]iven that the freezer never performed as promised by FPS." Finally, the proposed Idaho Consumer Protection Act claim relies on the allegation that FPS made performance representations that proved to be false.

As is thoroughly explained above, the sanctions order requires the jury to find that "FPS would have been able to prove that the FPS Freezer was capable of performing at the levels specified by the Parties' Agreement." ECF 69, at 39. All of Dickinson's proposed new causes of action therefore run up against the sanctions order because they all relate to whether the freezer operated as the parties agreed it would—i.e., whether it "was capable of performing at the levels specified by the Parties' Agreement." As FPS correctly notes in its opposition brief, Dickinson could theoretically have sought leave to amend to include claims not based on the freezer's performance, but Dickinson chose not to do so. ECF 102, at 15–16. The result of that decision is that all the proposed new causes of action would be futile, and the court therefore denies the motion to amend that would add them.

## III.

In asserting that the court erred in denying the motion for reconsideration, Dickinson contends that it has been asserting the "20–22 hour issue"

specifically, and the "terms, scope, and meaning of the parties' bargain" generally, "throughout the litigation in this case." ECF 98-1, at 19 n.3. If that is true, then there is no reason why Dickinson could not have moved for leave to amend sooner than it did. The case has been pending since December 2017, but Dickinson only sought leave to add the new claims in August 2020—not coincidentally, after losing on both a motion for sanctions and a motion to reconsider the sanction.

Dickinson contends that its motion is automatically timely because it filed its motion to amend on the last permissible day under the court's scheduling order (August 5, 2020). ECF 104, at 8. However, the Ninth Circuit has rejected precisely that sort of argument and has noted that there is no requirement that "a district court must always accept a motion for leave to amend simply because the court has established a period, pursuant to Federal Rule of Civil Procedure 16(b), in which the parties may file a leave [sic] to amend." *AmerisourceBergen*, 465 F.3d at 952 n.5 (emphasis removed). Thus,

> [i]n assessing timeliness, we do not merely ask whether a motion was filed within the period of time allotted by the district court in a Rule 16 scheduling order. Rather, in evaluating undue delay, we also inquire whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading.

*Id.* at 953 (cleaned up) (citing *Jackson*, 902 F.2d at 1388). "We have held that an eight month delay between the time of obtaining a relevant fact and seeking

a leave to amend is unreasonable." *Id.* (citing *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 799 (9th Cir. 1991)).

In this case, Dickinson filed the initial complaint on December 21, 2017. ECF 1. FPS filed its motion for sanctions based on spoliation of evidence on October 30, 2018, two weeks after discovering the spoliation. ECF 39. The court granted the motion for sanctions on May 21, 2019. ECF 69. Dickinson moved for reconsideration on September 6, 2019. ECF 81. The court denied reconsideration on June 1, 2020. ECF 93. Discovery was continuing throughout this entire period. The court amended the scheduling order several times, with the most recent amendment setting a discovery cutoff date of October 23, 2020, *see* ECF 96, although the court later held that date "in abeyance," ECF 107. Yet Dickinson did not move for leave to amend to add the new claims until August 5, 2020, over two and a half years after filing its complaint, despite now claiming that it has been asserting the issues in question "throughout the litigation in this case," ECF 98-1, at 19 n.3. If indeed Dickinson was aware of these claims so early in the litigation process, there is no reason why it could not have more promptly sought leave to amend. Dickinson's motion for leave to amend is therefore untimely.[19]

---

[19] One final point bears note: The court could perhaps have been inclined to view Dickinson's motion to supplement its motion for leave to amend more leniently as to timeliness than the original motion for leave because the Canadian court records

# IV.

In considering a motion for leave to amend, "it is the consideration of prejudice to the opposing party that carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (cleaned up). "The district court may deny a motion for leave to amend if permitting an amendment would, among other things, cause an undue delay in the litigation or prejudice the opposing party." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002); *see also Solomon v. N. Am. Life & Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (finding no abuse of discretion when district court denied motion for leave to amend filed "on the eve of the discovery deadline").

As explained above, *see* Part III, Dickinson filed its motion for leave to amend, *see* ECF 98, more than two and a half years after filing the original four-count complaint and approximately 11 weeks prior to the discovery cutoff of October 23, 2020. *See* ECF 96, at 2.[20] During those two and a half years, the

---

were unsealed in mid-December 2020, such that Dickinson presumably could not have sought leave to amend as to those matters at an earlier date. However, it is significant that Dickinson's motion to supplement does not seek to add any new causes of action narrowly tailored to the Canadian decisions—rather, the new material seeks only to amplify either the original causes of action or the ones proposed in the motion to amend. Because Dickinson may seek to introduce the Canadian decisions as evidence in support of its existing claims (assuming *arguendo* Dickinson is able to establish their admissibility under the Federal Rules of Evidence), there is no need to allow an amendment to include them.

[20] As noted above, on September 24, 2020, i.e., about a month and a half *after* Dickinson moved for leave to amend, the court ordered that the discovery deadline would be held "in abeyance" pending the resolution of various motions, including Plaintiff's

---

parties took 19 in-person depositions in multiple states and in Canada. *See* ECF 102, at 16. Dickinson propounded 35 interrogatories, 122 requests for production, and one request for admission, and FPS produced approximately 71,050 documents. *Id.* at 3. At the time the original motion for leave to amend was filed, the parties appeared to have effectively concluded the vast bulk of necessary discovery.

In its response to Dickinson's original motion for leave to amend, FPS noted that if the court granted leave to amend, the four-count, 51-paragraph complaint would swell to a 10-count, 172-paragraph complaint. *Id.* at 5. The original proposed amended complaint asserts, in addition to the four claims asserted in the original complaint, the six additional claims noted above.

Dickinson's supplemental motion for leave to amend revises the proposed amended complaint by further swelling it to 194 paragraphs. It includes the same new claims as the original proposed amended complaint and proposes no new causes of action, but it also includes new factual allegations relating to the two Canadian judicial decisions[21] involving FPS and another Canadian entity as well as additional factual argumentation (based on the Canadian rulings)

---

original motion for leave to amend. *See* ECF 107. The court's docket-management decision does not retroactively render the then-impending discovery cutoff irrelevant because that deadline remained in place when Dickinson filed its motion.

[21] *See above* Factual and Procedural Background Part D and Discussion Part II.A.

OPINION AND ORDER DENYING MOTIONS TO AMEND—34

for certain of its pre-existing and new claims. *See* ECF 112-13, ¶¶ 12–28, 30, 140, 146–47, 156, and 185. Dickinson implies that if leave to amend is granted, it will seek to undertake discovery of "overlapping facts" in the Canadian litigation. ECF 112-1, at 4 (explaining that Dickinson "agreed that it would *temporarily refrain* from pursuing discovery about the [Canadian] litigation" until the Canadian courts unsealed the relevant decisions (emphasis added)).[22]

It is plain to the court that adding six new causes of action would certainly require additional discovery, as FPS contends, and would most likely result in the need for the parties to re-depose some, perhaps most, of the 19 persons who were previously deposed. The Ninth Circuit has found that allowing amendment would be prejudicial when "[t]he new claims set forth in the amended complaint would have greatly altered the nature of the litigation and would have required defendants to have undertaken, at a later hour, an entirely new course of defense." *Morongo Band of Mission Indians v. Rose*, 893

---

[22] In its reply in support of its original motion for leave to amend, Dickinson contended there would be no need for additional discovery but then said that if there were such a need, Dickinson would stipulate to an extension of the discovery process. ECF 104, at 6. There is also no indication in the record that Dickinson had ever advised the court about, much less obtained the court's approval for, any supposed agreement to "temporarily refrain" from discovery on particular issues.

F.2d 1074, 1079 (9th Cir. 1990) (also noting that plaintiff had waited nearly two years to move to amend).[23]

The Ninth Circuit has further noted that it is unreasonable for a party to wait to move for leave to amend when it has already obtained the relevant facts and will drastically change its litigation theory as a result of the amendment. *See Fossen v. Blue Cross & Blue Shield of Mont., Inc.*, 660 F.3d 1102, 1115 (9th Cir. 2011) (citing *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010), and *AmerisourceBergen*, 465 F.3d at 953)); *Acri v. Int'l Ass'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986) ("We have also noted that late amendments to assert new theories are not reviewed favorably when the facts and the theory have been known to the party seeking amendment since the inception of the cause of action.").

In this case, Dickinson contends that it has been asserting the claims it seeks to add "throughout the litigation in this case." ECF 98-1, at 19 n.3. If that were true, then it underscores the prejudicial effect of Dickinson's delay, as moving to amend early in the process would have allowed the parties to propound discovery on the additional claims and would have allowed

---

[23] The court noted that neither the delay nor the significant change in the nature of the case was necessarily "fatal to amendment" on its own but noted that both factors were relevant to the overall decision. *Id.*

depositions to include examination on those matters. *See also Chodos v. West Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) (affirming denial of leave to amend when purported "new facts" had been available to movant for a long time such that delay in moving to amend was undue and constituted "a dilatory tactic").

If, as Dickinson's original motion for leave to amend asserts, no additional discovery is necessary, *see* ECF 104, at 5–8, then Dickinson's delay in seeking leave to amend is all the more inexcusable. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 809 (9th Cir. 1988) ("Appellants contend that Shell Oil defendants would have suffered no prejudice because discovery already had covered all the issues presented by the new claims for fraud and negligent interference with contract. As Shell Oil defendants point out, if appellants' contention were true their delay in seeking leave to amend would be even more inexcusable."). The court discounts Dickinson's assertion, however, in view of the statement in its motion to supplement indicating an intent to pursue further discovery. That statement also undercuts Dickinson's argument, *see* ECF 104, at 5–6, that FPS has not shown that additional discovery is needed and thus has failed to demonstrate prejudice. It is unnecessary for FPS to make that showing when Dickinson itself intends to pursue further discovery.

The time and expense of requiring the parties to re-open discovery and to conduct supplemental depositions, especially when additional time has

OPINION AND ORDER DENYING MOTIONS TO AMEND—37

passed and witnesses' recollections may fade, is a strong indicator of the prejudice allowing the proposed amendment would cause FPS.[24] *See id.* ("In fact the new claims . . . would have required additional discovery on a wide range of new issues; that discovery likely would have included new depositions by Shell Oil defendants' employees. The new claims would have required additional research and rewriting of trial briefs. The resulting delay and expense would have prejudiced Shell Oil defendants, who were entitled to rely on a timely close of discovery and a near-term trial date.").

Finally, as discussed above, when Dickinson filed its initial motion for leave to amend on August 5, 2020, there were 79 days (two months, two weeks, and four days) remaining prior to the discovery cutoff date of October 23, 2020. It would have been manifestly unreasonable to expect that the parties could conduct discovery on six new causes of action in that limited amount of time. While Dickinson contends there would be no prejudice because "the Court fully intends to re-set the deadlines for discovery and dispositive motions," ECF 117, at 8, based on the docket order holding those two deadlines "in abeyance," that

---

[24] It is significant in this regard that Dickinson did not promptly seek leave to amend after the court granted FPS's motion for sanctions in May 2019, an action that would have allowed more time for the parties to conduct discovery. Instead, Dickinson filed a massive motion for reconsideration, waited for the court to deny that, and then sought leave to amend on the last day permitted by the scheduling order. The court concludes that Dickinson's motion for leave to amend is simply a last-ditch strategic effort to avoid the consequences of the order granting the motion for sanctions.

OPINION AND ORDER DENYING MOTIONS TO AMEND—38

statement is unfounded and presumptuous insofar as it assumes the court intended to allow some sort of lengthy discovery period or other generous extension of time beyond, at most, the approximate balance of time left in the discovery period.[25] There is no evidence in the record for such a suggestion. More importantly, when Dickinson filed its original motion for leave to amend there was no indication the court would defer any deadlines, nor did Dickinson's motion propose any extension of time. Essentially, therefore, Dickinson is arguing that the court's docket-management order a month and half after the motion for leave to amend *retroactively* wiped away any prejudice granting the motion would cause. That theory is implausible (at best).

## Conclusion

For all of the foregoing reasons, the court **DENIES** Dickinson's motion for leave to amend its complaint and its motion to supplement that motion for leave.

DATED: July 30, 2021

/s/ *M. Miller Baker*
M. Miller Baker, Judge[26]

---

[25] As of the date of the court's order holding the discovery deadline in "abeyance," there were 29 days left before the discovery cutoff.

[26] Judge of the United States Court of International Trade, sitting by designation.

OPINION AND ORDER DENYING MOTIONS TO AMEND—39