EXHIBIT 11

EXHIBIT 11

**To:** Jeffrey Chang[jeffrey.chang@fpscorp.ca]; Siu Zhou[siu.zhou@fpscorp.ca]
**From:** Justin Lai
**Sent:** Fri 1/15/2016 10:19:42 AM
**Subject:** Dickinson Frozen Foods
**Attachment:** Q160117-01 DICKINSON FROZEN FOODS MT5-1-5.dwg
**Attachment:** Q160117 Dickinson Frozen Foods MT5-1-5.xlsx
**Attachment:** Q160117 Dickinson Frozen Foods MT5-1-5 IQF Tunnel Freezer for 8000 lb per hour diced potato.doc

Justin Lai
VP - Sales & Marketing
FPS Food Process Solutions Corp.
18388 McCartney Way
Richmond, BC
CANADA V6W 0A1
Phone: 604 232-4145
Mobile: 604 889-6270
Fax: 604 232-4154
E-mail: justin.lai@fpscorp.ca
website: www.fpscorp.ca
DISCLAIMER
This e-mail contains information that may be the confidential or privileged property of FPS Food Process Solutions Corp and should not be copied, modified, retransmitted, or used for any purpose without the written authorization of FPS Food Process Solutions Corp. If you have received this electronic transmission in error, please notify the sender and delete the material from any computer.

Exhibit No. 31
Wns: Alex Chen
Date: 7 January 2019

CHAREST
REPORTING INC
Jessica Archibald



FPS010113.00001

Confidential



FPS010113.00002

Confidential

ELEVATION VIEW

FLOOR SUPPORT LEG
TYP.

ENCLOSURE LENGTH

OVERALL LENGTH

49' - 3"

55' - 7"

FPS010113.00003

Confidential

This document is being produced in its Native Format.



18388 McCartney Way Richmond, BC V6W 0A1

## Quotation No. Q160117 for Dickinson Frozen Foods
## IQF Tunnel Freezer for 8,000 lb/hr Diced Potato

Dickinson Frozen Foods                                      January 14, 2016
903 E 3000 N
Sugar City, ID
83448

**Attention: Mr. Sergio Castaneda**

Dear Mr. Castaneda:

We are pleased to provide you with our proposal for the supply of the following equipment for your consideration:

### 1. Equipment

One (1) FPS model MT5-1-5 IQF Tunnel Freezer for 8,000 lb/hr diced potato with a 60" wide belt for freezing from an infeed temperature of 130ºF to an equilibrated outfeed temperature of 0ºF

### 2. Extent of Delivery

- Conveying construction is all stainless steel including belt supports, coil supports, baffling, etc.
- Infeed & discharge belt washer and belt dryer
- Floor, ceiling and enclosure are part of an integrated welded, insulated structural system
- Coil design is stainless steel tube with aluminum fins
- One (1) refrigerated precool coil
- Five (5) freezer coils on sequential hot gas defrost design
- Interior LED lighting with polycarbonate enclosures
- NEMA4 stainless steel control panel complete with Allen Bradley Compactlogix PLC, Allen Bradley Panelview 1000 color touch screen, drive frequency inverters, motor starters, circuit breakers, safety switches and emergency push stop
- Installation labor & supervision
- 7 day startup training
- Engineering drawings & utilities will be delivered 4-6 weeks after approval of layout drawing
- CPT Sugar City, ID

EXHIBIT 12

EXHIBIT 12 [Filed Under Seal]

EXHIBIT 13

EXHIBIT 13



**To:**       Sergio Castaneda[scastaneda@df-foods.com]
**Cc:**        Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering[kris.hinds@us.nestle.com]; Todd
Campbell[tcampbell@df-foods.com]; Juan Alvarado[jalvarado@df-foods.com]
**From:**    Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering
**Sent:**     Tue 6/27/2017 7:59:32 AM
**Subject:**  FW: Dickinson Foods Trip

Sergio, is the throughput variation due to freezer performance or due to other variables in production?

From: Sergio Castaneda [mailto:scastaneda@df-foods.com]
Sent: Tuesday, June 27, 2017 7:25 AM
To: Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering <kris.hinds@us.nestle.com>
Cc: Todd Campbell <tcampbell@df-foods.com>; Juan Alvarado <jalvarado@df-foods.com>
Subject: RE: Dickinson Foods Trip

| | |
|---|---|
| 6/21/2017 | 12:00 PM there was no production for that hour but the 1 o'clock was 7,000 lbs. |
| 6/21/2017 | 2:00 PM 4,850 lbs. for this hr. |
| 6/21/2017 | 2:44 PM 4,850 lbs. for this hr. |
| 6/21/2017 | 4:23 PM 6,000 lbs. for this hr. |
| 6/21/2017 | 5:25 PM 10,000 lbs. for this hour but the following hour was 2,000 lbs. |
| 6/22/2017 | 1:01 PM 6,000 lbs. |
| 6/22/2017 | 3:16 PM 8,000 lbs. |
| 6/22/2017 | 8:30 PM 6,000 lbs. |
| 6/23/2017 | 2:25 AM 8,400 lbs. |

From: Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering [mailto:kris.hinds@us.nestle.com]
Sent: Monday, June 26, 2017 5:08 PM
To: Sergio Castaneda <scastaneda@df-foods.com>
Cc: Todd Campbell <tcampbell@df-foods.com>; Juan Alvarado <jalvarado@df-foods.com>
Subject: FW: Dickinson Foods Trip

Hey Sergio

Could you guys verify the throughput at the various times?

Kris Hinds
Engineering Mgr


Nestlé

From: Joe Fazzari [mailto:joe.fazzari@colmaccoil.com]
Sent: Monday, June 26, 2017 3:17 PM
To: Jason Kwok <jason.kwok@fpscorp.ca>; Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering
<kris.hinds@us.nestle.com>; Jeff Chang <jeffrey.chang@fpscorp.ca>; Wiencke,Bent,ISSAQUAH,NUSA T&P –
Corporate Engineering <bent.wiencke@us.nestle.com>
Cc: Bruce Nelson <bruce.nelson@colmaccoil.com>; Todd Shelden <Todd.Shelden@colmaccoil.com>; Trever
Pope <Trever.Pope@colmaccoil.com>; Roger Williams <roger.williams@colmaccoil.com>; Kent Perkins
<kent.perkins@colmaccoil.com>; Colleen Grub <colleen.grub@colmaccoil.com>; Jeremy Olberding
<jeremy.olberding@colmaccoil.com>
Subject: RE: Dickinson Foods Trip

All,

Here is the completed spreadsheet for the coil performances.

Regards,

**Joe Fazzari, P.E.** | Vice President
370 N. Lincoln St. | P.O. Box 571 | Colville, Washington 99114 USA
T: 509.684.2595 | joe.fazzari@colmaccoil.com | www.colmaccoil.com
**Colmac Coil Manufacturing, Inc.**

**From:** Jason Kwok [mailto:jason.kwok@fpscorp.ca]
**Sent:** Monday, June 26, 2017 2:06 PM
**To:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering <kris.hinds@us.nestle.com>; Joe Fazzari
<joe.fazzari@colmaccoil.com>; Jeffrey Chang <jeffrey.chang@fpscorp.ca>; Wiencke,Bent,ISSAQUAH,NUSA
T&P – Corporate Engineering <bent.wiencke@us.nestle.com>
**Cc:** Bruce Nelson <bruce.nelson@colmaccoil.com>; Todd Shelden <Todd.Shelden@colmaccoil.com>; Trever
Pope <Trever.Pope@colmaccoil.com>; Roger Williams <roger.williams@colmaccoil.com>; Kent Perkins
<kent.perkins@colmaccoil.com>; Colleen Grub <colleen.grub@colmaccoil.com>; Jeremy Olberding
<jeremy.olberding@colmaccoil.com>
**Subject:** RE: Dickinson Foods Trip

Gentlemen,

Here attached the spreadsheets prepared by Trevor for the measured data from June 21st to 23rd. It included
the product capacity and coil suction temperatures in June 23rd spreadsheets.

Best Regards,

**Jason Kwok** | Manager, Modification Dept.

**FPS** FOOD PROCESS SOLUTIONS

**FPS Food Process Solutions Corp.**
18388 McCartney Way Richmond, BC V6W 0A1 Canada
Phone: 604 232-4145 •  Fax: 604 232-4154 •  www.fpscorp.ca
Mobile No. 604-376-2197

**From:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering [mailto:kris.hinds@us.nestle.com]
**Sent:** Thursday, June 15, 2017 12:58 PM
**To:** Joe Fazzari <joe.fazzari@colmaccoil.com>; Jeffrey Chang <jeffrey.chang@fpscorp.ca>; Jason Kwok
<jason.kwok@fpscorp.ca>; Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering
<bent.wiencke@us.nestle.com>
**Cc:** Bruce Nelson <bruce.nelson@colmaccoil.com>; Todd Shelden <Todd.Shelden@colmaccoil.com>; Trever
Pope <Trever.Pope@colmaccoil.com>; Roger Williams <roger.williams@colmaccoil.com>; Kent Perkins
<kent.perkins@colmaccoil.com>; Colleen Grub <colleen.grub@colmaccoil.com>; Jeremy Olberding
<jeremy.olberding@colmaccoil.com>
**Subject:** RE: Dickinson Foods Trip

Hey Joe

Coil #4 for full measurements and inlet and outlet of coils 3&4.  The cords may not be long enough to do

more than that.  I was also thinking of fishing cords through floor drains to keep them from being a tripping hazard.

Jeff and Jason- Are you in agreement?

Kris Hinds
Engineering Mgr



Nestlé

**From:** Joe Fazzari [mailto:joe.fazzari@colmaccoil.com]
**Sent:** Thursday, June 15, 2017 1:09 PM
**To:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering <kris.hinds@us.nestle.com>; Jeff Chang <jeffrey.chang@fpscorp.ca>; Jason Kwok <jason.kwok@fpscorp.ca>; Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>
**Cc:** Bruce Nelson <bruce.nelson@colmaccoil.com>; Todd Shelden <Todd.Shelden@colmaccoil.com>; Trever Pope <Trever.Pope@colmaccoil.com>; Roger Williams <roger.williams@colmaccoil.com>; Kent Perkins <kent.perkins@colmaccoil.com>; Colleen Grub <colleen.grub@colmaccoil.com>; Jeremy Olberding <jeremy.olberding@colmaccoil.com>
**Subject:** Dickinson Foods Trip

All,

I am sending this email only to the FPS and Nestle contacts and cc the Colmac people.  I will leave it up to FPS or Nestle to communicate the below with the end user.

We have reviewed our data logging equipment and here is what we are capable of recording with the equipment we currently have on hand:

Suction pressure for one coil
Suction temperature for one coil
Liquid pressure for one coil
Liquid temperature for one coil
Entering air relative humidity for one coil
Entering air dry bulb temperature for one coil
Leaving air temperature for one coil
Air face velocity for one coil
Surface temperatures for 3 return bends
Surface temperatures for 3 header legs

In addition to this, we have 10 more temperature only probes / inputs that are available.

Therefore, we only have a complete instrument set for <u>one coil</u> that will allow us to calculate that coil's capacity, but an additional 10 temperature only measurements with 20 foot long leads that could be used on the other coils to measure air temperatures or surface temperatures.

With this in mind, I'd appreciate input from Nestle and FPS to guide us on exactly which coil should be fully instrumented and then where you'd like the other 10 temperature probes (within 20 feet of the single coil we instrument).

If you would like to have three coils completely instrumented (as we discussed in our call yesterday), then we need to move this trip out to the following week (June 28th) so we can have time to purchase additional data loggers and sensors (about $10,000 in equipment).

In conclusion, please advise on the following two main items:

1) Do we want to push the trip out to the following week (June 28th) so we can fully instrument three coils?

2) If not, then please give us comments on which coil to fully instrument next week and where you'd like the additional 10 temperature only measurements.  For example, we could measure some entering and leaving air temps on coils 1 and 5 to at least give us some data from those coils (as long as they are within 20 feet).

Please respond as soon as possible so we can finish our preparations for this trip.

Thank you,

**Joe Fazzari, P.E.** | Vice President
370 N. Lincoln St. | P.O. Box 571 | Colville, Washington 99114 USA
T: 509.684.2595 | joe.fazzari@colmaccoil.com | www.colmaccoil.com
**Colmac Coil Manufacturing, Inc.**

**From:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering [mailto:kris.hinds@us.nestle.com]
**Sent:** Wednesday, June 14, 2017 3:31 PM
**To:** Jeff Chang <jeffrey.chang@fpscorp.ca>; Joe Fazzari <joe.fazzari@colmaccoil.com>; Jason Kwok <jason.kwok@fpscorp.ca>
**Cc:** Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>; Todd Campbell <tcampbell@df-foods.com>; Sergio Castaneda <scastaneda@df-foods.com>; Juan Alvarado <jalvarado@df-foods.com>
**Subject:** FW: SC visit

See message below

Kris Hinds
Engineering Mgr



**From:** Todd Campbell [mailto:tcampbell@df-foods.com]
**Sent:** Wednesday, June 14, 2017 4:29 PM
**To:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering <kris.hinds@us.nestle.com>; Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>
**Subject:** SC visit

Sergio is good for Wednesday June 21. I have given him the following instructions:
Sergio,
Nestle, Comag, FPS would like to come in next Wednesday or Thursday (June 21 or 22) to do some more data

logging. This will require the freezer to be cleaned and warm to install the loggers. Freezer will have to be ready by 8am sharp for the loggers to be installed. They said it will take a couple of hours to install the loggers.
Please let me know what day will work so I can pass it on.
The 500 hp compressor will also need to be used to perform this test. Please make sure Bob has it checked out and ready to work on the day you pick.
Please let me know ASAP so I can inform all of the participants. Kemper will also be involved.
Thanks

If there is something that I have missed let me know.
Thanks,


**Todd Campbell**
**Director of Operations**
Dickinson Frozen Foods, Inc.
P.O. Box 1010
600 N. W. 21st Street
Fruitland, Idaho 83619
*Phone: (208) 452-1624*
*Cell: (208) 709-4591*
tcampbell@df-foods.com



EXHIBIT 14

# EXHIBIT 14 [Filed Under Seal]

EXHIBIT 15

## EXHIBIT 15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

--oo0oo

| | |
|---|---|
| DICKINSON FROZEN FOODS, INC., | ) )Case No. )1:17-cv-00519-DCN |
| Plaintiff, | ) |
| vs. | )Video Deposition of: )BENT WIENCKE ) |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, | ) ) ) |
| Defendant. | ) ) |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, | ) ) ) |
| Counter-Claimant, | ) ) |
| vs. | ) ) |
| DICKINSON FROZEN FOODS, INC., | ) ) ) |
| Counter-Defendant. | ) ) |

August 7, 2019
9:58 a.m.

LOCATION:
Stoel Rives
201 South Main Street,
Suite 1100
Salt Lake City, UT 84111


* * *

Karen Christensen
- Registered Merit Reporter -
- Registered Professional Reporter -

1                    A P P E A R A N C E S

2   FOR THE PLAINTIFF/        John F. Kurtz, Jr., Esq.
    COUNTER-DEFENDANT:        HAWLEY TROXELL ENNIS & HAWLEY
3                             877 Main Street, Suite 1000
                              P.O. Box 1617
4                             Boise, ID 83701-1617
                              (208) 344-6000
5                             Jkurtz@hawleytroxell.com

6                             Steven Schossberger, Esq.
                              DICKINSON FROZEN FOODS
7                             6610 West Ct. St.
                              Pasco, WA
8                             (509) 545-4545

9   FOR THE DEFENDANT/        Elijah M. Watkins, Esq.
    COUNTER-CLAIMANT:         STOEL RIVES
10                            101 South Capitol Boulevard,
                              Suite 1900
11                            Boise, ID 83702
                              (208) 387-4275
12                            Elijah.watkins@stoel.com

13  FOR THE WITNESS:          Douglas B. Besman, Esq.
                              NESTLÉ USA
14                            30003 Bainbridge Road
                              Solon, OH 44139
15                            (440) 264-5191
                              Douglas.besman@us.nestle.com
16
     VIDEOGRAPHER:            Lance Harrison
17

18                        I N D E X

19
     EXAMINATION                                      PAGE
20
    BY MR. KURTZ                                         9
21   BY MR. WATKINS                                     192
     BY MR. KURTZ (Further Examination)                229
22

23

24

25

10:09:45  1    please provide me with just a general understanding of

10:09:49  2    the relationship that you observed between the

10:09:52  3    refrigeration system at the Dickinson facility and the

10:09:57  4    FPS freezer when you were involved in the work you did at

10:10:00  5    Dickinson?

10:10:02  6              MR. BESMAN:  I'm going to object as it's

10:10:04  7    compound and confusing.

        8              MR. KURTZ:  It's just very general.

10:10:06  9              MR. BESMAN:  I don't know if she wants to

10:10:08 10    read it back.

10:10:09 11              MR. WATKINS:  I'll join.

10:10:10 12         Q.   (BY MR. KURTZ)  I can restate the question.

10:10:12 13              I just wanted you to, just for the record,

10:10:14 14    just generally describe the interrelationship between the

10:10:18 15    refrigeration system that you observed at Dickinson when

10:10:21 16    you were doing your work there and the FPS freezer that

10:10:26 17    was there?

10:10:27 18              MR. BESMAN:  The interrelationship?

10:10:28 19         Q.   (BY MR. KURTZ)  Just how they interrelated

10:10:30 20    with each other, just general background.

10:10:31 21              MR. BESMAN:  Same objection.

10:10:32 22              MR. WATKINS:  Same.  Join.

10:10:33 23              MR. BESMAN:  If you can answer, go ahead.

10:10:35 24              THE WITNESS:  Well, when we -- so myself and

10:10:40 25    my colleague, Kris Hinds, when we --

```
1                    REPORTER:  I'm sorry, your what?
2                    THE WITNESS:  Kris Hinds.
3                    MR. BESMAN:  His colleague, Kris Hinds.
4                    THE WITNESS:  Colleague.
5                    REPORTER:  Kris Hinds?
6                    THE WITNESS:  Hinds, yeah.
10:10:48  7          Q.   (BY MR. KURTZ)  And his name is spelled
10:10:51  8    K-R-I-S H-I-N-D-S?
10:10:53  9          A.   Yeah.  He's going to be deposed tomorrow.
10                   REPORTER:  I'm sorry?
11                   THE WITNESS:  He's going to be deposed
10:10:56  12   tomorrow, Kris Hinds.
13                   REPORTER:  I'm just having a little trouble with
14   your accent, so slow is good.
10:11:03  15         THE WITNESS:  Okay.  When we started to look
10:11:07  16   at the ammonia refrigeration system and kind of studied
10:11:13  17   how it was interacting with the freezer, we noticed that
10:11:17  18   the refrigeration system had some issues.  And in the
10:11:25  19   beginning, our suspicion was maybe we were just dealing
10:11:31  20   with one issue, but we soon discovered that we were
10:11:34  21   dealing with multiple, multiple issues.
10:11:36  22         And we -- during our first visit, we created
10:11:41  23   a punch list of items to ensure that the issues we
10:11:46  24   identified with the ammonia refrigeration system were
10:11:49  25   addressed first before we were focusing on the
```

10:13:05 1        A.   Yes.   Yeah.

10:13:06 2        Q.   Who did you understand Jeff Chang to be?

10:13:09 3   What was his relationship to FPS?

10:13:10 4        A.   The president of FPS and the principal of --

10:13:15 5   one of the principals of FPS.

10:13:17 6        Q.   Did you have any dealings with any other

10:13:18 7   representatives of FPS?

10:13:23 8        A.   Yes, but I don't recall their names.

10:13:27 9        Q.   Were there any other dealings that you've had

10:13:29 10  with FPS, other than what you just described, prior to

10:13:33 11  going to the Dickinson facility in April of 2017?

10:13:38 12       A.   Not as I can recall, no.

10:13:43 13       Q.   How did you first learn about the issues that

10:13:48 14  were of concern at the Dickinson facility with respect to

10:13:51 15  the FPS freezer?

10:13:53 16            MR. BESMAN:   Objection.   Vague.   You can

10:13:55 17  answer.

10:13:56 18            MR. WATKINS:   Join.

10:13:57 19            THE WITNESS:   Do I answer?

10:13:58 20            MR. BESMAN:   Yes.

10:13:59 21       Q.   (BY MR. KURTZ)   Yeah.

10:14:01 22       A.   So Dickinson -- it's my understanding that

10:14:03 23  Dickinson potatoes is a supplier of potatoes to Nestlé,

10:14:07 24  and we're using potatoes in some of our products.   And a

10:14:16 25  situation arose where Dickinson wasn't able to supply

10:14:19  1   enough potatoes and our procurement department got

10:14:25  2   engaged in conversation with Dickinson potatoes and asked

10:14:28  3   why Dickinson wasn't supplying enough potatoes.

10:14:32  4         And Dickinson potatoes explained the

10:14:35  5   situation, that they installed a new line at their Sugar

10:14:38  6   City facility and the line wasn't producing what it was

10:14:41  7   supposed to produce.   And they explained that they were

10:14:47  8   experiencing major difficulties with the -- I don't want

10:14:52  9   to single any components out, but they were basically

10:14:55 10   mentioning that they had problems with the line producing

10:14:59 11   enough potatoes and they pinpointed it to the

10:15:02 12   refrigeration system and the freezer.

10:15:05 13         There was a mention that the contractors were

10:15:08 14   not able to resolve the issues.   It was an erroneous time

10:15:14 15   frame, and they were basically asking for help and asked

10:15:18 16   Nestlé if they would have a resource that could assist

10:15:22 17   them helping to troubleshoot the freezer and the

10:15:24 18   refrigeration system.

10:15:25 19         Q.   I'm assuming that most of what you just said

10:15:27 20   was something that was told to you by someone at Nestlé.

10:15:30 21         A.   Correct, yeah.

10:15:31 22         Q.   Who was the person that told you that at

10:15:35 23   Nestlé?

10:15:35 24         A.   My boss, Vernon Culver.

10:15:38 25         Q.   Okay.   Was that part of him provide -- giving

10:52:24  1    contributing factors to, say, the lack of performance,

10:52:32  2    and this was just one contributing factor.  And if we

10:52:35  3    would have fixed that, it wouldn't have solved all the

10:52:38  4    problems.

10:52:39  5          Q.   Are there any other -- other than the jog,

10:52:43  6    was there anything else that you thought still needed to

10:52:49  7    be rectified as of April 13th, 2017, with respect to the

10:52:57  8    refrigeration system?

10:52:58  9          A.   So the other component was with what's called

10:53:02 10    a suction riser.  That suction riser -- so we have six

10:53:10 11    coils and six suction risers going vertical, up, and they

10:53:17 12    were oversized.  And we determined that, ideally, the

10:53:21 13    last two suction risers of coils five and six should have

10:53:27 14    been reduced in size, but we also determined that that

10:53:32 15    wouldn't have fixed the performance issues.

10:53:35 16          Q.   So you ultimately determined that the

10:53:36 17    oversized suction risers did not adversely impact the

10:53:40 18    performance of the refrigeration system?

10:53:43 19               MR. WATKINS:  Objection.  Misstates

10:53:44 20    testimony.

10:53:45 21               THE WITNESS:  There was a miniscule impact

10:53:49 22    on the performance, yeah.

10:53:50 23          Q.   (BY MR. KURTZ)  Of the refrigeration system,

10:53:51 24    correct?

10:53:52 25          A.   Of the freezer coils, actually.

11:30:02  1    to you that that was their conclusion, also, correct?

11:30:05  2          A.   As far as I remember, yes.

11:30:08  3          Q.   And who were the team members that expressed

11:30:10  4    that to you?

11:30:11  5          A.   Well, first of all, Kris Hinds, who works for

11:30:15  6    Nestlé; Drew from Kemper Refrigeration; and the

11:30:29  7    individual from Colmac Coil.  But I don't know if that

11:30:34  8    was a time frame when Colmac Coil was heavily involved,

11:30:37  9    because we said earlier that the measurements were taken

11:30:40 10    in June and then in September again, so...  So I'm not

11:30:48 11    sure, as of the time frame, if Colmac Coil expressed back

11:30:55 12    on May 26th that they had concerns about the freezer.

11:30:58 13          Q.   Understood.  Okay.  Directing your attention

11:30:59 14    to Exhibit 327.

11:31:09 15               Again, this is an email stream.  It appears

11:31:35 16    to be -- starts out with an email from Mr. Campbell on

11:41:40 17    March 28th, 2017, and then an email to Vernon Culver from

11:31:54 18    Jill Fox on April 10th, 2017, and then followed by an

11:31:59 19    email from you to Jill Fox, Robert Riffert of

11:32:08 20    procurement, Vernon Culver and Michael Nelson and Kris

11:32:16 21    Hinds on June 29th, 2017.

11:32:20 22               Is that accurate?

11:32:21 23          A.   Yes.

11:32:21 24          Q.   And I'm going to focus on your email that you

11:32:26 25    drafted.

11:32:28  1          Could you describe who the various people are
11:32:30  2    that you sent the various email to?
11:32:34  3          A.   Jill Fox, she's from procurement; Rob
11:32:39  4    Riffert, same; Vernon Culver is my boss; Mike Nelson,
11:32:44  5    vice president of technical manufacturing; then Kris
11:32:52  6    Hinds from Nestlé.
11:32:58  7          Q.   Did you intend this email that you sent to be
11:33:01  8    accurate when you sent it?
11:33:03  9          A.   Yes.
11:33:04 10          Q.   And was it accurate?
11:33:07 11          A.   Yes.
11:33:09 12          Q.   Was this a document that you were preparing
11:33:12 13    to essentially report to other representatives of Nestlé
11:33:17 14    what conclusions you had reached to that point about the
11:33:23 15    operation of the freezer at Dickinson's facility?
11:33:30 16          A.   I believe there was a concern at one point if
11:33:38 17    Dickinson potatoes would be able to deliver enough
11:33:43 18    potatoes for our facilities and an update was requested
11:33:49 19    what our involvement was and what our involvement is and
11:33:54 20    if the issues have been resolved.
11:33:59 21          Q.   So this was essentially an internal report
11:34:01 22    that was being provided to representatives of Nestlé to
11:34:08 23    report to them the status of the situation.  Would that
11:34:11 24    be a fair characterization?
11:34:13 25          A.   Correct, yes.

11:34:14  1        Q.    And is that something you would do in your

11:34:17  2    ordinary course of the business of Nestlé, report to your

11:34:20  3    superiors and other people about the investigations that

11:34:23  4    you were doing on various freezers?   Is that something

11:34:27  5    that was normal for you to do as part of your regular big

11:34:30  6    business activity?

11:34:31  7        A.    It was normal that stakeholders request an

11:34:35  8    update regarding the status of something, you know, that

11:34:40  9    requires -- as it goes on a larger time frame, over

11:34:43 10    several months.

11:34:43 11        Q.    You were discussing information that was --

11:34:46 12    that you had in your mind at that point in time when you

11:34:48 13    sent this?

11:34:48 14        A.    Correct, yes.

11:34:51 15        Q.    You state in the second sentence that, "all

11:34:54 16    major refrigeration systems we identified have been

11:34:57 17    resolved by the refrigeration contractor."

11:35:02 18              That's similar to what you've testified

11:35:04 19    previously.   At that point, was that accurate -- that's

11:35:07 20    an accurate statement, correct --

11:35:08 21        A.    Correct.

11:35:09 22        Q.    -- of what you thought?

11:35:10 23        A.    Yes.

11:35:10 24        Q.    And that was based on all of the testing that

11:35:12 25    had been done as of that date and all the data that had

**Bent Wiencke - August 7, 2019**                    73

| | | |
|---|---|---|
| 11:35:15 | 1 | been gathered and the results of that data; is that |
| 11:35:17 | 2 | accurate? |
| 11:35:17 | 3 | A.    Yes. |
| 11:35:20 | 4 | Q.    Now, assuming that the data for the Colmac |
| 11:35:29 | 5 | data was gathered in June of 2017 -- June 1 or June 2 of |
| 11:35:37 | 6 | 2017, does that refresh your memory as to whether or not |
| 11:35:40 | 7 | the Colmac data was data that you also took into |
| 11:35:44 | 8 | consideration in reaching the conclusions that you had |
| 11:35:46 | 9 | reached when you sent out this email on June 29th, 2017? |
| 11:35:52 | 10 | A.    Yes.   The data was shared with all the team |
| 11:35:58 | 11 | members, yes. |
| 11:36:06 | 12 | Q.    Then you state in this email, "However, the |
| 11:36:08 | 13 | freezer throughput is still well below design |
| 11:36:11 | 14 | specification and the only major remaining issue is the |
| 11:36:15 | 15 | freezer itself." |
| 11:36:16 | 16 | Again, that was an accurate statement, based |
| 11:36:18 | 17 | on the work that you had done to -- all the work you had |
| 11:36:21 | 18 | done through that date, correct? |
| 11:36:22 | 19 | A.    Yes. |
| 11:36:23 | 20 | Q.    And did that opinion ever change? |
| 11:36:25 | 21 | A.    No. |
| 11:36:29 | 22 | Q.    You state, "We provided the freezer |
| 11:36:33 | 23 | manufacturer with evidence why the freezer is not |
| 11:36:36 | 24 | achieving the targeted throughput and that" they are no |
| 11:36:39 | 25 | longer -- "and that there are no longer any external |

| | | |
|---|---|---|
| 11:39:24 | 1 | MR. BESMAN:  Again, it's mischaracterizing |
| 11:39:27 | 2 | his testimony.  He was part of a team that investigated |
| 11:39:30 | 3 | this. |
| 11:39:31 | 4 | MR. WATKINS:  Join. |
| 11:39:32 | 5 | MR. KURTZ:  Understood.  And I'm not trying |
| 11:39:33 | 6 | to -- as part of the team, I'm focusing on the |
| 11:39:36 | 7 | conclusions that this particular witness reached.  We |
| 11:39:39 | 8 | have -- all the other persons will be -- |
| 11:39:41 | 9 | MR. BESMAN:  I understand. |
| 11:39:43 | 10 | MR. KURTZ:  -- providing testimony, so -- |
| 11:39:44 | 11 | MR. BESMAN:  I'm just trying to make clear |
| 11:39:45 | 12 | that this isn't -- he didn't come in there and do this |
| 11:39:47 | 13 | all by himself. |
| 11:39:48 | 14 | THE WITNESS:  Yeah. |
| 11:39:49 | 15 | MR. KURTZ:  He's made that very clear, and |
| 11:39:51 | 16 | we agree with that entirely. |
| 11:39:52 | 17 | THE WITNESS:  That the data clearly |
| 11:39:53 | 18 | supported that this was a main contributing factor.  So |
| 11:39:58 | 19 | we could clearly tell by the data that when one of the |
| 11:40:01 | 20 | coils was in defrost, that the load on the other coils |
| 11:40:03 | 21 | just went... |
| 11:40:05 | 22 | Q.   (BY MR. KURTZ)  Would it be accurate to say |
| 11:40:06 | 23 | that all of the conclusions that you personally reached |
| 11:40:11 | 24 | about the inadequacies and deficiencies related to the |
| 11:40:15 | 25 | freezer -- the FPS freezer were shared by all of the |

11:40:18  1   other members of the team that you identified?

11:40:23  2         MR. WATKINS:   Object.   Speculation.

11:40:24  3         THE WITNESS:   Except FPS, yes.

11:40:28  4         Q.   (BY MR. KURTZ)   Okay.   Okay.   Then you go on

11:40:34  5   to say, "The freezer manufacturer had some remaining

11:40:37  6   challenges and consequently we returned to Sugar City

11:40:41  7   last week to conduct measurements and provide proof."

11:40:49  8         What are you referring to when you say "the

11:40:51  9   freezer manufacturer had some remaining challenges"?

11:41:01 10         A.   Well, Jeffrey Chang was very much disagreeing

11:41:13 11   with all of our conclusions.   And we had several

11:41:23 12   conversations with him about if you're disputing all of

11:41:26 13   our conclusions, all of our data, then go out there and

11:41:33 14   take your own measurements and provide proof to us that

11:41:36 15   our data and conclusion is wrong.

11:41:39 16         Q.   Did you tell Mr. Chang that?

11:41:41 17         A.   I believe over the phone, yes.   Yeah.

11:41:47 18         Q.   Did -- other than -- well, let me strike

11:41:55 19   that.

11:41:55 20         With respect to those conclusions that you

11:41:59 21   said Jeff Chang was expressing, did Bruce Nelson of

11:42:03 22   Colmac ever agree, to your understanding, with those

11:42:08 23   conclusions that Jeff Chang was saying should be reached?

11:42:12 24         MR. WATKINS:   Objection.   Speculation.

11:42:14 25         THE WITNESS:   You're asking me to speculate.

11:45:48 1        A.    That's a pretty standard procedure, to
11:45:52 2   discuss that when you take measurements.  First question
11:45:55 3   you're asking, Has this instrumentation been calibrated
11:46:00 4   as accurate?
11:46:00 5        Q.    Did you have that conversation with Colmac
11:46:02 6   and did they respond to you that the instrumentation they
11:46:04 7   were using was calibrated properly?
11:46:06 8        A.    Yes.  Yeah.
11:46:07 9        Q.    And Bruce Nelson, was he the person who told
11:46:10 10  you that or some other representative?
11:46:11 11       A.    It was -- most likely, it was Trever Pope, or
11:46:15 12  Hope, who was actually doing the measurements.
11:46:22 13       Q.    You then state in the email marked as
11:46:25 14  Exhibit 327, "Besides being undersized, the freezer has
11:46:31 15  numerous design" -- and did you mean to say
11:46:35 16  inefficiencies or efficiencies?
11:46:37 17       A.    Oh, where is that?
11:46:40 18       Q.    It says, "Besides being undersized, the
11:46:43 19  freezer has numerous design" --
11:46:46 20       A.    Oh, deficiencies, yeah.
11:46:46 21       Q.    So it should be deficiencies?
11:46:48 22       A.    It's a typo, yes.
11:46:49 23       Q.    So, at that point in time, had you determined
11:46:52 24  that the freezer was undersized?
11:46:55 25       A.    Yes.

11:46:55 1        Q.    And how was the freezer undersized?   In what
11:46:58 2   way?
11:47:00 3        A.    So, first of all, it was due to the coils not
11:47:04 4   being designed for a five or 6,000 feet elevation.   So
11:47:08 5   the coils were undersized by at least 10 percent.   And
11:47:14 6   then, also, what the test data suggested was when we go
11:47:19 7   -- when one coil is in defrost, it imposes a tremendous
11:47:23 8   heat load on the other coils.
11:47:25 9             So in order to partition the coils off, major
11:47:28 10  design modifications would have been made.   And it would
11:47:32 11  have been -- it was discussed, and it was concluded it
11:47:36 12  would have been possible to do.
11:47:39 13       Q.    So the undersizing was the -- that you
11:47:42 14  identified was with respect to the coils?
11:47:44 15       A.    Yeah.
11:47:45 16       Q.    And was there undersizing with respect to
11:47:48 17  anything else besides the coils?
11:47:53 18       A.    No.   The coils -- when we determined that the
11:47:55 19  coils were performing what they were specified to do,
11:48:01 20  with the caveat -- or the main issue being that they were
11:48:07 21  specified to operate at sea level, not at five or
11:48:11 22  6,000 feet.
11:48:12 23       Q.    So they should have been larger to operate at
11:48:15 24  5,000 feet elevation?
11:48:17 25       A.    Correct, yes.

**Bent Wiencke - August 7, 2019**                    84

11:50:43  1    defect with respect to the precooler, was it basically

11:50:47  2    the lack of dwell time that was available on the

11:50:50  3    precooler because it was actually too short?

11:50:52  4        A.    Correct, yes.

11:50:58  5        Q.    You then you go on to say in your email, "We

11:51:01  6    do not foresee that the freezer can be modified in a cost

11:51:06  7    and time effective manner, i.e. there is no magic fix."

11:51:11  8            Was that the conclusion that you reached

11:51:15  9    then?

11:51:15 10            MR. BESMAN:   Same objection.

11:51:17 11            MR. WATKINS:   Join.

11:51:20 12        Q.    (BY MR. KURTZ)   And, again, that would be the

11:51:22 13    entire team, except for the FPS representatives?

11:51:26 14        A.    And I believe we had this discussion with FPS

11:51:32 15    involved and talked about potential design modifications,

11:51:38 16    and the conclusion we came to is that it was almost like

11:51:42 17    we have to cut the entire freezer apart and rebuild it.

11:51:46 18    And then you might as well put in a new freezer, so...

11:51:49 19        Q.    You discussed that directly with

11:51:51 20    representatives of FPS; is that correct?

11:51:53 21        A.    They were included in the discussions, yes.

11:51:57 22    Yeah.

11:51:57 23        Q.    And did you discuss the conclusions that were

11:52:02 24    reached that are described in Exhibit 327 with FPS

11:52:07 25    representatives?

**Bent Wiencke - August 7, 2019**                                85

11:52:11 1          A.   Like I stated earlier, they were part of all

11:52:14 2   these discussions, so none of -- nothing that's stated in

11:52:18 3   here was -- should have been any surprise to FPS.  So,

11:52:23 4   like I said earlier, everything was open book, we had

11:52:26 5   open communication with everyone.

11:52:27 6          Q.   So your best recollection today is you would

11:52:29 7   have discussed everything that was set forth in --

11:52:31 8          A.   Yes.

11:52:31 9          Q.   -- in the -- in Exhibit 327, of the 6/29/2017

11:52:40 10  email, with representatives of FPS?

11:52:43 11         A.   Yes.

11:52:43 12         Q.   That would have been primarily Jeff Chang and

11:52:45 13  Jason Kwok?

11:52:46 14         A.   Yes.

11:52:46 15         Q.   Would it be accurate to say that you always

11:52:49 16  included Jeff Chang on any kind of high-level discussion

11:52:54 17  like that?

11:53:00 18         A.   Yes.

11:53:01 19         Q.   Did you also try to include Jason Kwok in

11:53:05 20  those communications?

11:53:07 21         A.   If I remember correctly, he was part of most

11:53:10 22  of the conversation, so...

11:53:17 23         Q.   What did Jeff Chang or Jason Kwok or any

11:53:23 24  other representative of FPS say in response to you when

11:53:27 25  you indicated that it appeared as though the freezer

11:53:31 1    would have to have so many modifications to it that it

11:53:35 2    would be better to just bring in a new freezer?

11:53:40 3        A.    I don't recollect exactly what they said.

11:53:44 4        Q.    Did they disagree with your comments?

11:53:48 5        A.    Well, to a certain extent, they kept

11:53:52 6    disagreeing with our findings and conclusions.  And when

11:54:01 7    we suggested some of the modifications, there was a

11:54:04 8    general consensus that it would have been impossible to

11:54:08 9    modify the freezer.

11:54:37 10       Q.    I direct your attention to what's been marked

11:54:41 11   as Exhibit 345.

11:54:50 12            Did you receive a copy of this email from

11:55:13 13   Mr. Schossberger and all of the pages that are attached

11:55:17 14   to it?  It's marked as Exhibit 345.

11:55:22 15       A.    Yes.

11:55:31 16       Q.    Did you review the letter that was sent by

11:55:38 17   FPS's attorney that was attached to Exhibit 345?

11:55:42 18       A.    Yes.

11:55:42 19       Q.    Did you discuss that letter with anyone -- or

11:55:48 20   the attachment?

11:55:49 21            Did you also review the attachment that was

11:55:52 22   sent with the letter from the attorney for FPS from James

11:55:57 23   Peterson?

11:55:58 24       A.    I did discuss it with Kris Hinds, and I

11:56:04 25   believe we had a conference call with Todd Campbell and

11:56:08  1    also with Steve Schossberger to discuss the content of

11:56:14  2    the letter from Jim Peterson.

11:56:17  3         Q.   And did you disagree with the conclusions

11:56:22  4    that had been reached by Mr. Peterson in the attachment

11:56:27  5    to the letter from the attorney for FPS?

11:56:31  6         A.   Yes.

11:56:32  7         Q.   And did you communicate that disagreement to

11:56:36  8    representatives of Dickinson?

11:56:37  9         A.   Yes.

11:56:40 10         Q.   Did you know Mr. Peterson before you received

11:56:45 11    this letter?

11:56:46 12         A.   Yes.

11:56:46 13         Q.   Okay.  How had you known Mr. Peterson?

11:56:51 14         A.   We both discussed this, where we met in the

11:56:55 15    past, and we couldn't recollect, but we just knew we had

11:57:00 16    met in the past.  We couldn't recollect the capacity we

11:57:03 17    met in, when and where.

11:57:04 18         Q.   And then you ultimately met with Mr. Peterson

11:57:06 19    on September 21, 2017, correct?

11:57:09 20         A.   Yes.

11:57:09 21         Q.   At Dickinson's facility?

11:57:10 22         A.   Yes.

11:57:11 23         Q.   So let me hand you what's been marked as

11:57:15 24    Exhibit 346.

11:57:26 25              And Exhibit 346, this is an email that you

11:57:28   1   sent to Mr. Schossberger, correct, and with copies to

11:57:32   2   Mr. Campbell?

11:57:33   3        A.   Yes.

11:57:34   4        Q.   And in the beginning of it, at the top of the

11:57:37   5   page you state -- and this is an email dated July 24th,

11:57:42   6   2017, correct?

11:57:44   7        A.   Yes.

11:57:44   8        Q.   And you ask the question, "Has Jim Peterson

11:57:47   9   ever been on site and witnessed the operation?"

11:57:51  10        You asked that question of Mr. Schossberger.

11:57:54  11   What was your purpose in asking that question?

11:57:56  12        A.   I found it very peculiar that an expert in

11:58:02  13   this field -- and I'll include myself in this -- would be

11:58:06  14   able to form an opinion without having been on site and

11:58:10  15   actually conducted some of the evaluation studies that we

11:58:15  16   conducted.

11:58:18  17        Q.   So was it your suggestion that Mr. Peterson

11:58:22  18   actually come to the site to gather some of the

11:58:25  19   information -- similar types of data that you had been

11:58:28  20   gathering in the past to support your conclusions you

11:58:31  21   were able to reach, along with the other members of the

11:58:34  22   team?

11:58:34  23        A.   We mentioned that we're happy to share our

11:58:36  24   data and conclusions with him.  And if he wouldn't

11:58:45  25   agree -- or if he would disagree with our test data, he

11:58:48  1    would be free to take his own test data.

11:58:52  2         Q.   Did you have conversations with Mr. Peterson

11:58:58  3    when he -- before September 21, 2017, while you met with

11:59:05  4    him at the Dickinson facility in Sugar City?

11:59:08  5         A.   I do not recollect having any conversations

11:59:13  6    with him.

11:59:13  7         Q.   But both Mr. Peterson and you were present at

11:59:17  8    Sugar City on September 21, 2017, correct?

11:59:19  9         A.   Yes.

11:59:19 10         Q.   Who else was present at that time?

11:59:24 11         A.   I believe Jason Kwok was there.  I don't

11:59:29 12    think Jeff -- yeah, Jeff Chang was not there.  Bruce

11:59:31 13    Nelson was there, if I remember correctly.

11:59:34 14         Q.   And were representatives of Kemper there?

11:59:36 15         A.   Yeah, I think Drew was there.  And Eric White

11:59:43 16    was one of the principals.  If I remember correctly, he

11:59:48 17    was there.

11:59:48 18              MR. SCHOSSBERGER:  York?

11:59:50 19         Q.   (BY MR. KURTZ)  Eric York was there?

11:59:51 20         A.   Yeah.  And a third person I believe from

11:59:57 21    Kemper was there, too.

12:00:16 22         Q.   You then state in this -- in Exhibit 346 that

12:00:23 23    "he" -- and you're referring to Peterson -- correct me if

12:00:28 24    I'm wrong -- "he has not drawn any conclusions from the

12:00:31 25    data we collected with Colmac Coil."

12:00:34  1          Do you see that reference?

12:00:35  2      A.    Yes.

12:00:35  3      Q.    How did you know he had not reviewed the

12:00:38  4  Colmac?

12:00:39  5      A.    If he would have done that, he would have

12:00:41  6  drawn different conclusions.

12:00:45  7      Q.    Do you know whether Mr. Peterson ultimately

12:00:47  8  did review the Colmac data?

12:00:51  9      A.    To the best of my recollection, yes.  I'm

12:00:55 10  pretty sure we discussed it while we met in person in

12:00:59 11  Sugar City.

12:01:00 12      Q.    What do you recall about the conversations

12:01:03 13  that you had with Mr. Peterson and, in particular, with

12:01:07 14  respect to what his opinion was with respect to whether

12:01:12 15  the refrigeration system was operating correctly, on the

12:01:19 16  September 21, 2017, meeting?

12:01:23 17      A.    What I recall is that we went through his

12:01:28 18  report line item by line item and addressed some of his

12:01:32 19  concerns, and we asked him to review the design of the

12:01:37 20  refrigeration system.  We shared with him, very openly,

12:01:40 21  what design defects we identified in the refrigeration

12:01:43 22  system, what had been resolved.

12:01:45 23          And at the end of the meeting, he did concur

12:01:50 24  with us -- or agree with us, that the refrigeration

12:01:54 25  system was delivering more capacity than what was

```
          1    time is 12:18.
12:19:19  2              (A discussion was held off the record.)
12:19:19  3              VIDEOGRAPHER:  Back on the record.  The time
12:19:23  4    is 12:19.
12:19:24  5         Q.   (BY MR. KURTZ)  Okay.  If we go down to the
12:19:28  6    last two sentences that you have in your email to
12:19:32  7    Mr. Kwok and Jim Peterson, you state, "Based on data we
12:19:36  8    collected in the past and Kemper's report, it is likely
12:19:40  9    that the freezer is exposed to more than 100 TR of
12:19:45 10    parasitic loads (heat and moisture)."
12:19:51 11              Did you believe that to be an accurate
12:19:53 12    statement at the time?
12:19:54 13         A.   The data we collected supported that, yes.
12:19:58 14         Q.   And what are you referring to when you say
12:20:01 15    that "the freezer is exposed to more than 100" -- that's
12:20:04 16    100 tons of refrigeration?
12:20:06 17         A.   Yes.
12:20:06 18         Q.   -- "of parasitic loads (heat and moisture)"?
12:20:11 19    What are you referring to?
12:20:12 20         A.   That's related to the air infiltration into
12:20:16 21    the freezer when it's in operation and then, during
12:20:19 22    defrost, we see a lot of heat gain inside the freezer
12:20:23 23    that's being collected by the other coils.
12:20:25 24         Q.   Is that, in some respects, the equivalent of
12:20:28 25    saying your conclusion was the freezer would need as much
```

12:20:31 1   as 310 tons of refrigeration in order to perform

12:20:34 2   adequately?

12:20:36 3              MR. WATKINS:   Objection.   Misstates the

12:20:40 4   testimony.

12:20:40 5              THE WITNESS:   So we have data -- some of the

12:20:43 6   data we collected suggested that 310 tons wouldn't even

12:20:48 7   be enough.   Probably be more like 350 tons that we load.

12:20:54 8        Q.   (BY MR. KURTZ)   And what was the data that

12:20:55 9   you relied upon in reaching that conclusion?

12:20:58 10       A.   That was the data collected by Colmac Coil

12:21:03 11  and the data we evaluated, and we extracted from the data

12:21:09 12  the heat load the coils were actually seeing.

12:21:14 13       Q.   And how did you -- that data was obtained

12:21:18 14  from what tests that were done?

12:21:21 15       A.   Must have been June and September

12:21:24 16  measurements.

12:21:34 17             MR. KURTZ:  Well, this is kind of a timely

12:21:36 18  time to stop, so do you want to try to get back together

12:21:41 19  in -- I don't know what the thing's -- go off the

12:21:43 20  record.

        21             VIDEOGRAPHER:  Going off the record.  The

        22  time is 12:21.

        23             (A recess was taken.)

01:20:07 24             VIDEOGRAPHER:  Back on the record.  The time

01:20:08 25  is 1:20.

01:20:17  1                    MR. KURTZ:  Please mark this as Exhibit 270.

       2                    (Deposition Exhibit No. 270 was

01:20:36  3                 marked for identification.)

01:20:36  4         Q.   (BY MR. KURTZ)  Do you recognize Exhibit 270?

01:20:40  5         A.   Yes.

01:20:40  6         Q.   Okay.  What is exhibit -- is this a document

01:20:45  7    that was -- who prepared this document?

01:20:48  8         A.   I believe that's a document I prepared.

01:20:52  9         Q.   And could you describe generally -- well,

01:20:56 10    just go through and explain what it shows.

01:21:02 11         A.   This is the heat load calculation, basically

01:21:07 12    determining how much heat load the freezer is imposing on

01:21:12 13    the ammonia refrigeration system.

01:21:16 14         Q.   And so could you describe what -- how you

01:21:19 15    prepared this document?

01:21:24 16         A.   Using an Excel spreadsheet and used formulas

01:21:31 17    that are pretty common in the industry to determine the

01:21:34 18    heat load.

01:21:35 19         Q.   So you're trying to determine the heat load

01:21:38 20    of the product or the heat load on the freezer itself?

01:21:42 21         A.   The entire freezer, yes, which includes

01:21:46 22    product.

01:21:46 23         Q.   What conclusions did you reach as a result of

01:21:50 24    these calculations?

01:21:56 25         A.   So the conclusion I arrived at was that the

01:22:09  1   refrigeration system, as it was installed, should have

01:22:13  2   been able to handle the freezer load.  But it all put in

01:22:22  3   question that the 210 tons that was specified by FPS was

01:22:28  4   questionable, because during defrost, the freezer imposes

01:22:34  5   a higher load on the refrigeration system than the

01:22:39  6   210 tons.

01:22:40  7          Q.   So if you go to the bottom left-hand side of

01:22:45  8   the Exhibit 270, and towards the bottom it has a total

01:22:50  9   Cooling Capacity Required, 701.2 kW without coils and

01:22:56 10   defrost, 199.4 TR.

01:23:00 11              What is that describing?

01:23:03 12          A.   That's basically the heat load of the freezer

01:23:08 13   during normal operation when all the coils are in

01:23:12 14   freezing mode.

01:23:14 15          Q.   And then the next one is -- and what does the

01:23:18 16   701.2 KW refer to?

01:23:21 17          A.   I'm from Germany, so I grew up with metric

01:23:27 18   units and I still think and calculate in metric units,

01:23:30 19   and then I have to convert them into U.S. units, so...

01:23:35 20   So kW, the 701, if you convert that to tons of

01:23:40 21   refrigeration, it's the same, it's just using different

01:23:43 22   units, like using gallons or liters.

01:23:46 23          Q.   So 701.2 kW equals 199.4 tons of

01:23:52 24   refrigeration?

01:23:52 25          A.   Correct.

01:23:54 1        Q.    It's just one is in metric and the other one

01:23:54 2   is?

01:23:54 3        A.    IP units.   Inch-per-pound units.

01:23:57 4        Q.    So if you go to the next line where it has

01:24:01 5   857.2 KW, it would be the same situation, where that's

01:24:06 6   equal to 243.73 tons of refrigeration?

01:24:11 7        A.    Yes.

01:24:11 8        Q.    And then it says "with one coil in defrost."

01:24:16 9   So is this a measurement that you took or a calculation

01:24:19 10  that you did?

01:24:20 11       A.    That is a calculation I did, making an

01:24:26 12  estimate how much heat the coil in defrost mode is

01:24:32 13  releasing to enter the freezer.

01:24:34 14       Q.    And is that essentially showing that the tons

01:24:37 15  of refrigeration that need to be -- that the heat load on

01:24:45 16  the freezer when one coil was in defrost is 243.7 tons of

01:24:51 17  refrigeration?

01:24:53 18       A.    Yes.   Yeah.

01:24:54 19       Q.    And that would be, thereby, exceeding the

01:25:00 20  recommended 210 tons of refrigeration; is that accurate?

01:25:05 21       A.    Correct.

01:25:06 22       Q.    And you believe that is a reason why the

01:25:09 23  freezer did not operate correctly?

01:25:13 24       A.    So this is a theoretical calculation based

01:25:18 25  on, say, experience.   And the measurements we took

01:25:29  1    suggested a heat load much higher that the 243.7 tons.

01:25:33  2         Q.   And a refrigeration expert would know how to

01:25:37  3    make these calculations, correct?

01:25:39  4         A.   Yes.

01:25:40  5         Q.   And these are calculations that can be made

01:25:46  6    without actually taking measurements or data from the

01:25:51  7    operating freezer?

01:25:54  8              MR. WATKINS:   Objection.   Misstates

01:25:56  9    testimony.

01:25:58 10              THE WITNESS:   So let me answer this with:

01:26:02 11    These are textbook calculations, taking textbook and

01:26:05 12    then performing calculations.

01:26:07 13         Q.   (BY MR. KURTZ)  So what information -- would

01:26:10 14    you need to actually see the freezer in operation in

01:26:14 15    order to do these calculations?

01:26:21 16         A.   Can you rephrase that?

01:26:22 17         Q.   Yeah.   What I'm understanding is these are,

01:26:26 18    as you described it, textbook calculations that are done

01:26:31 19    by an expert refrigeration engineer.   And the question

01:26:38 20    is:   What information did you need in order to

01:26:44 21    calculate -- to make this calculation?   And, in

01:26:46 22    particular, I'm focused on whether or not you had to

01:26:49 23    actually see the refrigeration system in operation in

01:26:55 24    order to do these calculations, or is it -- are the

01:26:58 25    calculations capable of being made without actually

01:27:01  1    observing the freezer in operation?

01:27:03  2           A.   Yeah.  Again, these are theoretical

01:27:07  3    calculations, and all that is needed to perform these

01:27:11  4    calculations are the design program.  So, basically, you

01:27:17  5    know, when I freeze 8,000 potatoes an hour and then

01:27:22  6    basically what the incoming and the leaving temperatures

01:27:26  7    are.

01:27:26  8           Q.   And did you later verify that your

01:27:32  9    calculations that you did that are indicated in

01:27:36  10   Exhibit 270 were essentially accurate with regard to the

01:27:41  11   freezer when it was in operation?

01:27:44  12          A.   So the calculations did not match what we

01:27:48  13   observed at the freezers.

01:27:49  14          Q.   And what you ended up observing was actually

01:27:53  15   taking a higher amount of tons refrigeration, or heat

01:27:57  16   load, when it was in operation.  Is that with the one

01:28:00  17   coil in defrost?

01:28:01  18          A.   Correct.

01:28:01  19          Q.   And then there were -- I think you testified

01:28:04  20   to earlier was as high as 310 tons of refrigeration?

01:28:09  21          A.   I believe we had data that suggested

01:28:14  22   350 tons.  And, yes, 350 tons, but we're counting several

01:28:28  23   issues with the freezer, because it was so heavily

01:28:30  24   frosted that some of the data we had to put in question

01:28:35  25   whether it was accurate or not.

01:28:39  1        Q.    Do you have an explanation as to why it
01:28:42  2    turned out that the heat load that was being
01:28:45  3    calculated -- or being measured during operations turned
01:28:52  4    out to be so much higher than your calculation of 243.7
01:28:58  5    tons of refrigeration, with one coil in defrost?
01:29:01  6        A.    Yes, because the coils are not segregated
01:29:07  7    from each other.  So when one is in defrost, the chimney
01:29:10  8    effect is generated, where the heat load basically
01:29:13  9    migrates and the moisture load migrates from the coil in
01:29:15 10    defrost over to the other coils.
01:29:17 11        Q.    So in your calculation that you did, you did
01:29:21 12    not take that into consideration?  The calculation in
01:29:25 13    Exhibit 270, you didn't take in the configuration of the
01:29:29 14    freezer with respect to what you just described?
01:29:31 15        A.    Correct.
01:29:34 16        Q.    Would -- do you, as a refrigeration expert,
01:29:41 17    believe that you could look at the design of the freezer
01:29:45 18    and, based on your experience and knowledge, predict that
01:29:49 19    the tons of refrigeration would actually be higher than
01:29:55 20    the calculations, based upon the design of the FPS
01:30:00 21    freezer?
01:30:01 22             MR. WATKINS:  Objection.  Calls for expert
01:30:03 23    testimony of a freezer expert, not a refrigeration
01:30:06 24    expert.
01:30:06 25             MR. BESMAN:  Also, it's vague and

01:59:09  1   mounted properly to obtain accurate and reliable data?

01:59:14  2        A.   I don't remember anybody objecting to the

01:59:17  3   methodology we were using and the mounting of the

01:59:20  4   sensors.

01:59:20  5        Q.   Did that lead you to the conclusion, based on

01:59:23  6   your working with the team, that no one did object to

01:59:27  7   that?

01:59:27  8        A.   Correct.

01:59:36  9        Q.   Did you find -- do you know whether or not

01:59:40 10   Colmac calibrated the instrumentation that was used to

01:59:44 11   gather the data that's shown on Exhibit 273?

01:59:51 12        A.   If I recall correctly, I believe this

01:59:56 13   instrumentation was calibrated at Colmac Coil, at the

02:00:00 14   factory.

02:00:01 15        Q.   Did anyone from FPS or anyone from anywhere

02:00:06 16   else ever suggest to you that the data that had been

02:00:11 17   gathered by Colmac that's reflected in Exhibit 273 was

02:00:16 18   either not accurate or not reliable?

02:00:19 19        A.   Don't recall that.

02:00:21 20        Q.   But did you come to the conclusion that the

02:00:25 21   data that was gathered by Colmac, as reflected in

02:00:29 22   Exhibit 273, was accurate and reliable?

02:00:31 23        A.   It's like I said -- stated earlier, this was

02:00:34 24   not a laboratory experiment, so you're doing field

02:00:39 25   measurements, and there are always a lot of variables

02:00:43  1   involved when you do field measurements.  And we were
02:00:46  2   challenged with some of the coils being heavily frosted,
02:00:51  3   and that introduced some inaccuracies in the data
02:00:55  4   collection.
02:00:55  5        Q.   But at the end of the day, did you believe
02:00:59  6   that the data that was collected was essentially as
02:01:01  7   accurate as you could expect, in light of the fact that
02:01:04  8   it was being done in the field as opposed to in a
02:01:07  9   laboratory?
02:01:07 10        A.   Correct, yes.
02:01:08 11        Q.   And as a refrigeration expert, did you
02:01:12 12   consider the data that was gathered by Colmac to be
02:01:16 13   accurate and reliable for the purposes of determining
02:01:20 14   whether or not the freezer would operate properly?
02:01:24 15        A.   Correct.
02:01:30 16        Q.   What types of data is actually shown on
02:01:36 17   Exhibit 273?
02:01:39 18        A.   Basically, the leaving and entering air
02:01:47 19   temperatures.  We were able to use that to calculate the
02:01:50 20   coil performance.
02:01:51 21        Q.   Now, the Colmac data was actually gathered
02:01:57 22   from instrumentation that was put onto the freezer,
02:02:01 23   correct?
02:02:01 24        A.   Yes.
02:02:02 25        Q.   It wasn't data that was gathered from either

03:51:41  1            Is that right?

03:51:41  2        A.    Yeah.

03:51:42  3        Q.    And dated June 27th, 2017.  It says, "All,

03:51:46  4   Here is the corrected spreadsheet to the 5,000 ft

03:51:49  5   elevation."

03:51:51  6            Do you see that?

03:51:52  7        A.    Yes.

03:51:52  8        Q.    Is that what you testified to previously on

03:51:56  9   the issue of the coils having been designed for a sea

03:52:08 10   level elevation rather than 5,000-foot elevation?

03:52:11 11        A.    Yes.

03:53:07 12            MR. KURTZ:  Why don't we take a ten-minute

03:53:08 13   break?  I'm getting real close to being done here and I

03:53:12 14   just need to spend a few minutes going through some

03:53:16 15   documents and -- can we do that?

03:53:18 16            VIDEOGRAPHER:  Going off the record.  The

03:53:20 17   time is 3:53.

04:13:24 18            (A recess was taken.)

04:13:28 19            VIDEOGRAPHER:  Back on the record.  The time

04:13:31 20   is 4:13.

04:13:32 21        Q.    (BY MR. KURTZ)  Mr. Wiencke, could you

04:13:35 22   please -- I want to direct your attention to

04:13:37 23   September 21, 2017, the meeting that occurred at

04:13:41 24   Dickinson's facility where Mr. Jim -- James Peterson was

04:13:47 25   present and others.  What I'd like you to do is help me

04:13:50  1    go through, with as much precision as possible, what

04:13:53  2    happened on that day.

04:13:54  3              So what time did you arrive at that facility

04:13:57  4    that day of September 21st, 2017, approximately?

04:14:02  5        A.    Short part of 8:00, I think.

04:14:06  6        Q.    Did you meet with Mr. Peterson when you first

04:14:08  7    arrived?

04:14:13  8        A.    Not sure if I ran into him at the hotel or at

04:14:18  9    the facility.  I think at the facility.

04:14:21 10        Q.    Okay.  All right.  And take me through, if

04:14:24 11    you would, chronologically what occurred that day, on

04:14:28 12    September 21, 2017.

04:14:32 13        A.    I think we -- if I remember correctly, we

04:14:35 14    were all meeting in the conference room and kind of

04:14:38 15    getting settled in and organized and discussing how we

04:14:44 16    wanted the day to unfold.  And we felt like Jim Peterson

04:14:54 17    reported some inaccuracies, since he wasn't on site, so

04:14:58 18    we -- I believe we went through his report first and

04:15:01 19    discussed some of these items.

04:15:02 20        Q.    So that would be the report that Mr. Peterson

04:15:05 21    had prepared --

04:15:07 22        A.    Correct, yeah.

04:15:07 23        Q.    -- you discussed previously?

04:15:09 24        A.    Yeah.  And so we just discussed the items

04:15:14 25    item by item.  And then we gave him the opportunity to

04:15:17  1    actually go out and see the refrigeration system and the

04:15:23  2    freezer and basically form his own opinion and correct

04:15:26  3    his own data as he desired.   And then we called later in

04:15:38  4    the day and discussed some of the observations he had and

04:15:44  5    also addressed some of the concerns he had in his

04:15:47  6    opinion.

04:15:47  7          Q.   What observations did he say he had when he

04:15:51  8    went out and looked at the freezer and the refrigeration

04:15:56  9    system?

04:15:56 10          A.   I don't recall, exactly.   I just remember

04:16:02 11    that any concerns pertaining to the refrigeration system,

04:16:05 12    I think we came to a good -- let's say good agreement

04:16:12 13    where we said, Okay, let's agree upon what impact that

04:16:18 14    finding would have on the overall system.

04:16:22 15          And at the end of the day -- or the end of

04:16:25 16    the meeting, we estimated what we believed a

04:16:32 17    refrigeration system would be able to deliver.   And we

04:16:34 18    talked about some of the -- say, the design challenges

04:16:39 19    the refrigeration system had, like the suctions riser.

04:16:42 20    We agreed upon what impact it would have.   And at the

04:16:46 21    end, I think we all arrived at a number of -- not sure,

04:16:52 22    exactly -- 240 or 250 tons.   I think we all agreed to the

04:16:56 23    refrigeration system should be capable of delivering

04:16:59 24    that.

04:16:59 25          Q.   And, in particular, what are you referring to

04:17:02  1    when you say "capable of delivering that"?  210 tons of

04:17:06  2    refrigeration minus 40 degrees at the coil?

04:17:09  3         A.    No, it was on about two hundred and -- I

04:17:12  4    mean, excess of 240 tons at minus 40 degrees at the coil.

04:17:18  5         Q.    Was Mr. Jason Kwok with Mr. Peterson

04:17:22  6    throughout the various times that you were meeting with

04:17:26  7    him?

04:17:26  8         A.    I believe so, yes.

04:17:28  9         Q.    So Mr. Kwok would have basically overheard

04:17:31 10    the conversations that you were having with Mr. Peterson?

04:17:33 11         A.    Yeah.

04:17:34 12         Q.    Did Mr. Kwok say anything during the

04:17:36 13    meetings?

04:17:37 14         A.    I don't recall.

04:17:39 15         Q.    What did Mr. Peterson say about his report

04:17:42 16    that he had initially done?

04:17:49 17         A.    I don't remember exactly his words or exactly

04:17:53 18    how he responded.

04:17:55 19         Q.    Did he ultimately indicate to you in some way

04:17:58 20    that he no longer believed that what he had set out in

04:18:02 21    his report was accurate?

04:18:05 22         A.    I mean, at the end, it was -- I think we came

04:18:09 23    to an agreement that some of his initial claims were

04:18:13 24    inaccurate and had no basis, so...  At the end, we came

04:18:19 25    to a pretty good consensus, I would say.

04:18:22 1        Q.    And when you say "we," who were the

04:18:24 2    individuals that were there that were part of that

04:18:28 3    consensus?

04:18:28 4        A.    It was myself, Kris Hinds, the people from

04:18:31 5    Kemper refrigeration were there.  I think Eric York was

04:18:36 6    there and Drew and another individual.  And, yeah, I

04:18:45 7    think Colmac Coil were more focused on the coils

04:18:48 8    themselves than the refrigeration system.

04:18:50 9        Q.    Was Bruce Nelson there?

04:18:51 10       A.    I believe he was, yeah.

04:18:52 11       Q.    Any other representatives of Colmac there at

04:18:56 12   that time?

04:18:56 13       A.    Maybe Bruce wasn't, maybe it was Joe Fazzari.

04:19:00 14   I don't recall exactly who was there.

04:19:02 15       Q.    Were there any participants on the telephone

04:19:04 16   for any of the conversations that took place?

04:19:08 17       A.    I know that Jim Peterson and Jason Kwok, they

04:19:15 18   had frequent calls with Jeffrey Chang.  I know that.

04:19:17 19       Q.    Did you overhear any of those calls?

04:19:20 20       A.    No.

04:19:20 21       Q.    Did they talk to you about what they

04:19:22 22   discussed with Mr. Chang?

04:19:26 23       A.    Don't remember if they did.

04:19:29 24       Q.    But you say, at the end of the day, there was

04:19:34 25   a consensus that the refrigeration system was working

04:19:38   1    properly?

04:19:39   2         A.   Correct.

04:19:40   3         Q.   Were there any consensuses arrived at with

04:19:45   4    Mr. Peterson about the deficiencies that you identified

04:19:49   5    in the freezer?

04:19:51   6         A.   He did not want to entertain any discussion

04:19:58   7    regarding the freezer.

04:19:58   8         Q.   Did he essentially take the position that he

04:20:02   9    was a refrigeration expert and he was only there to

04:20:04  10    determine whether the refrigeration system was working

04:20:06  11    properly?

04:20:06  12         A.   That's what he -- well, he indicated that he

04:20:09  13    was hired to look over the refrigeration system and not

04:20:12  14    the freezer.

04:20:15  15         Q.   Did you discuss with him the deficiencies

04:20:18  16    that you had identified with the freezer?

04:20:25  17         A.   I believe we did discuss that, but he didn't

04:20:29  18    want to take a position.

04:20:32  19         Q.   So what he did agree with, though, was that

04:20:35  20    the refrigeration system was working properly?

04:20:38  21         A.   Correct, yes.

04:20:39  22         Q.   And as part of that discussion he had, did

04:20:43  23    you show him any of the data that had been gathered

04:20:47  24    related to the performance of the freezer -- of the

04:20:50  25    refrigeration system?

04:20:51  1        A.   Yeah.   If I remember correctly, we shared

04:20:54  2   everything with them.   You know, either we did or FPS

04:21:00  3   shared everything.

04:21:00  4        Q.   So, as far as you know, he had access to all

04:21:04  5   of the same data compilation that you had access to?

04:21:08  6        A.   Yes.   Yeah.

04:21:11  7        Q.   Did he discuss with you any conclusions that

04:21:15  8   he'd reached after reviewing the data, other than just

04:21:23  9   say he agreed that the refrigeration system was working

04:21:26 10   properly?

04:21:27 11        A.   So I remember us -- I think we used a

04:21:32 12   whiteboard and wrote down and said, Okay, let's agree on

04:21:37 13   what we can agree upon.   And we kind of wrote on the

04:21:41 14   whiteboard what we believed the two compressors were

04:21:45 15   delivering -- the cooling capacity delivery and what

04:21:48 16   impact some of the design deficiencies had on the system,

04:21:55 17   like the suction risers.   Yeah, I think that was pretty

04:22:01 18   much it, was just the suction risers.

04:22:04 19        Q.   Did Mr. Peterson agree with your conclusion

04:22:06 20   that the suction risers only had a minimum effect on the

04:22:11 21   operation of the refrigeration system?

04:22:13 22        A.   Yes.

04:22:19 23        Q.   And what was the tons again?   I think you

04:22:23 24   testified to this previously, but the tons of

04:22:26 25   refrigeration that all the participants in the

04:22:29  1    September 21, 2017, meeting agreed that the refrigeration

04:22:34  2    system was providing?

04:22:35  3         A.    I think it was a minimum of 240 tons.  It may

04:22:39  4    have settled in on 245 or that, but it was definitely

04:22:44  5    above the 210 tons that was specified.

04:22:47  6         Q.    Did Mr. Peterson indicate to you that he

04:22:49  7    thought it was -- would be necessary or appropriate for

04:22:52  8    him to conduct any additional testing of the

04:22:56  9    refrigeration system in order to confirm what he'd agreed

04:22:59 10    to at that meeting?

04:23:03 11         A.    No.

04:23:03 12         Q.    Did he suggest in any way that there was some

04:23:06 13    additional testing that could be done?

04:23:08 14         A.    Not as far as I remember.

04:23:23 15         Q.    Did you have -- well, at the time that you

04:23:27 16    met with Mr. Peterson, you had multiple data sets for

04:23:34 17    different time periods between June and September showing

04:23:38 18    both compressor refrigeration at 210 tons of

04:23:43 19    refrigeration and minus 40 degrees at the coil, correct?

04:23:46 20         A.    Can you repeat that?

04:23:47 21         Q.    Yeah.  You had compiled data from June of

04:23:59 22    2017 through September of 2017 indicating that the

04:24:05 23    refrigeration system was capable of achieving at least

04:24:11 24    210 tons of refrigeration and minus 40 degrees at the

04:24:14 25    coil?

04:24:15   1          A.     Correct, yes.

04:24:17   2          Q.     How did you -- so when -- what time during

04:24:25   3   the day was that agreement reached -- that you indicated

04:24:29   4   was reached as you were working on the whiteboard?

04:24:36   5          A.     So I think we met for -- maybe for

04:24:40   6   one-and-a-half -- I can't remember if we met for one day

04:24:42   7   or one-and-a-half days, but I think it was at the end of

04:24:46   8   the first day where we started talking about the details.

04:24:55   9          Q.     And do you recall what was -- did anybody

04:24:58  10   take a snapshot of what was on the whiteboard or take any

04:25:02  11   notes that you know of about what was on the whiteboard

04:25:06  12   that was being agreed upon?

04:25:09  13          A.     I don't believe anybody took any notes.

04:25:16  14          Q.     What do you recall was put up on the

04:25:19  15   whiteboard that was actually agreed to?

04:25:23  16          A.     That the ammonia refrigeration system was

04:25:28  17   exceeding the specified capacity of 210 tons.

04:25:32  18          Q.     Anything else?

04:25:33  19          A.     Well, now, remember, we ran through Jim

04:25:41  20   Peterson's opinion letter and we wanted to establish,

04:25:46  21   like -- as an example, we talked about suction risers.

04:25:49  22   Is this a smoking gun?  And we discussed if we would

04:25:53  23   change the suction risers out and optimize them, would

04:25:58  24   that fix the problem?  And it was agreed upon, no, it

04:26:01  25   would not fix the problem.  It may improve the

04:26:04  1    performance to a certain degree, but it would not fix the
04:26:09  2    problem.
04:26:09  3           Q.   Could you summarize for me the -- by
04:26:13  4    September 21, the conclusions that you and the others on
04:26:17  5    the team, other than FPS and James Peterson, reached
04:26:22  6    about the performance of the refrigeration system?
04:26:27  7           A.   If somebody considered everybody was somewhat
04:26:35  8    of a refrigeration expert, including Kemper
04:26:39  9    refrigeration, Jim Peterson, myself, and Kris Hinds, we
04:26:42 10    all came to the same conclusion and there was general
04:26:45 11    consensus that the refrigeration system exceeded 210 tons
04:26:51 12    capacity.
04:26:51 13           Q.   And was it capable of achieving at least
04:26:55 14    minus 40 degrees at the coil?
04:26:57 15           A.   Correct, yes.
04:26:58 16           Q.   And could you just summarize what conclusions
04:27:04 17    you had reached by September of 2017 with respect to the
04:27:09 18    deficiencies that you had identified in the freezer?
04:27:23 19           A.   So I would say the major design deficiency in
04:27:25 20    the freezer was the location and orientation of the
04:27:32 21    coils, that they were not properly segregated one from
04:27:38 22    each other.  There was, like, one open space.  And if one
04:27:43 23    went into defrost and -- like I said earlier, the coil
04:27:46 24    created a chimney effect and all the moisture and hot air
04:27:51 25    was migrating to the other coils.

1                      C E R T I F I C A T E

2

     STATE OF UTAH              )
3                               :ss
     COUNTY OF SALT LAKE        )
4
              THIS IS TO CERTIFY that the foregoing deposition
5     was taken before me, KAREN CHRISTENSEN, Registered Merit
      Reporter, Registered Professional Reporter, and notary
6     public in and for the State of Utah.

7             That the said witness was by me, before
      examination, duly sworn to testify the truth, the whole
8     truth and nothing but the truth in said cause.

9             That the testimony of said witness was reported
      by me in Stenotype and thereafter caused by me to be
10    transcribed into typewriting, and that a full, true and
      correct transcription of said testimony so taken and
11    transcribed is set forth in the foregoing pages and said
      witness deposed and said as in the foregoing annexed
12    deposition.

13            I further certify that I am not of kin or
      otherwise associated with any of the parties to said
14    cause of action, and that I am not interested in the
      event thereof.

15
              WITNESS MY HAND at Salt Lake City, Utah.
16

17

18                              _____

19                              KAREN CHRISTENSEN, RPR, RMR
      My Commission Expires:
20    February 15, 2020

21

22

23

24

25

EXHIBIT 16

## EXHIBIT 16

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

--oo0oo--

| | |
|---|---|
| DICKINSON FROZEN FOODS, INC., | )<br>)Case No.<br>)1:17-cv-00519-DCN |
|     Plaintiff, | )<br>) |
| vs. | )Video Deposition of:<br>)KRIS HINDS<br>) |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, | )<br>)<br>) |
|     Defendant. | )<br>) |
| FPS FOOD PROCESS SOLUTIONS CORPORATION, | )<br>)<br>) |
|     Counter-Claimant, | )<br>) |
| vs. | )<br>) |
| DICKINSON FROZEN FOODS, INC., | )<br>)<br>) |
|     Counter-Defendant. | )<br>) |

August 8, 2019
8:11 a.m.

LOCATION:
Stoel Rives
201 South Main Street,
Suite 1100
Salt Lake City, UT 84111

* * *

Karen Christensen
- Registered Merit Reporter -
- Registered Professional Reporter -

```
 1                  A P P E A R A N C E S

 2   FOR THE PLAINTIFF/     John F. Kurtz, Jr., Esq.
     COUNTER-DEFENDANT:     HAWLEY TROXELL ENNIS & HAWLEY
 3                          877 Main Street, Suite 1000
                            P.O. Box 1617
 4                          Boise, ID 83701-1617
                            (208) 344-6000
 5                          Jkurtz@hawleytroxell.com

 6                          Steven Schossberger, Esq.
                            DICKINSON FROZEN FOODS
 7                          6610 West Ct. St.
                            Pasco, WA
 8                          (509) 545-4545

 9   FOR THE DEFENDANT      Elijah M. Watkins, Esq.
     COUNTER-CLAIMANT:      STOEL RIVES
10                          101 South Capitol Boulevard,
                            Suite 1900
11                          Boise, ID 83702
                            (208) 387-4275
12                          Elijah.watkins@stoel.com

13   FOR THE WITNESS:       Douglas B. Besman, Esq.
                            NESTLÉ USA
14                          30003 Bainbridge Road
                            Solon, OH 44139
15                          (440) 264-5191
                            Douglas.besman@us.nestle.com
16
     VIDEOGRAPHER:          Lance Harrison
17

18
                       I N D E X
19
     EXAMINATION                                    PAGE
20
     BY MR. KURTZ                                       9
21   BY MR. WATKINS                                   170
     BY MR. KURTZ (Further Examination)               225
22   BY MR. WATKINS (Further Examination)             229
     BY MR. KURTZ (Further Examination)               230
23

24

25
```

11:29:03  1    the email it has CoilPro Analysis 6/22/17.   322A has the

11:29:11  2    CoilPro Analysis 6/22/17 on it as well.

11:29:14  3            Q.    Thank you for doing that.   Thank you.

11:29:49  4                  Let me direct your attention to Exhibit 276.

11:29:55  5            A.    Are we done with all these here?

11:29:57  6            Q.    Well, I hope so, but I can't guarantee it,

11:30:01  7    but I think probably yes.

11:30:03  8            A.    All right.   I know I'm messing them up,

11:30:13  9    but... okay.

11:30:19 10            Q.    So I wanted to focus you on the -- the second

11:30:26 11    email, May 8th, 2017.   Looks like an email from Gary L.

11:30:37 12    Schrift, S-H-R-I-F-T, Vice President - Utilities

11:30:40 13    Applications North America.

11:30:41 14                  That's an email to you, correct?   It says,

11:30:45 15    "Jan Clarke" --

11:30:46 16            A.    Yes.

11:30:46 17            Q.    -- "one of our" -- "Jan Clarke, one of our

11:30:48 18    senior engineers, is reviewing the screen shots and has

11:30:52 19    some questions.   Do you have a number he can call, or the

11:30:55 20    name and number of someone at the plant to ask questions?

11:30:58 21    Best regards."

11:30:59 22                  Did you do something in response to receiving

11:31:03 23    that email?

11:31:05 24            A.    Yeah.   I sent the email above that to Darren,

11:31:09 25    which is one of their maintenance technicians, if we

11:31:12  1    could -- because Darren was local, and I couldn't get the

11:31:14  2    information from the screens.

11:31:16  3        Q.    Okay.  So was this basically part of the

11:31:19  4    process of making sure that the compressors were properly

11:31:24  5    calibrated?

11:31:26  6        A.    Calibrated and getting the output they were

11:31:30  7    designed for.

11:31:30  8        Q.    Okay.  So this is part of the process that

11:31:33  9    was gone through in order to do that?

11:31:35  10       A.    Yes.

11:31:35  11       Q.    And so at least the process is being started

11:31:38  12   around May 8th of 2017?

11:31:41  13       A.    Yes.

11:31:41  14       Q.    Do you know when the process of getting that

11:31:45  15   accomplished was done?

11:31:50  16       A.    Not off the top of my head, but we did -- I

11:31:54  17   think one of the representatives from GEA was actually

11:31:59  18   there and calibrated everything and made sure everything

11:32:02  19   was working properly.  I think we insisted that someone

11:32:07  20   come out -- you know, someone come out and verify that

11:32:09  21   the compressor is running like it should.

11:32:12  22       Q.    Okay.  And that got done?  That was done?

11:32:14  23       A.    Yes.

11:32:17  24       Q.    Directing your attention to Exhibit 277.

11:32:21  25   This is also an email that's directed to you by Jan

11:32:27  1   Clarke, is that correct, on May 15th, 2017?

11:32:30  2          A.   Yes.

11:32:33  3          Q.   And you turn around and forward that email to

11:32:38  4   Bent Wiencke and others that are listed there; is that

11:32:44  5   right?

11:32:44  6          A.   Yes.

11:32:44  7          Q.   Okay.   And is this also part of the process

11:32:46  8   that you just described of getting the compressor

11:32:55  9   calibrated and operating correctly?

11:32:58 10          A.   Yes.   Because, you know, our fleet of

11:33:03 11   compressors are mostly another brand, I had to rely on

11:33:08 12   other people than myself because I'm not too familiar

11:33:11 13   with the GEA compressors.   That's why we relied heavily

11:33:15 14   on GEA themselves.

11:33:39 15               Oh, okay.

11:33:40 16          Q.   Are you good?

11:33:40 17          A.   Yeah, I'm good.

11:33:42 18          Q.   Directing your attention to Exhibit 278.

11:33:47 19          A.   Okay.

11:33:48 20          Q.   Okay.   Again, I'm focusing on the email at

11:33:53 21   the very top of the page.   It's dated May 17th, 2017.

11:34:02 22   Looks like it's an email from you to Todd Campbell, with

11:34:08 23   a copy going to Bent Wiencke.

11:34:11 24               Do you see that?

11:34:11 25          A.   Yes.

11:34:12  1          Q.    All right.   And in there you make the

11:34:16  2    statement, "We are systemically eliminating issues.

11:34:20  3    Currently working on the following:" and you say, "Kemper

11:34:23  4    to replace Check Valves on valve groups."

11:34:26  5              Do you see that?

11:34:27  6          A.    Yes.

11:34:27  7          Q.    And that was done, correct?

11:34:28  8          A.    Correct.

11:34:28  9          Q.    All right.   And then, "FES (GEA) checking

11:34:32 10    compressor screenshots and going to provide a procedure

11:34:35 11    to verify compressor performance."

11:34:37 12              That was also done, correct?

11:34:38 13          A.    Correct.

11:34:39 14          Q.    And then the next one, "Had a meeting with

11:34:41 15    FPS and Colmac to brainstorm."

11:34:43 16              Did that occur?

11:34:44 17          A.    Yes.

11:34:45 18          Q.    And what was discussed during that

11:34:48 19    brainstorming session?

11:34:49 20          A.    So we talked about the jog in -- in the

11:34:55 21    piping at the -- around the coil.   And then, you know,

11:35:06 22    another trip, that's when we started the initial talking

11:35:11 23    with Colmac on them coming out to do some measurements on

11:35:14 24    the coils to see if everything is performing like it

11:35:17 25    should there.

**Kris Hinds - August 8, 2019**                    132

11:35:18  1           Q.   So is that what you're referring to when you
11:35:19  2   say, "During the trip we would like to run some data
11:35:22  3   loggers through the freezer and develop a freezing
11:35:25  4   curve"?
11:35:26  5           A.   No.   The data loggers is what I pulled out
11:35:29  6   for doing the freezing curve for there.
11:35:31  7           Q.   Which you testified about earlier?
          8           A.   Yes.
11:35:34  9           Q.   And the chart you developed for that process?
11:35:35 10           A.   Yes.
11:35:35 11           Q.   So you're referring to that there.   All
11:35:38 12   right.
11:35:38 13                And then you say here, "Once we have the
11:35:42 14   procedure from FES, we are planning another trip?"
11:35:46 15                That's the procedure to make sure that the
11:35:50 16   compressors were fully calibrated?
11:35:54 17           A.   Calibrated and performing, yes.
11:35:56 18           Q.   And performing, okay.   And then it says,
11:35:59 19   "FPS" -- your email says, "FPS was to get a proposal to
11:36:03 20   eliminate jog in piping on 1 coil."
11:36:08 21                That was also in a previous email we
11:36:12 22   identified, but same response, it never got done by
11:36:16 23   anyone and FPS never provided a proposal?
11:36:20 24                MR. WATKINS:   Objection.   Misstates prior
11:36:22 25   testimony.

13:52:32  1        Q.   And you said it was not a sequential defrost
13:52:36  2   freezer?
13:52:36  3        A.   No.  We had the air blow system in lieu of
13:52:40  4   the sequential defrost.
13:52:41  5        Q.   Is the FPS freezer that was installed at
13:52:45  6   Dickinson the first IQF tunnel freezer with sequential
13:52:49  7   defrost you'd ever worked on before?
13:52:54  8        A.   IQF freezer, yes, but I have worked on other
13:52:58  9   freezers with sequential defrost.
13:53:00 10        Q.   But this was the first sequential defrost
13:53:03 11   you've ever worked on before at the Dickinson facility?
13:53:07 12        A.   Yes.
13:53:10 13        Q.   I think you testified earlier that the FPS
13:53:15 14   freezer did not always have the benefit of two
13:53:18 15   compressors running at all times.  Is that accurate?
13:53:23 16        A.   Yes.
13:53:23 17        Q.   What percentage of the time were both
13:53:28 18   compressors running for the FPS freezer at the Dickinson
13:53:31 19   facility?
13:53:31 20        A.   So at first, it was they were just getting
13:53:36 21   the other compressor ready.  But towards the end, I would
13:53:39 22   say the majority of the time both compressors were
13:53:42 23   running.
13:53:42 24        Q.   And I want to be clear.  When you say "at
13:53:45 25   first," do you mean since July of 2017 when the FPS

**Kris Hinds - August 8, 2019**                    179

13:53:48  1    freezer was installed?

13:53:49  2        A.    No, I mean when we first started to come

13:53:53  3    there.  It was March or April of 2017.

13:53:55  4        Q.    So in March or April of 2017, it wasn't

13:54:00  5    consistently running, but towards the end of your --

13:54:03  6        A.    Investigation.

13:54:04  7        Q.    -- investigation, it was running more

13:54:05  8    consistently?

13:54:06  9        A.    Yes.

13:54:06 10        Q.    And how do you know that?

13:54:09 11        A.    From the times that I was there, from the

13:54:12 12    data we pulled from the compressors showing that they

13:54:16 13    were -- you know, the parameters that they were running

13:54:19 14    at that time.

13:54:19 15        Q.    And so based on the days that you were at the

13:54:24 16    facility, you saw, more often than not, two compressors

13:54:31 17    running?

13:54:32 18        A.    Yes.

13:54:33 19        Q.    What is your understanding as to how

13:54:36 20    frequently both compressors were running when you were

13:54:39 21    not at the facility?

13:54:44 22        A.    You know, the -- my understanding is they

13:54:48 23    were trying to run those as much as possible to get the

13:54:51 24    throughput.  It helped with the throughput of the

13:54:55 25    freezer.

```
 1                    C E R T I F I C A T E

 2
      STATE OF UTAH           )
 3                            :ss
      COUNTY OF SALT LAKE     )
 4
              THIS IS TO CERTIFY that the foregoing deposition
 5    was taken before me, KAREN CHRISTENSEN, Registered Merit
      Reporter, Registered Professional Reporter, and notary
 6    public in and for the State of Utah.

 7            That the said witness was by me, before
      examination, duly sworn to testify the truth, the whole
 8    truth and nothing but the truth in said cause.

 9            That the testimony of said witness was reported
      by me in Stenotype and thereafter caused by me to be
10    transcribed into typewriting, and that a full, true and
      correct transcription of said testimony so taken and
11    transcribed is set forth in the foregoing pages and said
      witness deposed and said as in the foregoing annexed
12    deposition.

13            I further certify that I am not of kin or
      otherwise associated with any of the parties to said
14    cause of action, and that I am not interested in the
      event thereof.

15
              WITNESS MY HAND at Salt Lake City, Utah.
16

17
                            Karen Christensen
18
                            _____
19                          KAREN CHRISTENSEN, RPR, RMR
      My Commission Expires:
20    February 15, 2020

21

22

23

24

25
```

EXHIBIT 17

EXHIBIT 17

**To:**    Schrift, Gary[Gary.Schrift@gea.com]; dhiner@df-foods.com[dhiner@df-foods.com]
**Cc:**    Wiencke,Bent,SOLON,NUSA T&M Solon Engineering Utilities[bent.wiencke@us.nestle.com]; Clarke, Jan[Jan.Clarke@gea.com]; jalvarado@df-foods.com[jalvarado@df-foods.com]
**From:**    Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering
**Sent:**    Tue 5/9/2017 1:41:45 AM
**Subject:**    Re: Compressor Operation Parameters Check #1 (Dickenson)

Daren

Do you have a phone # Jan can call? Or Jan can email Q's?

Sent from my iPhone

On May 8, 2017, at 8:31 PM, Schrift, Gary <Gary.Schrift@gea.com> wrote:

> Kris,
> Jan Clarke, one of our senior engineers, is reviewing the screen shots and has some questions. Do you have a number he can call, or the name and number of someone at the plant to ask questions?
> Best regards
>
> Gary L Schrift
> Vice President - Utilities Applications North America
> Head of APC Utilities NAM
> APC Utilities NAM (S-APC-6.4.0)
> Phone +1 717 472 8202
> Mobile +1 717 487 0609
> gary.schrift@gea.com
> www.gea.com
> *We live our values.*
> Excellence • Passion • Integrity • Responsibility • GEA-versity
> GEA Refrigeration North America, Inc.
> 3475 Board Road, York Pennsylvania 17406, United States
>
>
> Confidentiality note
> This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!
>
> **From:** Schrift, Gary
> **Sent:** Sunday, May 07, 2017 7:50 AM
> **To:** 'Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering' <kris.hinds@us.nestle.com>
> **Cc:** Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>; Klidonas, Greg <Greg.Klidonas@gea.com>
> **Subject:** RE: Compressor Operation Parameters Check #1 (Dickenson)
> Chris, Bent,
> I have asked Greg Klidonas to have an engineer take a look at the information, to compare the original design conditions and ratings with current operating conditions to see if we feel the current operation seems in line with expectations of the compressor and to comment on whether there could be any reason for a false load to the compressor due to Vi operation or any other explaining relating to the compressor package. We obviously cannot comment on false loadings from the system.
> Best regards
>
> Gary L Schrift
> Vice President - Utilities Applications North America
> Head of APC Utilities NAM
> APC Utilities NAM (S-APC-6.4.0)
> Phone +1 717 472 8202
> Mobile +1 717 487 0609
> gary.schrift@gea.com
> www.gea.com
> *We live our values.*
> Excellence • Passion • Integrity • Responsibility • GEA-versity
> GEA Refrigeration North America, Inc.

Exhibit 276

NESTLÉ0004230

3475 Board Road, York Pennsylvania 17406, United States

**Confidentiality note**
This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

**From:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering [mailto:kris.hinds@us.nestle.com]
**Sent:** Monday, May 01, 2017 1:49 PM
**To:** Schrift, Gary <Gary.Schrift@gea.com>
**Cc:** Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>
**Subject:** Compressor Operation Parameters Check #1

Hi Gary

Here are the screen shots with the information to compare with program. There are several conditions at different times if that helps. Let me know if you need any other info and I can request from the plant. There are two emails due to email size.

Kris

<image001.png>

NESTLÉ0004231

EXHIBIT 18

<u>EXHIBIT 18</u>

**To:** Wiencke,Bent,SOLON,NUSA T&M Solon Engineering Utilities[bent.wiencke@us.nestle.com]; Read,George,CROWNSVILLE,NUSA T&P -- Corporate Engineering[George.Read@us.nestle.com]
**From:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering
**Sent:** Mon 5/15/2017 8:41:46 PM
**Subject:** Fwd: Dickenson Compressor Photo Request.

Sent from my iPhone

See below
Begin forwarded message:

> **From:** "Clarke, Jan" <Jan.Clarke@gea.com>
> **Date:** May 15, 2017 at 2:19:30 PM MDT
> **To:** "Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering" <kris.hinds@us.nestle.com>
> **Subject: RE: Dickenson Compressor Photo Request.**
>
> Kris,
> The operation of the solenoids in the photos supplied on Friday demonstrate that the solenoids are indeed operating properly for the respective Vi modes. Unless the solenoid wiring was changed, the previous photo of the solenoids could not have been taken when the compressor was operating in Vi Mode #3. I will provide you with a test procedure that we will use to verify the calibration of the slide valve is correct.
> I will also run our selection program for the operating conditions supplied previously to see how the compressor corresponds to the expected motor currents under those conditions.
> Best regards
>
> Mr. Jan Clarke
> Systems Diagnostics Eng
>
> GEA Refrigeration North America, Inc.
> Phone +1 717 472 8142, Fax +1 717 764 3627
> Mobile +1 717 309 5827
> Jan.Clarke@gea.com
> www.gea.com
>
> *We live our values.*
> Excellence • Passion • Integrity • Responsibility • GEA-versity
>
> 3475 Board Road, 17406 York, USA
>
> Confidentiality note
> This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

**From:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering [mailto:kris.hinds@us.nestle.com]
**Sent:** Friday, May 12, 2017 2:02 PM
**To:** Clarke, Jan <Jan.Clarke@gea.com>; Schrift, Gary <Gary.Schrift@gea.com>
**Cc:** Daren Hiner <dhiner@df-foods.com>
**Subject:** RE: Dickenson Compressor Photo Request.
Hi Jan
Attached to the email are the pics Daren took.
Kris



**From:** Clarke, Jan [mailto:Jan.Clarke@gea.com]
**Sent:** Thursday, May 11, 2017 3:08 PM

Exhibit 277

NESTLÉ0004135

**To:** Schrift, Gary <Gary.Schrift@gea.com>; Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering <kris.hinds@us.nestle.com>
**Subject:** RE: Dickenson Compressor Photo Request.

Kris,

Per our conversation this afternoon. I would like new photos taken of the compressor in the same areas as shown in the three attached pictures. One picture is of the solenoid area on the compressor itself, one is of the I/O subsystem and the other is of the OMNI main screen. One set of three pictures should be taken with the compressor running unloaded where the OMNI screen should indicate 'Vi Mode #1'. The second set of three pictures should be taken with the compressor running fully loaded and the OMNI screen should indicate 'Vi Mode #3'. Please take the new photos in order (groups) so I can easily identify which photos belong together.

Once I have this photos, I can confirm if my interpretation is correct and we can proceed from there.

FYI: I will be in meetings most of the morning but expect to be available tomorrow afternoon.

Best regards

Mr. Jan Clarke
Systems Diagnostics Eng

GEA Refrigeration North America, Inc.
Phone +1 717 472 8142, Fax +1 717 764 3627
Mobile +1 717 309 5827
Jan.Clarke@gea.com
www.gea.com

*We live our values.*
Excellence • Passion • Integrity • Responsibility • GEA-versity

3475 Board Road, 17406 York, USA

Confidentiality note
This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

**From:** Schrift, Gary
**Sent:** Monday, May 08, 2017 8:31 PM
**To:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering <kris.hinds@us.nestle.com>
**Cc:** Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>; Clarke, Jan <Jan.Clarke@gea.com>
**Subject:** RE: Compressor Operation Parameters Check #1 (Dickenson)

Kris,

Jan Clarke, one of our senior engineers, is reviewing the screen shots and has some questions. Do you have a number he can call, or the name and number of someone at the plant to ask questions?

Best regards

Gary L Schrift
Vice President - Utilities Applications North America
Head of APC Utilities NAM
APC Utilities NAM (S-APC-6.4.0)
Phone +1 717 472 8202
Mobile +1 717 487 0609
gary.schrift@gea.com
www.gea.com
*We live our values.*
Excellence • Passion • Integrity • Responsibility • GEA-versity
GEA Refrigeration North America, Inc.
3475 Board Road, York Pennsylvania 17406, United States

Confidentiality note
This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

**From:** Schrift, Gary
**Sent:** Sunday, May 07, 2017 7:50 AM
**To:** 'Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering' <kris.hinds@us.nestle.com>
**Cc:** Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>; Klidonas, Greg <Greg.Klidonas@gea.com>

NESTLÉ0004136

**Subject:** RE: Compressor Operation Parameters Check #1 (Dickenson)

Chris, Bent,

I have asked Greg Klidonas to have an engineer take a look at the information, to compare the original design conditions and ratings with current operating conditions to see if we feel the current operation seems in line with expectations of the compressor and to comment on whether there could be any reason for a false load to the compressor due to Vi operation or any other explaining relating to the compressor package. We obviously cannot comment on false loadings from the system.

Best regards

Gary L Schrift
**Vice President - Utilities Applications North America**
**Head of APC Utilities NAM**
APC Utilities NAM (S-APC-6.4.0)
Phone +1 717 472 8202
Mobile +1 717 487 0609
gary.schrift@gea.com
www.gea.com
*We live our values.*
Excellence • Passion • Integrity • Responsibility • GEA-versity
GEA Refrigeration North America, Inc.
3475 Board Road, York Pennsylvania 17406, United States

Confidentiality note
This e-mail, including any attachment, may contain confidential and privileged information. If you have received it by mistake, please notify us by reply e-mail and then delete this e-mail and any attachment from your system. Thank you!

**From:** Hinds,kris,GLENDALE,NUSA T&P - Corporate Engineering [mailto:kris.hinds@us.nestle.com]
**Sent:** Monday, May 01, 2017 1:49 PM
**To:** Schrift, Gary <Gary.Schrift@gea.com>
**Cc:** Wiencke,Bent,ISSAQUAH,NUSA T&P – Corporate Engineering <bent.wiencke@us.nestle.com>
**Subject:** Compressor Operation Parameters Check #1

Hi Gary

Here are the screen shots with the information to compare with program. There are several conditions at different times if that helps. Let me know if you need any other info and I can request from the plant. There are two emails due to email size.

Kris

EXHIBIT 19

EXHIBIT 19 [Filed Under Seal]

EXHIBIT 20

EXHIBIT 20

**To:**       Eric York[ericy@kempernorthwest.com]; Matt Medeiros[matt@kempernorthwest.com]; Rick Cleveland[RickC@FECompany.com]
**From:**     Lonny Myers
**Sent:**     Tue 8/22/2017 11:09:20 AM
**Subject:**  FW: Visit to Dickenson Potato

FYI

Freezing Equipment Company
Lonny@fecompany.com
503-702-2786

For additional information click the above picture

-----Original Message-----
From: Clarke, Jan [mailto:Jan.Clarke@gea.com]
Sent: Tuesday, August 22, 2017 10:40 AM
To: kalob.greenlee@kempernorthwest.com
Cc: Nesbitt, Jim <Jim.Nesbitt@gea.com>; Schrift, Gary <Gary.Schrift@gea.com>; Lonny Myers <Lonny@FECompany.com>
Subject: Visit to Dickenson Potato

I came to Dickenson Potato in Sugar City, ID to examine the 800 GL compressor sold under GEA contract #07723-001. The compressor was running production when I arrived at site and shutting it down was not an option.

The compressor was operating with a setpoint of 8.5"Hg but the suction pressure was observed as high as 3.2"Hg with the compressor fully loaded. The achievable suction pressure varied based on the 'type' of product being processed at the time. The motor current was approximately 150 to 200 amps below the full load amperage. The lower motor current can be attributed to the discharge pressure being well below design at 136 psi. The motor current would have been higher if the discharge pressure were higher and is not an indication of a lack of capacity.

The compressor Vi control relies heavily on the compressor slide valve being calibrated properly. For this reason, determining if the slide valve calibration was correct was one of the first items checked. The slide valve was observed to be operating properly. Despite this fact an additional calibration procedure was performed to ensure it was done properly. There was no discernible difference in compressor performance after the recalibration so it can be assumed the prior calibration was correct.

The controls for the compressor capacity were examined to ensure solenoid coils were in their proper locations. The digital outputs controlling the solenoids were manually manipulated to test individual components: slide valve load/unload solenoids, Vi slide/load unload solenoids and slide valve movement. All items performed as expected and numerical results are consistent with the compressor operating properly.

Sent from my iPhone



DFF003295